## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER
11 Dupont Circle NW, Suite 450
Washington, D.C. 20036,

                                        Plaintiff,

        v.

UBER TECHNOLOGIES, INC.
1455 Market St.,
San Francisco, CA 94103,

and

RASIER, LLC
1455 Market St.,
San Francisco, CA 94103,

and

DRINNEN, LLC
1455 Market St.,
San Francisco, CA 94103,

                                        Defendants.

Case No._____

**COMPLAINT**

Jury Trial Demanded

## INTRODUCTION

1.      The revolutionary and disruptive new industry known as "ride-sharing" has

provided new freedom of travel for many people in Washington, D.C. and elsewhere. It permits

them to use their smartphones to secure rides more swiftly, reliably, and conveniently—and then

ride more cheaply—than was possible under taxi service alone. Wheelchair users, however, have

been denied these benefits because Defendants Uber Technologies Inc., Rasier, LLC, and

Drinnen, LLC (collectively "Uber") have chosen not to include wheelchair-accessible vehicles in

their growing fleet.

2.      Plaintiff Equal Rights Center brings this action against Defendants under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the District of Columbia Human Rights Act, D.C. Code § 2-1401.0 *et seq.*, for denying wheelchair users full and equal enjoyment of Defendants' transportation service.

3.      Uber is at the forefront of a watershed change in transportation services, providing a highly convenient service to millions of riders: the ability to arrange cheap, door-to-door transportation with just a few minutes' notice. Uber's ride-hailing service generates billions of dollars in revenue annually.

4.      Uber has operated in the District of Columbia metropolitan area since 2011 and has rapidly expanded its base of users and drivers in the area. Uber represents that at any time of day, a person in any neighborhood in the D.C. area can use Uber's smartphone application to connect with a vehicle in Uber's fleet. That vehicle generally will arrive quickly and will take the person to any other location in the metropolitan area at a pre-determined price that is typically cheaper than the same ride taken with traditional taxicab or limousine services.

5.      Were they to be accessible to wheelchair users, Uber's transportation services could have life-changing effects for wheelchair users, improving their ability to work, study, participate in community life, and generally to live more independently.

6.      Instead, Uber has adopted and enforced policies that exclude wheelchair users from its basic services entirely, or else provide deficient services to wheelchair users. Uber has adopted vehicle-selection criteria in the greater D.C. area that effectively exclude vehicles capable of transporting wheelchair users who cannot transfer from their wheelchairs to the seat of an Uber vehicle.  As a consequence, not one vehicle in Uber's 30,000-vehicle fleet in D.C. is capable of transporting individuals who use wheelchairs that cannot be folded and stowed in a

trunk. That means those who use motorized chairs, in particular, are entirely excluded from the benefits Uber offers.

7.      Uber has the ability to make its D.C. fleet accessible to wheelchair users, but chooses not to do so. It exercises considerable control over the vehicles used by its drivers, both by mandating the approved models and other specifications of Uber vehicles, and by helping drivers acquire inaccessible, Uber-approved vehicles in a variety of ways, including specialized leasing and rental programs.

8.      Rather than requiring some of its cars to be wheelchair accessible or otherwise facilitating that result, Uber's policies impose vehicle-type restrictions that actively discourage its drivers from acquiring and operating wheelchair accessible vehicles.

9.      Uber's smartphone application provides no means by which a driver with an accessible vehicle can connect with riders who need such accessibility, although Uber has the technological ability to provide such a connection.

10.      Rather than incorporate wheelchair accessible vehicles into its own D.C. fleet, Uber created a separate option in its application for wheelchair users to hail non-Uber vehicles— "TAXI WAV."[1]  But TAXI WAV does nothing to expand the number of wheelchair accessible vehicles available in D.C.  Instead, it merely redirects requests for wheelchair accessible vehicles to any accessible D.C. taxicabs that happen to be in service.

11.      The Equal Rights Center's investigation demonstrates that this Uber policy relegates wheelchair users to a demonstrably inferior substitute for standard Uber service. Wheelchair users predictably must wait far longer for service through TAXI WAV than others do for vehicles in Uber's own fleet, and they frequently find accessible taxis completely

---

[1] "WAV" stands for "wheelchair accessible vehicle."

unavailable for extended periods of time. Moreover, the fares for individual trips are substantially higher for those who are forced to use D.C. taxi service rather than Uber's own service.

12.     The bottom line is that Uber has instituted ongoing polices that systematically deny wheelchair users full and equal enjoyment of Uber's service in the District of Columbia and surrounding areas.  Wheelchair users do not enjoy the improved freedom of movement that Uber's service offers the remainder of the D.C. community.

13.     Among those wheelchair users who are denied enjoyment of Uber's services are the members of, and people served by, Plaintiff Equal Rights Center ("ERC").

14.     ERC is a non-profit organization focused on eradicating discrimination in its home community of greater Washington D.C. and nationwide.  One of its primary areas of focus is promoting the civil rights of people with disabilities, with a goal of ensuring that people with disabilities have the same choices and opportunities—including for transportation—as people without disabilities.

15.     ERC has been independently injured by Defendants' effective exclusion of wheelchair users.

16.     ERC brings this lawsuit to remedy these ongoing injuries to itself and its members. Among other things, ERC seeks an injunction that would require Defendants to offer their services to wheelchair users on terms equal to those on which Uber's services are offered to the community as a whole, as well as monetary and other equitable relief.

**PARTIES**

17.     Plaintiff Equal Rights Center is a non-profit corporation headquartered in Washington, D.C.  Pursuant to its mission, ERC identifies and seeks to eliminate unlawful and

unfair discrimination in a variety of areas, including public and private transportation services and other public accommodations, on behalf of individuals with disabilities and others in D.C. and throughout the nation. To advance its mission, ERC engages in education and outreach within the D.C. community; provides counseling to individuals facing discrimination; works with local and federal officials to enhance disability rights laws and their enforcement; undertakes investigations to uncover unlawful discrimination; and, when necessary, initiates enforcement actions.

18.    ERC is a membership organization with more than 8000 members. Many of these members are individuals with disabilities, including wheelchair users directly affected by the discriminatory practices described in this complaint.

19.    Defendant Uber Technologies, Inc. is a privately held, for-profit corporation headquartered in California. Uber provides travel services to individuals around the world, including in the D.C. metropolitan area.

20.    Defendant Rasier, LLC, is a wholly owned subsidiary of Uber Technologies. It is a for-profit Delaware corporation with headquarters in California. It holds many of the licenses required for Uber's operations. In particular, Rasier is a licensed, private sedan business in the District of Columbia.

21.    Defendant Drinnen, LLC, is a subsidiary of Uber.  It is a Delaware corporation.  It holds a permit to operate as a digital dispatch company in the District of Columbia.

## JURISDICTION AND VENUE

22.    The Court has jurisdiction over the federal-law claims pled herein pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. It has supplemental jurisdiction over the claims brought

under D.C. law under 28 U.S.C. § 1367, because those claims are related to Plaintiff's federal claims and arise out of a common nucleus of related facts.

23.     Venue is proper pursuant to 28 U.S.C. § 1391(b). Plaintiff is headquartered and operates in this district, Defendants conduct business in this district, and the events giving rise to the claims alleged herein occurred and continue to occur within this district.

## FACTUAL BACKGROUND

### The Central Role of Accessible Transportation in Promoting the Independence and Community Integration of Wheelchair Users

24.     Thousands of adults in the D.C. area use wheelchairs.  As the nation's capital, the District of Columbia is also the headquarters of many national disability rights advocacy groups. The memberships of these organizations are largely composed of individuals in the disability community, including wheelchair users, who often travel to and within the District of Columbia for activities related to their advocacy work. Access to transportation is, and has been, a pressing concern for wheelchair users in D.C. and elsewhere.

25.     The inaccessibility of Uber's transportation services has prevented, and continues to prevent, wheelchair users from becoming fully integrated into society. As a House Committee report on the bill that would become the ADA aptly put it: "Transportation is the linchpin which enables people with disabilities to be integrated and mainstreamed into society." H.R. Rep. 101-485(II) at 37 (1990). Without reliable transportation options, people cannot maintain employment, obtain healthcare, visit family and friends, or otherwise be full and regular participants in civic life.

26.     The difficulty of navigating D.C. and the surrounding metropolitan area is particularly acute for wheelchair users. Users of motorized wheelchairs and rigid, non-folding

manual wheelchairs (collectively, "non-folding wheelchairs") cannot ride in standard cars with their wheelchairs.

27.     Since the passage of the ADA in 1990, wheelchair users have made incomplete, but significant gains in accessing a variety of transportation options. None of these options available in the D.C. area provides the ease of use, round-the-clock coverage, convenience and competitive pricing that Uber provides to other customers, but denies to wheelchair users through its failure to provide accessible vehicles.

### Uber's Lack of Accessibility for Wheelchair Users

28.     By instituting and maintaining a policy precluding accessible vehicles from its fleet, Uber denies people who use non-folding wheelchairs the benefits of Uber's services in D.C.

29.     Although Uber has approximately 30,000 drivers in the D.C. area operating approximately 30,000 different vehicles to provide a variety of transportation options—including basic, luxury, oversize, carpool, and other services based on customer preference—not a single vehicle in Uber's massive D.C. fleet is wheelchair accessible.  Nor in D.C. do Uber's policies permit users to request accessible Uber-branded vehicles at all.

30.     Uber is capable of incorporating wheelchair accessible vehicles into its basic service option (known as UberX), but it chooses not to do so in D.C. There is no technological or other practical reason why Uber cannot incorporate wheelchair accessible vehicles, nor would doing so fundamentally alter Uber's service or pose an undue burden, financially or otherwise.

31.     Far from embracing accessibility options, Uber has told at least one individual that he could not drive for Uber if he used a wheelchair accessible vehicle.  As a result, the driver

replaced the wheelchair accessible van he had been driving with a non-accessible vehicle in order to drive for Uber.

32.     Uber has otherwise moved aggressively to fully satisfy customer demand in D.C. It does so by offering a variety of options at different price points and investing heavily to put more cars and more varied options on the road.

33.     For instance, in response to user demand, Uber devised a ride pricing system to incentivize the availability of larger vehicles and luxury vehicles.  Recently, it has offered incentives to other drivers to make car seats available for users traveling with small children. It also has rolled out a carpool option for users who prefer even cheaper fares and who do not mind slightly longer rides.

34.     Uber even advertises its services to people with certain kinds of disabilities not involving wheelchair use.  Uber emphasizes that individuals with vision impairments can use Uber and will "no longer have to prearrange rides through a dispatcher or resort to other, less convenient, means of hailing a ride."

35.     But when it comes to wheelchair users, Uber only offers TAXI WAV, which is merely a referral to the inadequate and diminishing number of accessible taxicabs that may be operating on any given day.

36.     Were Uber to provide wheelchair accessible vehicles—as Plaintiff alleges is required under the Americans with Disabilities Act and the D.C. Human Rights Act—it would experience a vast and growing demand from wheelchair users.

37.     As described below, through its practices and policies, Uber exercises substantial control over the leasing and rental of the vehicles that make up its UberX fleet, including dictating which car models will be used and deciding how much financial assistance to provide

drivers in acquiring them. In the D.C. market, it has chosen to use this power to prevent drivers from acquiring wheelchair accessible vehicles rather than encouraging them to do so.

38.     Elsewhere, Uber has demonstrated that it knows how to provide incentives for drivers to secure and use enough wheelchair accessible vehicles to serve wheelchair users.  For example, in Chicago, Uber now arranges for participating drivers to rent accessible vehicles for $450 per week. It then provides financial incentives to drivers for securing such vehicles, such as waiving the service fees drivers must pay Uber for rides made to wheelchair users, and guaranteeing that, if the drivers are on the road for 35 hours per week, they are paid at least $20 per hour.

39.     Not only does Uber thus provide for wheelchair accessible vehicles to enter its Chicago fleet, it has introduced a service that permits users to hail those Uber-branded vehicles through a service it calls UberWAV. Uber does not yet provide equivalent service to wheelchair users in Chicago, but it has at least established the basic infrastructure that would allow it to do so.

40.     This program demonstrates that Uber has the ability to ensure that the supply of wheelchair accessible vehicles in its fleet meets demand better than what is currently provided in the D.C. area. Doing so would not fundamentally alter Uber's business model—which is based on just such calibrations of supply and demand—and would not pose an undue burden to a company that is valued at billions of dollars.

41.     Rather than employing such incentives in D.C., Uber has chosen to adopt and enforce policies that actively discourage drivers from leasing, renting, purchasing, and operating wheelchair accessible vehicles.

42.     Uber has the capability to provide accessibility training to all drivers who want it. But, again, it chooses not to provide such training in D.C.

**Wheelchair Users are Deprived of Equal Use and Enjoyment of Uber's Services**

43.     Because it provides no Uber-branded accessible vehicles in the D.C. area, Defendants deprive wheelchair users of the benefits of Uber's ease of use, round-the-clock availability, convenience, and competitive pricing that Uber offers all other customers.

44.     Defendants provide a smartphone application that allows users to hire a private vehicle for transportation in any region in which Uber operates. As Uber describes its service: "Tap a button, get a ride."[2]

45.     To use Uber, an individual downloads the application on his or her smartphone, creates an account, and provides Uber with his or her phone number and credit card information.

46.     Once these preliminary steps are taken, the user may submit ride requests, which include both pick-up and destination locations, and can be for the user and any accompanying passengers. Upon receiving a request, Uber's system determines which nearby drivers will have the opportunity to respond and directs the request to them. After a driver accepts the trip request, Uber notifies the user of the driver's name, phone number, vehicle make and model, license plate number, estimated time of arrival, and customer satisfaction rating. Through a map on the application, the user can track the vehicle as it travels to pick up the user.

47.     At the trip's conclusion, Uber automatically processes payment with the user's credit card information. Uber collects the customer's fare directly, keeps between 20% and 25% for itself, and remits the remainder of the fare to the driver. Uber provides the user an electronic receipt and an opportunity to rate the driver.

---

[2] https://www.uber.com/ride/

48.     Uber has operated in D.C. since 2011. Today it offers several service options in the D.C. market.

49.     UberX is Uber's most popular service. It provides users with rides in standard vehicles—the equivalent of traditional taxi service—at prices that are typically lower than taxi fares.

50.     In addition to UberX, Uber offers a number of other options for users of its ride-hailing service:

> a.     UberBlack provides "high-end rides with professional drivers."
>
> b.     UberXL offers seating capacity for up to six passengers.
>
> c.     UberSUV offers luxury SUVs with seating capacity for up to six passengers.
>
> d.     UberPOOL allows multiple users to share rides to defray the cost. UberPOOL operates like a carpool.  One user is picked up, then the next (and sometimes a third), and the driver drops off the rider whose destination is closest to the most recent pick up before transporting the other users.

51.     Uber also offers two services that connect users to taxi drivers, rather than to vehicles in Uber's own fleet.

> e.     TAXI allows a user to connect with an independent taxi driver in D.C.  When using TAXI, the user must pay standard D.C. taxi fares instead of Uber's fares, plus a $2 fee to Uber.
>
> f.     TAXI WAV allows a user to connect with an independent taxi driver in D.C. who operates a wheelchair accessible vehicle.  As with TAXI,

11

when using TAXI WAV, the user must pay standard D.C. taxi fares instead of Uber's fares, plus a $2 fee to Uber.

52.     With the exception of TAXI WAV, none of the above-referenced Uber services is accessible to wheelchair users.

### The Cost of Uber's D.C. Service

53.     The cost of a ride hailed using Uber depends on which of Uber's services the user selects.

54.     Uber exercises full control over the price of UberX, UberBlack, UberXL, UberSUV, and UberPOOL. For these services, Uber charges a base fare, a per-minute rate, and a per-mile rate, each of which varies depending on the specific option selected. At times when demand is particularly high, Uber increases the per-minute and per-mile rates through a process known as "surge pricing" in order to encourage additional drivers to meet that demand. Because surge pricing is unpopular with consumers, however, Uber has reduced its use of surge pricing and uses other methods to ensure that its supply of drivers meets demand. Other than UberPOOL, selecting UberX is the cheapest option.

55.     For TAXI and TAXI WAV, on the other hand, Uber's role in pricing is simply to collect a $2 fee. In addition to that fee, the user must also pay the standard D.C. taxi base fare and rates.

56.     Rides with TAXI and TAXI WAV are typically more expensive than rides taken with UberX because of the vast disparity in the per-mile and per-minute rates. As of May 2017, Uber charged $.17 per minute and $1.02 per mile for UberX rides. By contrast, D.C. taxis charge $.58 per minute, $3.25 for the first mile traveled, and $2.16 for every additional mile.

57.     Except when surge pricing is in effect or for very short rides, UberX and UberPool will be cheaper than a taxi ride, whether the taxi is hailed off the street or through TAXI and TAXI WAV.

### Uber's D.C. Drivers

58.     Uber has approximately 30,000 active drivers in the D.C. area who provide rides through UberX, UberBlack, UberXL, UberSUV, and UberPOOL ("Uber Drivers").

59.     Uber mandates that all Uber Drivers be 21 years of age, have a valid driver's license, have a year of driving experience (or three years if the driver is under 23 years old), hold insurance, and pass a criminal background check.

60.     Uber temporarily or permanently stops referring rides to Uber Drivers who do not meet Uber's standards. This includes Uber Drivers who discriminate; those who otherwise mistreat passengers; and those who fail to maintain a sufficiently high rating from passengers or otherwise fail to satisfy Uber's performance metrics.

61.     Individual Uber Drivers determine when and where they work, but Uber uses a variety of methods to ensure that the drivers on the road are matched to demand at all times of day and in all areas. Uber regularly informs drivers as to where demand is or is likely to become high and, as noted above, sometimes uses "surge pricing" to give drivers the incentive to work during times and places of heavy demand. Its algorithm for matching up passengers to drivers has become increasingly sophisticated, such that now a driver frequently has the next ride lined up even as one passenger is being dropped off. Uber also uses a variety of means to encourage drivers to continue taking passengers. *See* New York Times, How Uber Uses Psychological Tricks to Push Its Drivers' Buttons, https://www.nytimes.com/interactive/2017/04/02/technology/uber-drivers-psychological-

tricks.html.  On its website, Uber advertises that users can request rides "24 hours a day, 7 days a week."

### *Uber's Vehicles*

62.     Each Uber Driver is responsible for obtaining a vehicle for providing rides through UberX, UberBlack, UberXL, UberSUV, and UberPOOL, but Uber controls and restricts what types of vehicles Uber Drivers can use.

63.     For UberX, an Uber Driver must use a "4-door car or minivan" that is in good condition, seats at least four passengers in addition to the driver, and has a model year of 2007 or later. Uber provides a list of "recommended vehicles" for drivers participating in UberX.

64.     Uber Drivers who choose to provide rides through UberBlack, UberXL, and UberSUV are subject to additional vehicle restrictions.

65.     Uber facilitates continued growth in its driver pool and maintains additional control over the cars Uber Drivers use by providing drivers with special programs for leasing and renting vehicles.

66.     Xchange Leasing, LLC is an Uber subsidiary that assists Uber Drivers in financing car leases. Launched in 2015 and backed by $1 billion in funding, Xchange Leasing operates throughout the country. In the D.C. area, Uber Drivers can lease cars with help from Xchange Leasing at one dealership with which Uber has partnered and at two Xchange Leasing showrooms.

67.     Xchange Leasing allows Uber Drivers, many of whom might not otherwise qualify for a comparable lease, to make a low initial deposit; weekly payments then are deducted directly from the drivers' Uber earnings. These leases can include terms specialized for someone

planning to use the car to be a professional driver. For example, most standard car leases have mileage limits, but Xchange Leasing helps drivers secure leases that allow unlimited mileage.

68.     Uber restricts the types of car makes and models that are available through Xchange Leasing. Uber only allows Uber Drivers who use Xchange Leasing to lease from a designated list of car models, all of which are standard vehicles, *i.e.*, not any type of vehicle that could fit a non-folding wheelchair.

69.     Uber knew or should have known that its policy of requiring at least four passenger seats for its standard service precludes the use of any accessible vehicle that will permit a wheelchair user to remain in the wheelchair while riding in an Uber vehicle.

70.     Uber also partners with rental car companies in the D.C. area (and elsewhere) to help Uber Drivers rent vehicles for a short period of time. Through these partnerships, drivers are able to obtain weekly rentals at a discounted rate. Upon information and belief, these special deals are only available for midsized sedans.

71.     As Uber develops new markets and technologies, it is partnering closely with car manufacturers to ensure that the next generation of cars meets the needs of its services. For example, Uber is partnering with various manufacturers in the development of self-driving cars that will be tailored to Uber's technology. It is not, however, using its considerable market power to require that the next generation of cars be wheelchair accessible.

### TAXI WAV Does Not Provide Comparable Service

72.     The limited service that Uber does provide in D.C. for wheelchair users—offering a connection to the limited number of wheelchair-accessible taxis on the road—does not provide anything resembling the same service that Uber provides to those who do not use wheelchairs. Users of TAXI WAV do not enjoy the low fares and quick response times that are two of the

primary reasons underlying Uber's explosive growth. They are charged higher fares than UberX users and must wait substantially longer to be picked up.

73.     Four matched pair tests that Plaintiff ERC performed in May, June, and July of 2016 demonstrate the vast difference in wait time and cost between requesting a ride through UberX and TAXI WAV.  For each test, a wheelchair user requested a ride through TAXI WAV and a "control" tester requested a ride through UberX.  The testers requested their rides within five minutes of one another. They requested pick-up at the same location and drop-off at the same destination. The differences in wait time and cost were stark, as reflected in the charts reporting the results of the tests below:

**Date: Thursday, May 19, 2016**

|  | TAXI WAV | UberX |
|---|---|---|
| Request Time | 4:09pm | 4:05pm |
| Trip Start Time | 4:53pm | 4:11pm |
| Trip End Time | 5:03pm | 4:18pm |
| Total Wait Time | 44 minutes | 6 minutes |
| Total Trip Time | 54 minutes | 13 minutes |
| Meter Fare | 7.82 | 4.00 |
| Automatic Gratuity to Driver | 1.56 | N/A |
| Booking Fee | 2.00 | 1.35 |
| D.C. Taxicab Commission Fee | N/A | .05 |
| Total Charge | 9.38 | 5.40 |
|  | **Difference** | **Percentage** |
| Difference in Wait Time | +38 minutes | +633.33% |
| Difference in Trip Time | +41 minutes | +315.38% |
| Difference in Price | +3.98 dollars | +73.7% |

**Date: Wednesday, June 1, 2016**

|  | TAXI WAV | UberX |
|---|---|---|
| Request Time | 5:10pm | 5:08pm |
| Trip Start Time | 5:39pm | 5:12pm |
| Trip End Time | 5:59pm | 5:31pm |
| Total Wait Time | 29 minutes | 4 minutes |
| Total Trip Time | 49 minutes | 23 minutes |
| Meter Fare | 13.49 | 7.46 |

| | | |
|---|---|---|
| Automatic Gratuity to Driver | 2.70 | N/A |
| Booking Fee | 2.00 | 1.35 |
| D.C. Taxicab Commission Fee | N/A | .09 |
| Total Charge | 16.19 | 8.90 |
| | **Difference** | **Percentage** |
| Difference in Wait Time | +25 minutes | +625% |
| Difference in Trip Time | +26 minutes | +113.04% |
| Difference in Price | +7.26 dollars | +94.61% |

**Date: Wednesday, June 15, 2016**

| | **TAX WAV** | **UberX** |
|---|---|---|
| Request Time | 5:02pm | 5:01pm |
| Trip Start Time | 5:35pm | 5:04pm |
| Trip End Time | 5:57pm | 5:21pm |
| Total Wait Time | 33 minutes | 3 minutes |
| Total Trip Time | 55 minutes | 20 minutes |
| Meter Fare | 15.03 | 7.07 |
| Automatic Gratuity to Driver | 3.01 | N/A |
| Booking Fee | 2.00 | 1.35 |
| D.C. Taxicab Commission Fee | N/A | .08 |
| Total Charge | 18.04 | 8.50 |
| | **Difference** | **Percentage** |
| Difference in Wait Time | +30 minutes | +1000% |
| Difference in Trip Time | +35 minutes | +175% |
| Difference in Price | +9.54 dollars | +132.82% |

**Date: Tuesday, July 5, 2016**

| | **TAXI WAV** | **UberX** |
|---|---|---|
| Request Time | 1:56pm | 1:51pm |
| Trip Start Time | 2:44pm | 1:55pm |
| Trip End Time | 2:58pm | 2:03pm |
| Total Wait Time | 48 minutes | 4 minutes |
| Total Trip Time | 62 minutes | 12 minutes |
| Meter Fare | 10.25 | 4.43 |
| Automatic Gratuity to Driver | 2.05 | N/A |
| Booking Fee | 2.00 | 1.35 |
| D.C. Taxicab Commission Fee | N/A | .06 |
| Total Charge | 12.30 | 5.84 |
| | **Difference** | **Percentage** |
| Difference in Wait Time | +44 minutes | +1100% |
| Difference in Trip Time | +50 minutes | +416.66% |
| Difference in Price | +6.46 dollars | +110.62% |

17

74. The results of the tests are summarized in the following chart:

| | Difference in Trip Time (Minutes) | Difference in Trip Time (Percentage) | Difference in Wait Time (Minutes) | Difference in Wait Time (Percentage) | Difference in Price (Dollars) | Difference in Price (Percentage) |
|---|---|---|---|---|---|---|
| Test 1 | 41 | 315.38 | 38 | 633.33 | 3.98 | 73.7 |
| Test 2 | 26 | 113.04 | 25 | 625 | 7.26 | 94.61 |
| Test 3 | 35 | 175 | 30 | 1000 | 9.54 | 132.82 |
| Test 4 | 50 | 416.66 | 44 | 1100 | 6.46 | 110.62 |
| Average | 38 minutes | 255.02% | 34.25 minutes | 840% | 6.81 dollars | 102.94% |

75.     If anything, these tests understate the disparity in pricing today, because  at the time ERC conducted its testing, Uber was refunding the $2 fee it charges when users book rides through TAXI WAV as part of a promotion for the start of the TAXI WAV service.

76.     Similarly, these tests likely understate the disparity in wait times. They were performed during times of the day when some wheelchair accessible taxicabs are available. At other times, no wheelchair accessible vehicles are available, and a user cannot hail a ride through TAXI WAV at all.

77.     Additional testing conducted by ERC in May 2017 confirms that Uber continues to fail to provide services to wheelchair users that is comparable to the services Uber provides to other customers. Indeed, if anything, ERC's May 2017 testing indicated that Uber's services for wheelchair users have become worse.

78.     In May 2017, Plaintiff ERC conducted another test, with a wheelchair user again requesting a ride through TAXI WAV and a "control" tester requesting a ride through UberX. Within two minutes, the "control" tester was picked up by an UberX driver. In contrast, the TAXI WAV user was initially matched to a driver, only to be notified by the driver that the driver was too far away. When the tester offered to wait, the driver cancelled the ride. TAXI

18

WAV did not find another driver over the next forty-five minutes that the tester attempted to access TAXI WAV services.

79.     Thus, while these tests resulted in wheelchair user wait times averaging more than eight times longer than a control tester's—certainly an inferior service—in the May 2017 test, the tester was not able to get an accessible ride through TAXI WAV at all.

80.     Each of ERC's tests was performed at mid-day in areas in the Northwest quadrant of D.C. that are expected to be convenient places for hailing a taxi or ride-sharing vehicle. Yet, it proved difficult or impossible for a wheelchair user to hail an accessible vehicle through Uber.

81.     The much greater time TAXI WAV users must spend waiting for a car—which is attributable to Uber's refusal to make its services accessible and available to wheelchair users— eliminates the expediency and flexibility that are among the primary benefits that Uber provides to other users. Moreover, the additional wait time is unpredictable, and wheelchair users might find no wheelchair accessible taxis on the road at all, making it difficult for users of TAXI WAV to adhere to schedules.

82.     As ERC's tests demonstrate, a wheelchair user who requests an accessible vehicle through Uber's smartphone-based application can predictably be expected to pay approximately twice as much for a comparable ride than does an Uber customer who does not request an accessible vehicle. In short, users of TAXI WAV pay significantly more for a greatly inferior service.

### *Injury to ERC Members*

83.     ERC is a civil rights organization focused on eradicating discrimination in its home community of greater Washington D.C. and nationwide.  One of its key areas of focus is promoting the civil rights of people with disabilities, with a goal of ensuring that people with

disabilities have the same choices and opportunities that people without disabilities enjoy every day.  Promoting accessible transportation is a critical part of advancing ERC's mission.

84.     To ensure that its over 8,000 members are adequately represented, ERC conducts surveys of its membership to ascertain what issues are most pressing to its members and how to best advance its members' interests in those areas.  ERC also engages in informal outreach to members and maintains an active presence in the disability rights community.

85.     One of these members, Heidi Case, brought the problem of Uber's exclusion of wheelchair users to ERC's attention. Ms. Case has a mobility disability that substantially limits one or more of her major life activities, and she uses a motorized wheelchair for mobility.  When traveling for work, medical appointments, routine errands, and social engagements, Ms. Case relies on a mixture of public transportation, paratransit services, and limited for-hire vehicle options. But these means of transportation have proven unreliable and inadequate for years.  To ensure that she arrives at appointments on time, Ms. Case must arrange for-hire vehicles hours and sometimes a full day in advance. When she chooses to use public transportation and paratransit services, Ms. Case must contend with an assortment of other problems, including unreliable availability of accessible service, long travel times, and delays.

86.     Initially, Ms. Case was hopeful that Uber would provide her, like those who do not use a wheelchair, with the freedom to both schedule appointments throughout the day— knowing she could reliably meet them—and make more spontaneous decisions about where and when to travel. Ms. Case thought she could take advantage of Uber's on-demand nature and affordability to gain the same flexibility Uber provides to those who do not use wheelchairs.

87.     However, Ms. Case quickly found out that Uber would be of no help to her. Through friends and contacts in the disability community, Ms. Case learned that Uber had zero

wheelchair accessible vehicles. Recognizing that it would be futile to even attempt to request an Uber, Ms. Case declined to download Uber's app onto her phone.

88.     Ms. Case complained to ERC about Uber's lack of accessible vehicles in the hope that ERC could help put an end to Uber's exclusion of wheelchair users. To this day, Ms. Case remains unable to use Uber even though she is eager to do so, as Uber holds the potential of a more independent lifestyle and increased quality of life.

89.     These experiences are not unique to Ms. Case.  Many of ERC's members who use wheelchairs similarly desire to use Uber's services. Just as with Ms. Case, however, these other members are precluded from doing so by Uber's policies that prevent wheelchair accessible vehicles from joining the UberX and UberPOOL platforms.

### Injury to ERC

90.     ERC has also suffered injuries from Defendants' discriminatory practices that are independent of the injuries suffered by ERC's members.

91.     Defendants' discriminatory practices and policies have frustrated and continue to frustrate ERC's mission of promoting the civil rights of people with disabilities and ensuring that people with disabilities have the same choices and opportunities (including transportation choices and opportunities) as people without disabilities.

92.     ERC has worked hard to improve accessible transportation offerings in the D.C. area.  Defendants' polices have frustrated, and continue to frustrate, those efforts by conspicuously denying equal access to wheelchair users, providing unequal and inferior services to wheelchair users, and making it more difficult for wheelchair users to find accessible transportation.  ERC first became aware of Defendants' discriminatory conduct in the course of its regular consultation with disability advocacy organizations and ERC members who are

wheelchair users.  As a result of Defendants' actions, ERC has been forced to expend

considerable time and resources to counteract the effects of Defendants' discriminatory conduct

and serve its members notwithstanding Defendants' actions.

93.     ERC engaged in targeted outreach to raise awareness among key community

leaders of Uber's inaccessibility and the impact it has on the disability community.  For example,

ERC engaged with the Chairman of the D.C. Taxi Commission, the Director of the D.C.

Department of Transportation, the Acting Director of the D.C. Office on Aging, and interested

community members on this issue—meeting with them and specifically discussing the impact of

Uber's inaccessibility on D.C. wheelchair users.  ERC would not have had to spend the time and

resources reaching out to these community leaders were it not for Defendants' discriminatory

policies and practices.

94.     ERC also expended significant time and resources to investigate the extent of

Uber's inaccessibility in order to pinpoint the specific areas where improvements were needed to

afford equal access to wheelchair users.   For example, ERC developed and conducted a formal

survey of its members to understand the full extent of the impact Uber's policies had on them

and the disability community more generally, and to identify changes to Uber's policies and

practices that would address those issues.

95.     In addition, ERC conducted an investigation concerning the services provided by

TAXI WAV and how it could better serve the needs of those who use wheelchairs. Were it not

for Defendants' discriminatory practices and policies, ERC would not have undertaken these

efforts.

96.     ERC's diversion of resources to investigation, outreach, and other measures

designed to counteract Defendants' discriminatory conduct, has forced ERC to postpone or

abandon other projects and services.  This has caused and continues to cause ERC to suffer concrete and demonstrable injuries.

97.     For example, ERC's diversion of resources to address Uber has deprived ERC of the resources necessary to pursue complaints from its members.  In one such example, because of Defendants' conduct, ERC was not able to pursue a member's complaint about the Washington Metropolitan Area Transportation Authority's plans to construct stations on the Silver Line that would be inaccessible to people in wheelchairs. ERC would have undertaken further investigation and outreach efforts to ensure the accessibility of the Silver Line stations— an outcome central to achieving ERC's mission—were its time and resources not diverted to investigating and remedying Defendants' discriminatory practices and policies.

98.     Likewise, because of Defendants' conduct, ERC has been unable to remedy members' complaints about MetroAccess Paratransit, a shared-ride paratransit service provided by the District of Columbia to people with qualifying disabilities.  ERC has received multiple complaints from members about MetroAccess's service and its unreliability.  ERC would have undertaken steps to combat MetroAccess's failings—another issue that is significant in advancing ERC's mission—were its time and resources not diverted to investigating and remedying Defendants' discriminatory practices and policies.

99.     Further, because of Defendants' conduct, ERC has been unable to pursue a member's complaint about a chain restaurant that refuses to allow service animals on the premises, a policy that has the effect of excluding the people who rely on those animals. Every day carries the potential for another person with a disability to be denied service at this chain establishment, but ERC has been prevented from assessing the scope of the problem and taking

steps to remedy it because of the shortage of resources resulting from its efforts to investigate and counteract Defendants' practices and policy.

100.     ERC's diversion of resources to investigation and targeted outreach concerning Uber has further deprived ERC of the resources necessary to provide other planned educational and outreach programs as well.  ERC has been forced to delay planned projects as a result of Defendants' conduct.

101.     Similarly, because of Defendants' conduct, ERC has been forced to forego various disability rights training and education efforts. For example, ERC had planned to provide training and design educational materials regarding the rights of people with disabilities to have service animals. But, because ERC's resources were instead diverted to investigating and addressing Defendants' discriminatory practices and policies, ERC has not been able to provide these trainings or design these educational materials.

102.     Until remedied, Defendants' unlawful and discriminatory policies will continue to injure ERC by diverting its resources and frustrating its mission.

## CAUSES OF ACTION

### First Cause of Action

**Disability Discrimination in Violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.***

103.     Plaintiff realleges and incorporates by reference paragraphs 1 to 102 of this Complaint.

104.     Title III of the ADA prohibits discrimination on the basis of disability in the full and equal enjoyment of specified public transportation services provided by private entities primarily engaged in the business of transporting people and whose operations affect commerce. 42 U.S.C. § 12184.

105.     Defendants are entities primarily engaged in the business of transporting people.

106.     Defendants provide specified public transportation services within the meaning of the term under Title III on a regular and continuing basis.

107.     Defendants' operations affect interstate commerce, including by providing transportation across state lines from D.C. to Virginia and from D.C. to Maryland.

108.     Title III of the ADA also prohibits discrimination on the basis of disability in the full and equal enjoyment of services provided by places of public accommodations. 42 U.S.C. § 12182.

109.     Defendants operate a public accommodation subject to Title III's non-discrimination requirements.  42 U.S.C. §§ 12181, 12182.

110.     Defendants operate a "travel service" as defined by 42 U.S.C. § 12181.

111.     By failing to make wheelchair accessible vehicles available through UberX or any of its other offerings, Defendants deny individuals who use non-folding wheelchairs, including ERC members like Heidi Case, full and equal enjoyment of Defendants' services in violation of Title III of the ADA.

112.     By forcing users of non-folding wheelchairs who use Uber's application to pay the higher fares charged under TAXI WAV– and then to pay a $2 fee – Defendants deny such individuals, including ERC members like Heidi Case, full and equal enjoyment of Defendants' services in violation of the ADA.  Title III's regulations construing the statute's non-discrimination requirement specifically prohibit charging higher fares to individuals with disabilities.  *See* 49 C.F.R. § 37.29.

113.     By forcing users of non-folding wheelchairs to wait longer to obtain rides through TAXI WAV than other users wait to obtain rides through UberX, Defendants deny such

25

individuals, including ERC members like Heidi Case, full and equal enjoyment of Defendants'

services in violation of Title III of the ADA.

114.    By failing to make reasonable modifications to their policies, practices, and

procedures to make wheelchair accessible vehicles available at the same price and with similar

wait times as inaccessible vehicles, Defendants deny users of non-folding wheelchairs, including

ERC members like Heidi Case, full and equal enjoyment of Defendants' transportation service in

violation Title III of the ADA.

115.    Plaintiff ERC has been injured by Defendants' unlawful conduct in violation Title

III of the ADA.

116.    Defendants' conduct constitutes an ongoing and continuing violation of the ADA

and unless restrained from doing so, Defendants will continue to violate the ADA. Said conduct

has injured Plaintiff ERC and its members, and, unless enjoined, will continue to inflict injuries

for which Plaintiff has no adequate remedy at law.

**Second Cause of Action**

**Disability Discrimination in Violation of the D.C. Human Rights Act,**
**D.C. Code § 2-1401.0 *et seq.***

117.    Plaintiff realleges and incorporates by reference paragraphs 1 to 116 of this

Complaint.

118.    The D.C. Human Rights Act ("DCHRA") makes it unlawful to deny any person

the full and equal enjoyment of the services of a place of public accommodation on the basis of

disability.  D.C. Code § 2-1401.31.

119.    Defendants operate a place of public accommodation within the meaning of the

DCHRA.

120.    Defendants operate a travel service and a "public conveyance" that constitute a "place of public accommodation" within the meaning of the DCHRA.  D.C. Code § 2-1401.02.

121.    By failing to make wheelchair accessible vehicles available through UberX, Defendants deny individuals who use non-folding wheelchairs, including ERC members like Heidi Case, full and equal enjoyment of Defendants' services in violation of the DCHRA.

122.    By forcing users of non-folding wheelchairs to pay the higher fares charged under TAXI WAV and to pay a $2 fee, Defendants deny such individuals, including ERC members like Heidi Case, full and equal enjoyment of Defendants' services in violation of the DCHRA.

123.    By forcing users of non-folding wheelchairs to wait longer to obtain rides through TAXI WAV than other users wait to obtain rides through UberX, Defendants deny such individuals, including ERC members like Heidi Case, full and equal enjoyment of Defendants' services in violation of the DCHRA.

124.    By failing to make reasonable modifications to their policies, practices, and procedures to make wheelchair accessible vehicles available at the same price and with similar wait times as inaccessible vehicles, Defendants deny users of non-folding wheelchairs, including ERC members like Heidi Case, full and equal enjoyment of Defendants' services in violation of the DCHRA.

125.    Plaintiff ERC has been injured by Defendants' unlawful conduct in violation of the DCHRA

126.    Defendants' conduct constitutes an ongoing and continuing violation of the DCHRA that has injured Plaintiff ERC and its members. As a result of this conduct, Plaintiff has suffered damages.  Unless enjoined, Defendants' conduct will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

127.    Defendants' conduct is intentional, willful, and made in reckless disregard of the known rights of others. Individuals who use non-folding wheelchairs have complained to Uber for years—in D.C. and elsewhere—about Uber's failure to provide accessible vehicles. Uber could readily make its service accessible to wheelchair users, but intentionally chooses not to do so.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Equal Rights Center respectfully requests that judgment be entered against Defendants as follows:

(a)     Declaring that Defendants' policies and practices alleged herein violate Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*, and the District of Columbia Human Rights Act, D.C. Code § 2-1401.0 *et seq.*;

(b)     Permanently enjoining Defendants and their agents, subsidiaries, affiliates, employees, successors, and all other persons in active concert or participation with them, from denying people who use non-folding wheelchairs full and equal enjoyment of Defendants' services;

(c)     Requiring Defendants and their agents, subsidiaries, affiliates, employees, successors, and all other persons in active concert or participation with them, to develop and implement policies, practices, and procedures that afford people who use non-folding wheelchairs full and equal enjoyment of Defendants' services;

(d)     Awarding all available damages to Plaintiff, including, but not limited to, compensatory damages, as well as punitive damages in an amount that would punish Defendants for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future;

(e)      Awarding reasonable attorneys' fees and costs under D.C. Code § 2-1403.13 and

42 U.S.C. § 12205; and

(f)      Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff requests trial by jury as to all issues in this case.


Dated:  June 28, 2017                      Respectfully Submitted,


/s/ Megan Cacace
Megan Cacace (D.C. Bar No. 981553)
Michael Allen (D.C. Bar No. 409068)
Sasha Samberg-Champion (D.C. Bar No. 1026113)
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)
mcacace@relmanlaw.com
mallen@relmanlaw.com
ssamberg-champion@relmanlaw.com

Matthew K. Handley (D.C. Bar No. 489946)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
11 Dupont Circle, NW, Suite 400
Washington, D.C. 20036
(202) 319-1000
(202) 319-1010 (fax)
matthew_handley@washlaw.org