**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**Equal Rights Center,**

                       *Plaintiff,*

      **v.**

**Uber Technologies, Inc.,** *et al.***,**

                       *Defendants.*

**Case No. 17-cv-01272-KBJ**

**ORAL ARGUMENT
REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

SUMMARY OF PLAINTIFF'S ALLEGATIONS ...................................................... 5

ARGUMENT ................................................................................................................. 7

I.   ERC CANNOT SUE ON ITS OWN BEHALF.................................................. 7

A.   ERC Lacks Standing Because Its Alleged Diversion Of Resources To
     Litigation And Lobbying Is Not An Article III Injury................................. 7

B.   ERC Lacks Standing Because Uber Did Not Cause The Alleged Injuries .................. 9

C.   ERC Lacks Standing Because The Alleged Injuries Cannot Be
     Redressed Through Judgment Against Uber ............................................... 10

D.   ERC Lacks A Private Right Of Action Under The ADA Because It Was
     Not Subjected To Any Allegedly Discriminatory Conduct........................ 11

II.  ERC LACKS STANDING TO SUE ON BEHALF OF ITS MEMBERS ......................... 12

A.   ERC's Members Lack Standing To Sue In Their Own Right ..................... 12

B.   The Participation Of ERC's Members Is Unavoidable.............................. 15

III. THE ADA PROVISIONS PLAINTIFFS INVOKE DO NOT APPLY HERE................. 17

A.   Section 12182 Is Inapplicable Because The Uber App Is Not A "Place Of
     Public Accommodation" ............................................................................. 17

     1.   As a matter of plain language, the phrase "place of public
          accommodation embraces only real, physical spaces ....................... 19

     2.   The Act's structure and context confirm that the phrase "place of public
          accommodation" embraces only real, physical spaces ..................... 21

     3.   The Uber App is not a "travel service" or any other real, physical space ........ 22

B.   Section 12184 Is Inapplicable Because Uber Is Not Primarily Engaged In
     The Business Of Transporting People" ....................................................... 24

     1.   Uber is not "engaged in the business of transporting people" because it
          does not actually transport passengers............................................ 24

     2.   Uber's primary business is technology............................................ 27

i

IV. EVEN IF THE ADA PROVISIONS APPLIED, ERC STILL FAILS TO STATE A CLAIM UNDER TITLE III OF THE ADA ......................................................... 28

    A.    Even If Section 12182 Applied, ERC Fails To State A Claim Because It Challenges The Mix Of Services Uber Offers ......................................... 28

    B.    Even If Section 12184 Applied, ERC Fails To State A Claim Because A Lack Of Accessible Vehicles Is Not Discrimination As A Matter Of Law ........................... 29

    C.    Forcing Uber To Provide WAV Services Is Not A Reasonable Modification ......... 31

    D.    ERC's Allegations Regarding uberX Are Implausible And Irrelevant .................... 33

V.  ERC FAILS TO STATE A CLAIM UNDER THE DCHRA ............................................... 34

CONCLUSION ............................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Access Now, Inc. v. Sw. Airlines, Co.*,
   227 F. Supp. 2d 1312 (S.D. Fla. 2002) ................................................................19

*Air Transp. Ass'n v. Reno*,
   80 F.3d 477 (D.C. Cir. 1996) .............................................................................15

*Barnes v. Marriott Hotel Servs.*,
   No. 15-01409, 2017 WL 635474 (N.D. Cal. Feb. 16, 2017) ..................................14

*Beecham v. United States*,
   511 U.S. 368 (1994) .........................................................................................22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .....................................................................................7, 22

*Boykin v. Gray*,
   895 F. Supp. 2d 199 (D.D.C. 2012) ..................................................................35

*Buchannan v. Consol. Stores Corp.*,
   125 F. Supp. 2d 730 (D. Md. 2001) ....................................................................8

*Cal. Indep. Sys. Operator Corp. v. FERC*,
   372 F.3d 395 (D.C. Cir. 2004) ..........................................................................22

*Carparts Distrib. Ctr. v. Auto. Wholesaler's Ass'n*,
   37 F.3d 12 (1st Cir. 1994) ...........................................................................18, 23

*Chabner v. United of Omaha Life Ins. Co.*,
   225 F.3d 1042 (9th Cir. 2000) ..........................................................................29

*Chapman v. Pier 1 Imports Inc.*,
   631 F.3d 939 (9th Cir. 2011) .......................................................................13, 15

*Telecomm. Res. & Action Ctr. ex rel. Checknoff v. Allnet Commc'n Servs.*,
   806 F.2d 1093 (D.C. Cir. 1986) ........................................................................16

*Civil Rights Educ. & Enf't Ctr. v. Hospitality Props. Tr.*,
   867 F.3d 1093 (9th Cir. 2017) .....................................................................13, 14

*Clapper v. Amnesty Int'l*,
   568 U.S. 398 (2013) .........................................................................................15

*CTS Corp. v. Waldburger*,
  134 S. Ct. 2175 (2014) ............................................................................18

*Cullen v. Netflix, Inc.*,
  600 F. App'x 508 (9th Cir. 2015) ............................................................18

*Doe v. Mut. of Omaha Ins. Co.*,
  179 F.3d 557 (7th Cir. 1999) ...................................................................18

*Dryer v. Flower Hosp.*,
  383 F. Supp. 2d 934 (N.D. Ohio 2005) ....................................................32

*\*Earll v. eBay, Inc.*,
  599 F. App'x 695 (9th Cir. 2015) ............................................................18

*Easly ex rel. Easly v. Snider*,
  36 F.3d 297 (3d Cir. 1994) .......................................................................32

*EEOC v. Aramark Corp.*,
  208 F.3d 266 (D.C. Cir. 2000) .................................................................19

*ERC v. Abercrombie & Fitch Co.*,
  767 F. Supp. 2d 510 (D. Md. 2010) ...................................................12, 16

*ERC v. Equity Residential*,
  798 F. Supp. 2d 707 (D. Md. 2011) .........................................................12

*\*ERC v. Hilton Hotels Corp.*,
  No. 07-1528, 2009 WL 6067336 (D.D.C. Mar. 25, 2009) ................12, 13

*ERC v. Post Props., Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) ..........................................................7, 8, 9

*Fennell v. Aetna Life Ins. Co.*,
  37 F. Supp. 2d 40 (D.D.C. 1999) .............................................................19

*Fitts v. Fannie Mae*,
  44 F. Supp. 2d 317 (D.D.C. 1999) ...........................................................19

*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) .....................................................................9

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ...............................................................7, 8

*Ford v. Schering-Plough Corp.*,
  145 F.3d 601 (3d Cir. 1998) .....................................................................17

*Funches v. Barra*,
  No. 14-7382, 2016 WL 2939165 (S.D.N.Y. May 17, 2016) .................................................2

*Garelick v. Sullivan*,
  987 F.2d 913 (2d Cir. 1993)..........................................................................................9

*Greater Hous. Transp. Co. v. Uber Techs., Inc.*,
  155 F. Supp. 3d 670 (S.D. Tex. 2015) ...........................................................................6

*In re Green*,
  360 B.R. 34 (Bankr. N.D.N.Y. 2007) ...........................................................................27

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995)....................................................................................................20

*Hall St. Assocs. v. Mattel, Inc.*,
  552 U.S. 576 (2008)....................................................................................................22

*Holt v. Am. City Diner, Inc.*,
  No. 05-1745, 2007 WL 1438489 (D.D.C. May 15, 2007).................................................13, 14

*Hunt v. Wash. Apple Advert. Comm'n*,
  432 U.S. 333 (1977)....................................................................................................12, 15

*Huron v. Cobert*,
  809 F.3d 1274 (D.C. Cir. 2016) .....................................................................................12

*Holman ex rel. J.H. v. Just for Kids, Inc.*,
  248 F. Supp. 3d 1210 (D. Utah 2017)...........................................................................19, 22

*Kalantar v. Lufthansa German Air.*,
  402 F. Supp. 2d 130 (D.D.C. 2005) ..............................................................................22

*Klay v. All Defendants*,
  389 F.3d 1191 (11th Cir. 2004) ....................................................................................16

*Lenox v. Healthwise, Ltd.*,
  149 F.3d 453 (6th Cir. 1998) .......................................................................................28

*Lexmark Int'l. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014)................................................................................................11, 12

*Long Term Care Pharmacy All. v. UnitedHealth Grp.*,
  498 F. Supp. 2d 187 (D.D.C. 2007) ..............................................................................16

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)....................................................................................................7, 9, 13

*Magee v. Coca-Cola Refreshments, Inc.,*
    833 F.3d 530 (5th Cir. 2016) ......................................................17, 22

*In re Magic Restaurants, Inc.,*
    205 F.3d 108 (3d Cir. 2000)..................................................................27

*In re Managed Care Litig.,*
    No. 00-1334, 2003 WL 22410373 (S.D. Fla. Sept. 15, 2003) ................16

*McBeth v. Gabrielli Truck Sales,*
    768 F. Supp. 2d 383 (E.D.N.Y. 2010) ...................................................26

*McCullum v. Orlando Reg'l Healthcare Sys.,*
    768 F.3d 1135 (11th Cir. 2014) .............................................................11

*Meyer v. Uber Techs., Inc.,*
    868 F.3d 66 (2d Cir. 2017).........................................................9, 15, 16

*Milton Hosp. Transitional Care Unite v. Thompson,*
    377 F. Supp. 2d 17 (D.D.C. 2005) .........................................................27

*Mizell v. SunTrust Bk.,*
    26 F. Supp. 3d 80, 85 (D.D.C. 2014) .......................................................7

*Morgan v. Joint Admin. Bd.,*
    268 F.3d 456 (7th Cir. 2001) .................................................................18

*Nat'l Coal. to Ban Handguns v. ATF,*
    715 F.2d 632 (D.C. Cir. 1983)................................................................25

*Nat'l Veterans Legal Servs. Program v. Dep't of Defense,*
    No. 14-01915, 2016 WL 4435175 (D.D.C. Aug. 19, 2016) .....................7

*Navarro v. Encino Motorcars, LLC,*
    845 F.3d 925 (9th Cir. 2017) ...........................................................24, 26

*New Eng. Anti-Vivisection Soc'y v. Fish & Wildlife Serv.,*
    208 F. Supp. 3d 142, 166 (D.D.C. 2016) .................................................8

*Noel v. NYC Taxi & Limousine Comm'n,*
    687 F.3d 63 (2d Cir. 2012).............................................................30, 31

*Pallozi v. Allstate Life Ins. Co.,*
    198 F.3d 28 (2d Cir. 1999)....................................................................18

*Pallozi v. Allstate Life Ins. Co.,*
    204 F.3d 392 (2d Cir. 2000)..................................................................18

*Parker v. Metro. Life Ins. Co.,*
  121 F.3d 1006 (6th Cir. 1997) ....................................................................17, 23

*Parr v. L&L Drive-Inn Rest.,*
  96 F. Supp. 2d 1065 (D. Haw. 2000) .................................................................14

*Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,*
  713 F. Supp. 2d 734 (N.D. Ill. 2010) .................................................................16

*Progress v. CFPB,*
  No. 17-686, 2017 WL 1750263 (D.D.C. May 4, 2017)......................................27

*Protect Democracy Project v. Dep't of Defense,*
  263 F. Supp. 3d 293 (D.D.C. 2017).....................................................................27

*Ramos v. Uber Techs., Inc.,*
  No. 14-502, 2015 WL 758087 (W.D. Tex. Feb. 20, 2015).................................32

*Reno v. ACLU,*
  521 U.S. 844 (1997) .............................................................................................19

*Riley v. California,*
  134 S. Ct. 2473 (2014).................................................................................18, 19

*Roberts ex rel. Roberts v. KinderCare Learning Ctrs.,*
  896 F. Supp. 921 (D. Minn. 1995)......................................................................32

*Royal Foods Co. v. RJR Holdings, Inc.,*
  252 F.3d 1102 (9th Cir. 2001) ............................................................................25

*Samuels v. Rayford,*
  No. 91-0365, 1995 WL 376939 (D.D.C. Apr. 10, 1995)....................................35

*Sch. Bd. of Nassau Cnty. v. Arline,*
  480 U.S. 273 (1987).............................................................................................31

*Schmidt v. Lessard,*
  414 U.S. 473 (1974).............................................................................................10

*Small v. Gen. Nutrition Cos.,*
  388 F. Supp. 2d 83 (E.D.N.Y. 2005) ..................................................................12

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016).........................................................................................13

*Staley v. Nat'l Capital Area Council, Boy Scouts,*
  No. 10-2768, 2011 WL 2416724 (D. Md. June 9, 2011).....................................19

*State Farm Mut. Auto Ins. Co. v. Schaefer*,
  No. 14-4149, 2014 WL 5844043 (W.D. Mo. Nov. 12, 2014) ................................................27

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)...........................................................................................................11

*Taniguchi v. Kan Pac. Saipan*,
  132 S. Ct. 1997 (2012)................................................................................................20, 24

*Toomer v. City Cab*,
  443 F.3d 1191 (10th Cir. 2006) ...................................................................................30, 31

*Turlock Irr. Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ..............................................................................................8

*U.S. Jaycees v. Bloomfield*,
  434 A.2d 1379 (D.C. 1981) ...............................................................................................35

*Uber Promotions, Inc. v. Uber Techs., Inc.*,
  162 F. Supp. 3d 1253, 1259 (N.D. Fla. 2016)......................................................................9

*Village of Bedford Park v. Expedia, Inc.*,
  876 F.3d 296 (7th Cir. 2017) ............................................................................................26

*Wai v. Allstate Ins. Co.*,
  75 F. Supp. 2d 1 (D.D.C. 1999) ........................................................................................19

*Warth v. Seldin*,
  422 U.S. 490 (1975)..........................................................................................................16

*West v. Lynch*,
  845 F.3d 1228 (D.C. Cir. 2015) ........................................................................................11

*Weyer v. Twentieth Century Fox Film Corp.*,
  198 F.3d 1104 (9th Cir. 2000) ...............................................................................17, 24, 28

*Whidden Mem. Hosp. v. Sebelius*,
  828 F. Supp. 2d 218 (D.D.C. 2011) ..................................................................................27

*Whitbeck v. Vital Signs, Inc.*,
  116 F.3d 588 (D.C. Cir. 1997) ..........................................................................................34

*Williams v. Savage*,
  569 F. Supp. 2d 99 (D.D.C. 2008) ....................................................................................19

## STATUTES

42 U.S.C. § 12181................................................................................................................3, 22

42 U.S.C. § 12181(7) ...........................................................................................................19, 20, 21

42 U.S.C. § 12181(7)(A) ..................................................................................................................21

42 U.S.C. § 12181(7)(D) ..................................................................................................................21

42 U.S.C. § 12181(7)(F) ...................................................................................................................23

42 U.S.C. § 12181(7)(G) ..................................................................................................................25

42 U.S.C. § 12181(10) .....................................................................................................................25

42 U.S.C. § 12182(a) ............................................................................................................5, 17, 33, 34

42 U.S.C. § 12182(b)(1)(E) ..............................................................................................................11

42 U.S.C. § 12182(b)(2)(A)(ii) ........................................................................................................31

*42 U.S.C. § 12184(a) ............................................................................................................... *passim*

42 U.S.C. § 12184(b)(1) ...................................................................................................................25

42 U.S.C. § 12184(b)(2)(A) ..............................................................................................................31

*42 U.S.C. § 12184(b)(3) .............................................................................................................25, 29

42 U.S.C. § 12184(b)(4) ...................................................................................................................25

42 U.S.C. § 12184(b)(5) ...................................................................................................................25

42 U.S.C. § 12184(b)(6) ...................................................................................................................25

42 U.S.C. § 12184(b)(7) ...................................................................................................................25

42 U.S.C. § 12187 ............................................................................................................................20

42 U.S.C § 12188(a)(1) ....................................................................................................................11

42 U.S.C. § 12189 ............................................................................................................................21

D.C. Code § 2-1401.01 .......................................................................................................................3

D.C. Code § 2-1401.02(24) ..............................................................................................................35

D.C. Code § 2-1402.31(a)(1) ...........................................................................................................34

D.C. Code § 2-1403.16(a) ................................................................................................................35

**REGULATIONS & AGENCY MATERIALS**

28 C.F.R. § 36.307(a)............................................................................2, 28

49 C.F.R., Pt. 37, App'x D.................................................................30

*49 C.F.R. § 37.29(b)...........................................................................2, 30

49 C.F.R. § 37.29(c)..............................................................................33

**DICTIONARIES**

AM. HERITAGE COLLEGE DICTIONARY (3d ed. 1993) ...............................20

RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1987) ...................................20

WEBSTER'S II NEW COLL. DICTIONARY (1995) .............................24, 27

WEBSTER'S THIRD NEW INT'L DICTIONARY (1986) ...............................20

WEBSTER'S THIRD NEW INT'L DICTIONARY (unabr. 1961)........................35

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65(d)(1)(B) ...................................................................10

Fed. R. Civ. P. 65(d)(1)(C) ...................................................................10

UBER EATS (2017)..................................................................................28

UBER FREIGHT (2017) ............................................................................28

## <u>INTRODUCTION</u>

Uber Technologies, Inc. ("Uber") is a technology company.  It develops software and other technologies for various industries, including the restaurant industry (Uber Eats), the freight industry (Uber Freight), and the ridesharing industry.  For participants in the ridesharing industry, Uber offers a cutting-edge smartphone application (the "Uber App") that networks a two-sided market—riders seeking rides with independent, third-party transportation providers ("Drivers") looking to provide rides in several U.S. cities, including Washington, D.C.  Uber's business is very different from the businesses of bus or taxi service providers.  Those entities typically purchase, own, operate, manage, and maintain vehicles; they often employ the individuals who drive them.  They actually provide transportation.  By contrast, Uber does not own the vehicles Drivers use to provide ridesharing services, and it neither employs nor controls any Drivers.  Uber does not provide transportation.

Uber's technology, and the two-sided ridesharing market it anchors, has been revolutionary for riders and Drivers with accessibility needs by increasing mobility options and economic opportunities.  For example:

- To assist persons who are blind or have low vision, the Uber App is compatible with mobile screen-reading technology (VoiceOver for iOS and Talkback for Android) and wireless braille displays.

- The Uber App is fully functional without audio and offers visible and vibrating alerts, which allow riders who are deaf or hard of hearing to request rides using the Uber App.

- The assistive technologies within or leveraged by the Uber App create flexible economic opportunities for Drivers who are deaf or hard of hearing.

- The Uber App enables economic opportunities for Drivers with disabilities who use modified vehicles and/or hand controls to seek and accept ride requests, just as it has helped Drivers without disabilities make money on their own terms.

- In some cities, Uber has piloted an option within the Uber App called "uberASSIST," which networks riders who need help getting into vehicles and/or stowing equipment (like folding wheelchairs, walkers, canes, and scooters) and specially trained Drivers.

Wheelchair accessible vehicles ("WAVs") present uniquely challenging issues. WAV supply is sparse: WAVs are not widely available on the market, are expensive to obtain, and are costly to maintain and operate.  At the same time, demand for WAV services is geographically dispersed and limited.  Notwithstanding these challenges, Uber has made significant strides in facilitating the ability of riders who use non-folding, motorized wheelchairs to more easily request and obtain rides from Drivers who—in part due to Uber's efforts—both choose to possess WAVs and choose to use the Uber App to seek and accept ride requests.[1]  In a handful of cities, including Washington, D.C., Uber is piloting an option within the Uber App called "uberWAV."  That pilot is still in its early phases, and Uber continues to learn and assess the reliability, operational feasibility, and economic sustainability of uberWAV.

Plaintiff Equal Rights Center ("ERC") commenced this lawsuit in June, 2017.  In its initial complaint, ERC argued that Uber is required to "make its fleet accessible" and take unspecified steps to force third-party Drivers who are not before the Court to decide to "meet[] the demand of wheelchair users" in Washington, D.C.  As Uber pointed out in its motion to dismiss the initial complaint, (1) private entities, even those subject to Section 12184, "are not required to purchase or lease accessible automobiles" and are "not required to purchase vehicles other than automobiles in order to have a number of accessible vehicles in [their] fleet[s]," 49 C.F.R. § 37.29(b); and (2) Section 12182 does not require a "public accommodation to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities," 28 C.F.R. § 36.307(a), so, for example, "a camera store ... is not required to stock cameras specially designed for such persons," and "a bookstore ... need not assure that the books are available in Braille as well as print," *Funches v. Barra*, No. 14-7382,

---

[1]     Folding wheelchairs (used by the majority of wheelchair users) and many other assistive devices like canes and walkers may be stowed in practically any standard vehicle.

2016 WL 2939165, at *4 (S.D.N.Y. May 17, 2016).  ERC's amended complaint does not and cannot change that, and the amended complaint must be dismissed.

When ERC first filed, the uberWAV pilot had yet to launch in Washington, D.C.  Despite ERC's repeated attempts to take credit for it in its amended complaint, ERC is well aware that Uber's plans to launch the uberWAV pilot in Washington, D.C. predated—and were not caused by—this lawsuit.  For Uber shares ERC's laudable goal of seeking to improve the lives of individuals with disabilities, and its actions prove it.  But ERC's portrayal of Uber as indifferent to the needs of, and as attempting to intentionally discriminate against, riders and Drivers with disabilities is wrong, and its legal claims are unfounded and misguided.

ERC now claims that too few Drivers with WAVs are available to seek and accept ride requests in Washington, D.C. at any given time.  ERC does not identify a policy, practice, act, or omission of Uber's that discriminates against people who need WAVs.  (It vaguely asserts the legal conclusion that discriminatory policies exist but doesn't actually identify any.)   It acknowledges that Drivers provide transportation using vehicles they obtain on their own, and that Drivers with WAVs are free to decide whether, when, where, and for how long to seek and accept ride requests via the Uber App.  ERC's alleged grievance is a matter of supply and demand in a specific market—not discrimination.  Yet ERC claims that Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*, compel Uber to get more Drivers with WAVs on the road.  The statutes impose no such obligation.

ERC had an opportunity, apprised of Uber's arguments, to amend its complaint and cure its pleading deficiencies.  Still, ERC's amended complaint fails for lack standing and for failure to state a claim, and so should be dismissed in its entirety.

**ERC Cannot Sue On Its Own Behalf.**  ERC lacks Article III standing.  The injury it claims—having spent time and money preparing for this litigation and on related lobbying—is not cognizable under Article III.  It's a self-inflicted injury; ERC caused it, not Uber.  And it's an injury not likely to be redressed by a favorable decision.  As ERC concedes, Uber does not own the vehicles Drivers use to provide rides requested via the Uber App, and Drivers determine whether—and with what types of vehicles—to operate.  Uber cannot force Drivers who are not before the Court to obtain WAVs (or any other vehicles).  Uber cannot force Drivers who use the Uber App to accept ride requests during different or longer hours.  Those decisions are within Drivers' discretion.  A favorable decision will not saturate the D.C. market with WAVs.

Even if it had standing, ERC lacks a private right of action under Title III of the ADA.  It's an entity; not an individual with a disability.  And it does not allege that it (as opposed to its members) has been subjected to disability-based discrimination.

**ERC Cannot Sue On Behalf Of Its Members.**  ERC also lacks standing to sue for its members.  Associational standing fails whenever the entity's members would lack standing and/or would have to participate in the lawsuit themselves.  Both problems strip ERC of associational standing here.  The redressability and causation defects that deprive ERC of standing for itself would deprive any ERC member of standing.  And ERC fails to allege that its members suffered any injury.  Indeed, the only member identified in the amended complaint, Heidi Case, has never used the Uber App—she hasn't downloaded it, created a rider account, or even attempted to request a WAV ride.

In addition, ERC's members would have to participate in this litigation.  Claims for damages almost always doom associational standing because members have to make individualized showings.  ERC seeks compensatory damages here.  Moreover, member

participation is necessary to determine which, if any, of ERC's members who would have standing are not bound to arbitrate their disputes with Uber.  Anyone who uses the Uber App must first create an account, and to create an account, the user must agree to Uber's Terms of Use—including its arbitration provision. ERC can't circumvent its members' arbitration obligations through a representative suit, so each member would have to participate for the Court to sort out which members are (and are not) arbitration-bound.

> **ERC Fails To State A Claim Under The ADA.**   ERC claims Uber is subject to Title III of the ADA as both an operator of a "place of public accommodation" under 42 U.S.C. § 12182(a) and as an entity "primarily engaged in the business of transporting people" under 42 U.S.C. § 12184(a).  As a matter of plain language, neither provision applies to Uber.  And even if one or both did apply, ERC fails to plausibly allege any discrimination under the ADA. A "place of public accommodation" need not offer specialized goods and services to accommodate individuals with disabilities; its obligation is to ensure equal access to whatever goods and services it does offer.  And entities "primarily engaged in the business of transporting people" have no obligation to offer WAV service or to purchase or lease accessible vehicles.

> **ERC Fails To State A Claim Under The DCHRA.**  ERC's duplicative claim under the DCHRA fails for the same reasons its ADA claim fails.

## SUMMARY OF PLAINTIFF'S ALLEGATIONS

ERC alleges that the Uber App is a smartphone application that enables Drivers to seek and accept ride requests from riders who request rides via the Uber App.  ECF No. 22 ("FAC") ¶ 43.  The technological features of the Uber App allow riders to "submit ride requests, which include both pick-up and destination locations."  *Id.* ¶ 45.  Leveraging global-positioning technology, Drivers logged in to the Uber App in the area are then given the choice to accept the

request or not, from her or his Uber App.  *Id.*  If the Driver accepts the request, the Uber App allows the rider to track the vehicle as the Driver navigates to the rider's pick-up location.  *Id.*

In Washington, D.C., the options available in the Uber App include, among others uberWAV and TAXI WAV (which allows riders to request rides from DC taxi Drivers with WAVs).  *Id.* ¶¶ 49–52.  ERC admits that Drivers participating in any of these options use vehicles they obtained on their own.  *Id.* ¶ 64.  That's true; Uber doesn't own them.  *See, e.g.*, *Greater Hous. Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 677 (S.D. Tex. 2015) ("Uber does not own vehicles or employ drivers.").  And "Drivers determine when and where they" seek and accept ride requests via the Uber App.  FAC ¶ 62.

ERC is an advocacy organization.  *Id.* ¶ 14.  Its members include individuals who use motorized wheelchairs and individuals who do not, individuals with disabilities and individuals without disabilities.  *Id.* ¶¶ 17–18.  One of ERC's members is alleged to have "declined to download" the Uber App because "friends and contacts in the disability community" supposedly told her that the she couldn't request rides from Drivers with WAVs via the Uber App.  *Id.* ¶ 101. No other member's experience is alleged in the complaint.  Nor does ERC allege that any of its other members are not presently using and enjoying the uberWAV option in the Uber App.

According to ERC, nearly every mode of transportation in Washington, D.C. is "unreliable and inadequate" for individuals who use motorized wheelchairs—including taxis, public transportation (like the Metro), for-hire vehicles, and paratransit services.  *Id.* ¶ 99; *see id.* ¶¶ 27.  ERC claims the law requires Uber to somehow do what actual transportation companies (governmental and private) have supposedly failed to do—fill what ERC believes are gaps in WAV service.  *Id.* ¶ 5.  ERC's claims are misguided, especially because Uber voluntarily initiated the uberWAV pilot in Washington, D.C.

## ARGUMENT

Rule 12(b)(6) tests the legal sufficiency of a plaintiff's allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Accepting all factual allegations as true and discarding any implausible or conclusory assertions, the complaint must "raise a right to relief above the speculative level." *Id.* at 555. A Rule 12(b)(6) motion must be granted unless the plaintiff alleges "enough facts to state a claim to relief that is plausible on its face." *Mizell v. SunTrust Bk.*, 26 F. Supp. 3d 80, 85 (D.D.C. 2014) (Jackson, J.). And at the pleading stage, a plaintiff's burden to establish standing is commensurate with the pleading standard. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). So a Rule 12(b)(1) motion based on a lack of standing will be granted unless the plaintiff alleges sufficient facts to plausibly satisfy Article III's standing requirements. *See id.*

Under these standards, ERC's complaint must be dismissed in its entirety for lack of standing and for failure to state a claim, as explained below.

## I.      ERC CANNOT SUE ON ITS OWN BEHALF.

Article III's standing requirements are familiar—injury, causation, and redressability. *See id.* To have organizational standing, an entity must meet Article III's requirements in its own right. *ERC v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). ERC flunks all three standing requirements, and it lacks a private right of action under the ADA in any event.

### A.      ERC Lacks Standing Because Its Alleged Diversion Of Resources To Litigation And Lobbying Is Not An Article III Injury.

For an organization, injury-in-fact requires more than a setback to its interests or goals. *Id.* An organization has standing only when the challenged conduct has "perceptibly impaired the organization's … daily operations." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). An "alleged diversion of even scarce resources" isn't enough. *Nat'l Veterans*

*Legal Servs. Program v. Dep't of Defense*, No. 14-01915, 2016 WL 4435175, at *7 (D.D.C. Aug. 19, 2016).  Nor may it "suffice to show that … the organization will have to divert resources to combat" the challenged action.  *New Eng. Anti-Vivisection Soc'y v. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 166 (D.D.C. 2016) (Jackson, J.).  "[T]he expenditure of resources on advocacy is not a cognizable Article III injury."  *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015).

ERC's purported injury—that it spent time and money it could have used for other endeavors on lobbying government officials and preparing to litigate this case—is not a cognizable injury. Specifically, "ERC conducted an investigation" of the TAXI WAV and uberWAV options and surveyed its members.  FAC ¶¶ 108–09.  It "engaged in targeted outreach" to "key community leaders"—aka lobbying—regarding the accessibility of vehicles Drivers choose to use when accepting ride requests via the Uber App.  *Id.* ¶ 107.  Because ERC used its resources on these efforts, it decided to "postpone or abandon other projects and services," *id.* ¶ 110, including investigating members' complaints, *id.* ¶¶ 111–12, and providing training about service animals, *id.* ¶ 113.

That's not enough to satisfy Article III.  "[A]n organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury because an organization that chooses to spend its money in this way has made a self-inflicted budgetary choice that cannot qualify as an injury in fact."  *New Eng.*, 208 F. Supp. 3d at 166; *accord Food & Water*, 808 F.3d at 920.  Simply put, having elected to investigate Uber instead of pursuing other projects, "ERC cannot now claim that because it chose to channel its funds this way, [Uber] caused it injury in fact sufficient to satisfy Article III."  *Buchannan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 737 (D. Md. 2001); *see Post Props.*, 633 F.3d at

1142 ("efforts at increasing legal pressure on" defendant are not "efforts to counteract [defendant]'s alleged injury to ERC's interest").

### B.   ERC Lacks Standing Because Uber Did Not Cause The Alleged Injuries.

"The causation component of the Article III standing test insures that any injury alleged by a plaintiff is attributable to the defendant." *Garelick v. Sullivan*, 987 F.2d 913, 919 (2d Cir. 1993). Neither self-inflicted injuries nor injuries that result from "independent action of some party not before the court" are attributable to the defendant. *Lujan*, 504 U.S. at 560; *see Post Props.*, 633 F.3d at 1142. That describes ERC's alleged injuries. ERC *chose* to allocate its resources to investigating Uber and related lobbying and advocacy. "ERC's diversion of resources to the investigation of, and resulting legal challenge to, [Uber's] alleged discriminatory practices is a self-inflicted injury, not one attributable to [Uber]." *Post Props.*, 633 F.3d at 1142.

At most, the injuries ERC asserts flow from an allegedly insufficient number of Drivers in Washington, D.C. who both choose to possess WAVs and, at any given time, choose to seek and accept ride requests via the Uber App. *See, e.g.*, FAC ¶¶ 80, 90–95. While ERC asserts that Uber takes steps to encourage Drivers to seek and accept ride requests via the Uber App at certain times, it does not allege that Uber does or can dictate whether, when, where, or how frequently Drivers who have chosen to invest WAVs choose to use them to seek accept ride requests via the Uber App. ERC concedes the opposite: "Drivers determine when and where they work." *Id.* ¶ 61. And ERC concedes that Drivers provide rides using vehicles they obtained on their own dime. As ERC puts it, Drivers are "responsible for obtaining a vehicle for providing rides." FAC ¶ 62; *accord Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 70 (2d Cir. 2017); *Uber Promotions, Inc. v. Uber Techs., Inc.*, 162 F. Supp. 3d 1253, 1259 (N.D. Fla. 2016). Those intervening choices break the causal chain necessary for Article III standing. *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996).

## C.   ERC Lacks Standing Because The Alleged Injuries Cannot Be Redressed Through Judgment Against Uber.

The vague relief ERC seeks—an injunction compelling Uber "to develop and implement policies, practices, and procedures that afford people who use non-folding wheelchairs full and equal enjoyment of Defendants' services," FAC at 32—is imprecise and meaningless as directed to Uber.   Such an injunction would necessarily be subject to Federal Rule of Civil Procedure 65(d)(1), which means it must "state its terms specifically" and "describe in detail— and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)–(C).  Those strict requirements cannot be met here.

As ERC alleges, Uber's technology is on the cutting-edge of "calibrat[ing] … supply and demand" for the ridesharing industry.  FAC ¶ 39.  Yet, despite Uber's efforts—including making available the uberWAV and TAXI WAV options in the Uber App in Washington, DC—ERC claims that the number of Drivers who both choose to possess WAVs and choose to seek and accept ride requests via the Uber App does not "meet[] the demand of wheelchair users."  *Id.* ¶ 40.  Tellingly, ERC doesn't even try to explain how this Court would craft (let alone monitor and enforce) an appropriate injunction.  That is because ERC cannot do so.

No doubt, Uber can and has voluntarily come up with and implemented ideas, like uberWAV and TAXI WAV.  But Uber's efforts alone cannot redress ERC's alleged injuries. Rather, redress for the transportation difficulties ERC alleges will inevitably turn on whether enough Drivers choose to both possess WAVs and use them to provide rides requested via the Uber App.  Uber cannot force Drivers to do so; and this Court cannot do so either, because Drivers are independent third-parties not before the Court.  *See Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that *those enjoined* receive explicit notice of precisely what is required.")

(emphasis added). "Relief that does not remedy the injury suffered," like the relief ERC seeks here, is not redressable. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998); *see West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2015) ("Courts do not lightly speculate how independent actors not before them might exercise their broad discretion.").

### D.   ERC Lacks A Private Right Of Action For Itself Under The ADA Because It Was Not Subjected To Any Allegedly Discriminatory Conduct.

Even if ERC had *standing* to assert its ADA claim, it lacks a private right of action to sue for itself. Private litigants may sue to enforce federal statutes only to the extent Congress has authorized them to do so. *Lexmark Int'l v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014). Congress confined Title III of the ADA's private right of action to persons "being subjected to discrimination on the basis of disability." 42 U.S.C § 12188(a)(1). An individual or entity that does not have a disability can be subjected to discrimination only when such individual or entity is (a) *itself* denied "equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities," (b) "*because of* the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E) (emphasis added); *see McCullum v. Orlando Reg'l Healthcare Sys.*, 768 F.3d 1135, 1143–44 (11th Cir. 2014) ("We reject the contention that non-disabled individuals may seek relief under the … ADA for injuries other than exclusion, denial of benefits, or discrimination that they themselves suffer.").

ERC cannot avail itself of the private right of action Congress created. Obviously, ERC is not an individual with a disability. ERC does not allege that it was discriminated against because of some "known … relationship or association" with individuals with disabilities. *See* 42 U.S.C. § 12182(b)(1)(E). ERC does not allege that *ERC* was discriminated against at all. Rather, ERC concedes its purported injuries "are *independent* of the injuries suffered by ERC's

members." FAC ¶ 104 (emphasis added); *see id.* ¶ 16. And the alleged harms to ERC's mission, purpose, and bottom line, *id.*, ¶¶ 107–16, are insufficient. *See Small v. Gen. Nutrition Cos.*, 388 F. Supp. 2d 83, 93 (E.D.N.Y. 2005) ("A plaintiff ... which has suffered no direct discrimination but has only incurred any potential injuries as a result of discrimination against others, is provided no remedy by Title III.").

For this reason, courts regularly hold ERC lacks a private right of action (or "statutory standing," which means the same thing, *Lexmark*, 134 S. Ct. at 1387 n.4). *See ERC v. Hilton Hotels Corp.*, No. 07-1528, 2009 WL 6067336, at *4–5 (D.D.C. Mar. 25, 2009); *ERC v. Equity Residential*, 798 F. Supp. 2d 707, 728–30 (D. Md. 2011); *ERC v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 521 (D. Md. 2010). ERC lacks a private right of action here, as well.

## II.  ERC LACKS STANDING TO SUE ON BEHALF OF ITS MEMBERS.

Organizations may sue on behalf of their members only if, among other things, those "members would otherwise have standing to sue in their own right," and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). ERC cannot meet either requirement for this "associational standing."

### A.  ERC's Members Lack Standing To Sue In Their Own Right.

Associational standing is derivative, so it may never be broader than the standing of the organization's members. *Huron v. Cobert*, 809 F.3d 1274, 1279 (D.C. Cir. 2016). An organization must allege "who the[] members are" (who it purports to assert claims for) and sufficient facts to show those members having standing. *Hilton Hotels*, 2009 WL 6067336, at *3.

ERC includes allegations specific to a single member—Heidi Case. FAC ¶ 99. The allegation that "[m]any of ERC's members who use wheelchairs" have had "experiences" that are "similar[]" to Ms. Case's alleged experience, *id.* ¶ 103, is "simply too vague to establish that

these [unnamed] members would have standing to sue in their own right," *Hilton Hotels*, 2009 WL 6067336, at *5.   The causation and redressability defects discussed above apply equally to Ms. Case.   That alone dooms associational standing for ERC.

ERC also fails to allege any cognizable Article III injury to Ms. Case.   An injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).   Standing to sue for injunctive relief, which is the only relief available to private litigants under Title III of the ADA, further requires "a real and immediate threat of repeated injury in the future." *Chapman v. Pier 1 Imports Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (en banc).   Thus, for an individual ADA plaintiff, Article III's injury requirement is satisfied only in two scenarios: (i) she visits a facility, encounters an accessibility barrier, and intends to return; or (ii) she would visit the facility but for the claimed accessibility barrier—dubbed the "deterrent effect doctrine."   *Id.* at 950; *accord Hilton Hotels*, 2009 WL 6067336, at *3.   ERC invokes only the latter scenario for Ms. Case; it concedes she never attempted to use the Uber App or set up an Uber rider account. FAC ¶ 100.

ERC fails to plausibly allege that Ms. Case has been deterred from using the Uber App. The deterrent effect doctrine nudges the outer bounds of Article III standing.   *See Chapman*, 631 F.3d at 946.   At the very least, to take advantage of the doctrine, a plaintiff must allege sufficient, specific facts that make her claim of deterrence plausibly genuine and concrete.   *See Holt v. Am. City Diner, Inc.*, No. 05-1745, 2007 WL 1438489, at *7–8 (D.D.C. May 15, 2007); *Civil Rights Educ. & Enf't Ctr. v. Hospitality Props. Tr.*, 867 F.3d 1093, 1099–1100 (9th Cir. 2017).   A "mere profession of an intent, some day, to return" to or visit the facility in question does not suffice.   *Lujan*, 504 U.S. at 564 n.2.   "[T]he injury alleged by the plaintiff—whether based on an intent to return or deterrence—cannot be based only on conclusory statements

13

unsupported by specific facts." *Barnes v. Marriott Hotel Servs.*, No. 15-01409, 2017 WL 635474, at *7 (N.D. Cal. Feb. 16, 2017).  Thus, deterrence may be plausible if the plaintiff alleges she is a regular customer of the facility; has concrete plans to visit the facility in the near future; or lives near the facility and visited it recently.  *See Holt*, 2007 WL 1438489, at *7; *Civil Rights Educ.*, 867 F.3d at 1099–1100.

Despite an opportunity to amend, ERC alleges nothing like that for Ms. Case.  ERC does not identify any specific instance in which Ms. Case even considered using the Uber App.  All it says is that Ms. Case "declined to download" to the Uber App because "friends and contacts" advised her (incorrectly) that she couldn't request WAV rides via the Uber App.  FAC ¶ 101. That outdated and now irrelevant pre-amendment theory of deterrence no longer holds now that the uberWAV option is available in Washington, D.C., and it makes no sense because ERC alleges that all other transportation options in Washington, D.C. are deficient.  *See id.* ¶¶ 27, 99. Regardless, Ms. Case's lack "of past patronage" alone "seems to negate the possibility of future injury."  *Parr v. L&L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1079 (D. Haw. 2000).

Nor does ERC allege that Ms. Case has any concrete plans to use the Uber App in the future.  ERC offers only the vague assertion that Ms. Case is "eager to" use the Uber App *someday*, despite being able to do so now.  FAC ¶ 101.  Such "'some day' intentions … are insufficient to establish standing."  *Barnes*, 2017 WL 635474, at *8; *accord Holt*, 2007 WL 1438489, at *7.

Those someday intentions are not plausibly genuine either.  Ms. Case hasn't even taken the basic, threshold steps necessary to use the Uber App—downloading the free application to her smartphones and creating a free account.  FAC ¶ 100.  ERC does not even allege that Ms. Case has a sufficient smartphone, an active App Store or Play Store account, or a valid

14

payment method.  ERC likewise does not allege that Ms. Case is willing to provide her email address, phone number, and payment method to Uber.  And they do not allege that Ms. Case would be willing to agree to Uber's Privacy Policy and Terms of Use—including the mandatory arbitration agreement.  Ms. Case would have to do *all of that* in order to request rides from Drivers via the Uber App.  *See Meyer*, 868 F.3d at 70–72.  And she must genuinely be willing to do *all of that* in order to have standing.  Because ERC fails to allege sufficient facts to show that Ms. Case would have standing, ERC lacks standing to represent her.

An imminent injury must be "certainly impending," and mere "allegations of possible future injury" are insufficient.  *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013).  Claiming deterrence from doing *anything* does not grant ADA plaintiffs standing automatically.  There must be a nexus between the alleged wrong, the plaintiff's disability, and the activity from which the plaintiff was allegedly deterred.  *Cf. Chapman*, 631 F.3d at 954–55 (ADA plaintiffs have standing to sue only for alleged accessibility barriers that affect their claimed disabilities).  ERC does not allege that Ms. Case was prevented in any way from downloading or operating the Uber App, including creating an Uber App account.  ERC simply alleges a possible future injury Ms. Case might face if she used Uber App *after downloading it and creating an account*.  That is precisely the sort of speculative, possible future injury Article III forbids.

### B.      The Participation Of ERC's Members Is Unavoidable.

In all events, ERC's claims are not proper associational standing claims.  In several ways, the nature of the claims asserted and the relief sought would require any member on whose behalf ERC intends to sue to participate in the litigation.

*First*, ERC seeks both compensatory and punitive damages (FAC at 33) under the DCHRA, which is a telltale sign that associational standing fails.  *See Hunt*, 432 U.S. at 342–43; *Air Transp. Ass'n v. Reno*, 80 F.3d 477, 483 (D.C. Cir. 1996).  "In virtually all cases, a claim for

monetary damages requires the participation of individual members of the association." *Long Term Care Pharmacy All. v. UnitedHealth Grp.*, 498 F. Supp. 2d 187, 193 (D.D.C. 2007). For "both the fact and extent of injury would require individualized proof" from individual members. *Warth v. Seldin*, 422 U.S. 490, 515–16 (1975); *see Abercrombie*, 767 F. Supp. 2d at 521 (ERC lacked associational standing to pursue damages under state law).

*Second*, organizations cannot litigate claims on behalf of members who would be bound to arbitrate the same claims. *See Klay v. All Defendants*, 389 F.3d 1191, 1202–03 (11th Cir. 2004). ERC correctly alleges that riders must "create[] an account" to use the Uber App. FAC ¶ 44. Riders can't create an account without first agreeing to Uber's Terms of Use, including the agreement to arbitrate all claims. *See Meyer*, 868 F.3d at 71. Accordingly, it is highly likely that any ERC member who could plausibly allege a cognizable injury has created and Uber account and thereby agreed to arbitrate the claims asserted in this case. (Indeed, despite having extensively surveyed its members, FAC ¶ 108, ERC does not allege otherwise.) That prospect compels the participation of individual members in this case. *See, e.g.*, *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 713 F. Supp. 2d 734, 744 (N.D. Ill. 2010); *In re Managed Care Litig.*, No. 00-1334, 2003 WL 22410373, at *10 (S.D. Fla. Sept. 15, 2003).

*Finally*, participation of ERC's members would be necessary to determine whether each member, in fact, would have downloaded and used the Uber App (rather than some other ridesharing smartphone application) but for the allegedly insufficient number of Drivers with WAVs. Not every Washington, D.C. resident has the kind of smartphone or computer needed to use the Uber App, or has a credit card, or would agree to Uber's Terms of Use and Privacy Policy. Individual participation is necessary to answer these questions. *See also Telecomm. Res. & Action Ctr. ex rel. Checknoff v. Allnet Commc'n Servs.*, 806 F.2d 1093, 1095–96 (D.C. Cir.

1986) (Ginsburg, R.B., J.) (an organization cannot circumvent Federal Rule of Civil Procedure 23 by asserting associational standing to represent a small number of its members). Thus, ERC lacks associational standing.[2]

## III.   THE ADA PROVISIONS ERC INVOKES DO NOT APPLY HERE.

ERC invokes two provisions of Title III of the ADA—Section 12182, which applies to operators of "places of public accommodation," 42 U.S.C. § 12182(a), and Section 12184, which applies to private entities "primarily engaged in the business of transporting people," 42 U.S.C. § 12184(a).  Neither provision applies to Uber in this context.

### A.   Section 12182 Is Inapplicable Because The Uber App Is Not A "Place Of Public Accommodation."

Section 12182 prohibits disability-based discrimination "by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  The breadth of the phrase "place of public accommodation" is a pure question of statutory interpretation.  The Courts of Appeals have split over the answer, but not evenly.  The better and overwhelming majority view is that "place of public accommodation" means a real, physical space.

The Third, Fifth, Sixth, and Ninth Circuits subscribe to the majority view.  Faithful to the statute's text, these courts hold that Congress intended the phrase "place of public accommodation" to refer to only real, physical spaces open to the public.  *See Ford v. Schering-Plough Corp.*, 145 F.3d 601, 612–13 (3d Cir. 1998); *Magee v. Coca-Cola Refreshments, Inc.*, 833 F.3d 530, 534 (5th Cir. 2016); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1012–13 (6th Cir. 1997) (en banc); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114–15 (9th Cir. 2000).  Applying this interpretation, the Ninth Circuit (the only circuit court to have adjudicated the question) has held that an Internet website is not a "place of public

---

[2]       To the extent this jurisdictional defect requires factual development, Uber requests an opportunity to conduct limited and focused jurisdictional discovery.

accommodation." *Earll v. eBay, Inc.*, 599 F. App'x 695, 696 (9th Cir. 2015) (ebay.com); *Cullen v. Netflix, Inc.*, 600 F. App'x 508, 509 (9th Cir. 2015) (netflix.com).

Only the First Circuit has adopted the opposite, minority view, *i.e.*, that "place of public accommodation" may refer to real places and business that sell goods or services exclusively by mail or over the phone. *See Carparts Distrib. Ctr. v. Auto. Wholesaler's Ass'n*, 37 F.3d 12, 19 (1st Cir. 1994).[3] En route to that conclusion, the First Circuit gave short shrift to the statute's text. Rather, the court admitted its interpretation was driven by policy more than statutory text. Citing the Act's broad remedial purpose and a few legislative statements, the court opined that distinguishing between businesses operating real, physical spaces and businesses conducting commerce by other means (like mail or phone) would be "irrational" and "absurd." *Carparts*, 37 F.3d at 19–20. A remedial purpose is not cause to ignore statutory text, as "almost every statute might be described as remedial in the sense that all statutes are designed to remedy some problem," and "no legislation pursues its purpose at all costs." *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2185 (2014). The First Circuit impermissibly traded its policy judgment for Congress's. It has not applied its aberrant rationale to software or cyberspace.

Under the correct, majority view, ERC fails to state a claim under Section 12182. Smartphone applications are not real, physical spaces. They are not "places" in any sense. "Mobile application software on a cell phone, or 'apps,' offer a range of tools for managing detailed information about all aspects of a person's life." *Riley v. California*, 134 S. Ct. 2473, 2490 (2014). Much like the Internet, a smartphone application is "a unique medium … located

---

[3]     The Second Circuit has cited *Carparts* with approval, but in a case involving insurance services of a physical place of public accommodation. *See Pallozi v. Allstate Life Ins. Co.*, 198 F.3d 28, 32 & n.3 (2d Cir. 1999). The Second Circuit expressly declined to determine whether Title III would apply to a place of public accommodation unconnected to any actual, physical place. *Id.*; *see Pallozi v. Allstate Life Ins. Co.*, 204 F.3d 392, 393 (2d Cir. 2000). The Seventh Circuit has opined that Title III applies to more than just physical places, but only in *dicta*. *See Morgan v. Joint Admin. Bd.*, 268 F.3d 456, 489 (7th Cir. 2001); *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999).

in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet" and a smartphone. *Reno v. ACLU*, 521 U.S. 844, 851 (1997).  With increasing frequency, "the data a user views on modern cell phones may not in fact be stored on the device itself." *Riley*, 134 S. Ct. at 2491.

 The D.C. Circuit hasn't weighed in.  *See EEOC v. Aramark Corp.*, 208 F.3d 266, 268 (D.C. Cir. 2000).  The majority of courts in this district, however, have adopted the majority view.  *Williams v. Savage*, 569 F. Supp. 2d 99, 110 n.8 (D.D.C. 2008) (only "physical locations" can be "places of public accommodation"); *Fennell v. Aetna Life Ins. Co.*, 37 F. Supp. 2d 40, 44–45 (D.D.C. 1999) (same); *Fitts v. Fannie Mae*, 44 F. Supp. 2d 317, 324 (D.D.C. 1999) (same).  *But see Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1, 10 (D.D.C. 1999) (adopting minority view).  District courts within the Fourth, Tenth, and Eleventh Circuits have done the same.  *See, e.g.*, *Staley v. Nat'l Capital Area Council, Boy Scouts*, No. 10-2768, 2011 WL 2416724, at *9 (D. Md. June 9, 2011); *Holman ex rel. J.H. v. Just for Kids, Inc.*, 248 F. Supp. 3d 1210, 1217 (D. Utah 2017); *Access Now, Inc. v. Sw. Airlines, Co.*, 227 F. Supp. 2d 1312, 1321 (S.D. Fla. 2002).

The majority of the Courts of Appeals have it right.  All the traditional clues of congressional intent—the text, structure, and context of the Act—demonstrate that the phrase "place of public accommodation" refers to only real, physical spaces.  Any broader reading ignores the statute's text and violates settled rules of statutory interpretation.

### 1.  As a matter of plain language, the phrase "place of public accommodation" embraces only real, physical spaces.

Section 12182 applies to only a subset of businesses.  If the phrase "place of public accommodation" applied to every business of any sort, Congress would not have written Title I (employers) or Title II (public service providers) of the ADA, and it would not have exhaustively listed the types of businesses that qualify as "places of public accommodation."  *See* 42 U.S.C.

§ 12181(7). Both halves of the phrase—"place" and "public accommodation"—confirm that Congress intended it to mean only businesses with real, physical spaces open to the public.

**Place.** The word "place" is undefined in Title III, so it takes its everyday meaning. *See Taniguchi v. Kan Pac. Saipan*, 132 S. Ct. 1997, 2002–03 (2012). Ordinarily, the word "place" connotes a "physical environment," "physical surroundings," or a "dwelling." WEBSTER'S THIRD NEW INT'L DICTIONARY 1727 (1986) ("WEBSTER'S"); *accord* RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1478 (2d ed. 1987) ("RANDOM HOUSE") (defining "place" as specific or general "spaces" and as a "building, location" or "residence, dwelling, or house"). No dictionary contemporaneous with the ADA's enactment defined "place" as anything incorporeal or digital, like smartphone applications.

Congress used "place" consistent with its ordinary meaning throughout Title III, a sure sign that's the meaning Congress intended. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995). Title III refers to specific types of "places" in Section 12181 ("place of lodging," "place of public gathering," "place of recreation," and "place of exercise") and Section 12187 ("place of worship"). 42 U.S.C. §§ 12181(7), 12187. Those terms cannot refer to smartphone applications because the activities linked to them can occur only in real, physical spaces. The Fitbit App is not a "place of exercise." The Airbnb App is not a "place of lodging." A bible study application is not a "place of worship."[4] And the iMessage, Facebook Messenger, Google Hangouts, Instagram, and Snapchat apps are not "place[s] of public gathering."[5]

Then there's Section 12189, which concerns "examinations and courses." In that section, Congress distinguished offering tests "in a *place* … accessible to persons with disabilities" from

---

[4]    *See* WEBSTER'S 1727 (listing "place of worship" as an example of "a *building* or *locality* used for a special purpose") (emphases added).

[5]    *See* AM. HERITAGE COLLEGE DICTIONARY 1086 (3d ed. 1993) (to "gather" is "[t]o collect in one place; assemble").

offering tests "in a … *manner* accessible to persons with disabilities."   42 U.S.C. § 12189 (emphases added).  Smartphone applications may be used to offer tests in an accessible "manner," but one would not say such tests are offered in an accessible "place."

**Public accommodation.** Congress's special definition for "public accommodation" in Title III likewise reaches only real, physical spaces open to the public.  The statute exhaustively identifies twelve categories of "public accommodations."  42 U.S.C. § 12181(7).  Each has its own subparagraph, and each subparagraph is formulated the same way: a general residual clause concludes a disjunctive list of specific examples.  *See id.*  Take, for example, the fourth category, which includes "an auditorium, convention center, lecture hall [specific examples], or other place of public gathering [residual clause]."  42 U.S.C. § 12181(7)(D).

The residual clauses refer to "other place[s]," "other establishment[s]," and "[o]ther station[s]." 42 U.S.C. § 12181(7).   Like "place," the words "establishment" and "station" connote only real, physical spaces.  *See* WEBSTER'S 778 ("establishment" means "a more or less fixed and usu[ally] sizable place of business or residence"); *id.* at  2229 (defining "station" as various types of real, physical "places" or "locations"); RANDOM HOUSE 663, 1861.  Congress appears to have recognized the words' similar meanings.  *See* 42 U.S.C. § 12181(7)(A) (equating "*place* of lodging" and "an *establishment*") (emphases added).  By linking the residual clauses to other places, establishments, and stations, Congress made clear that the statutory definition of "public accommodation" refers to only real, physical spaces.

## 2.   The Act's structure and context confirm that the phrase "place of public accommodation" embraces only real, physical spaces.

Two interpretive canons confirm the plain-text reading of "place of public accommodation" as limited to real, physical spaces.  There's *ejusdem generis*, which instructs that statutory catchall clauses be interpreted in context: "when a statute sets out a series of

specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows." *Hall St. Assocs. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008). And there's *noscitur a sociis*, which teaches that items within a statutory list should be interpreted alike, catchall clause or no. *See Beecham v. United States*, 511 U.S. 368, 371 (1994). So when a word in a statutory list has multiple meanings, it takes the meaning most similar to its neighbors "in order to avoid giving unintended breadth to the Acts of Congress." *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004).

Both canons apply to each subparagraph in Section 12181(7)'s definition of "public accommodation," and the *noscitur* canon applies to Section 12181(7) as a whole (twelve subparagraphs make one list). Applying those canons, the majority of the Courts of Appeals to have considered the question have concluded "that every term listed in § 12181(7) is a physical place open to the public." *E.g.*, *Magee*, 833 F.3d at 534.

### 3. The Uber App is not a "travel service" or any other real, physical space.

The phrase "place of public accommodation" embraces only real, physical spaces open to the public. To state a claim under Section 12182, then, a plaintiff must allege that the defendant owns, leases, or operates a real, physical space open to the public. ERC has not—and cannot—do so here. For ERC alleges that Uber operates only a smartphone application (*e.g.*, FAC ¶ 43), which is not a real, physical space.[6]

ERC's assertion that Uber "operate[s] a 'travel service' as defined by 42 U.S.C. § 12181," FAC ¶ 124, is conclusory and legally inaccurate, and so should be disregarded, *see Twombly*,

---

[6]     Drivers' vehicles are not "places of public accommodation," either. *See Holman.*, 248 F. Supp. 3d at 1222–23 (a van is not a "place of public accommodation"); *see also Kalantar v. Lufthansa German Air.*, 402 F. Supp. 2d 130, 139 (D.D.C. 2005) ("place of public accommodation" under Title II of the Civil Rights Act does not embrace any "vehicle or other mode of transportation"). Regardless, as ERC admits, Uber does not own, lease, or operate Drivers' vehicles. FAC ¶ 64.

550 U.S. at 555.  While the ADA doesn't define "travel service," it is part of a list of examples in one of the subparagraphs in the definition of "public accommodation": "a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment."   42 U.S.C.  § 12181(7)(F).  Everything in that list is a real, physical space.  Accordingly, courts have interpreted "travel service" to refer to "an office where travel agents provide travel services."  *Parker*, 121 F.3d at 1014.  This reading not only comports with the statute's text; it also fits with Congress's specific treatment of transportation in Section 12184.

The First Circuit's decision in *Carparts* provides no reason part with the courts that have interpreted the term "travel service" as "an office where travel agents provide travel services."  The First Circuit summarily asserted that "[m]any travel services conduct business by telephone or correspondence without requiring their customers to enter an office in order to obtain their services."  *Carparts*, 37 F.3d at 19.  So, the First Circuit thought various "service establishments," even those without an actual, physical space open to the public, could be "places of public accommodation."  *Id.*  Of course, in 1994, the court wasn't considering a business like Uber's.  Regardless, focusing on the term "travel service" in isolation, the First Circuit failed to consider the statute's plain language, contextual clues, or the applicable interpretive rules.  *See id.*  Had the court consulted the *noscitur* canon, for example, it would have been compelled to conclude that "travel service" refers to a real, physical space, just like the rest of the words in the same list.  *See Parker*, 121 F.3d at 1014.

The ADA furthers important goals, and Congress drafted its operative provisions to apply to all sorts of real, physical spaces open to the public, even those unforeseen when the statute

was enacted in 1990 (*e.g.*, an Apple Store or Internet Cafe). But Congress did not draft the phrase "place of public accommodation" so broadly that it reaches non-physical places (*e.g.*, Apple's App Store or the Internet itself). "Congress has the authority to improve the circumstances of disabled people in some respects even if it does not improve them in all respects." *Weyer*, 198 F.3d at 1112.

### B.   Section 12184 Is Inapplicable Because Uber Is Not "Primarily Engaged In The Business Of Transporting People."

Section 12184 is a separate provision, and it applies only to private entities that are "primarily engaged in the business of transporting people." 42 U.S.C. § 12184(a). None of the terms in the phrase "primarily engaged in the business of transporting people" is defined in the ADA, so they take their ordinary meanings. *See Taniguchi*, 566 U.S. at 566. Understood correctly, the phrase refers only to an entity whose principal business is actually conveying passengers from place to place. That's not what Uber does: Uber is primarily a technology company that networks riders and Drivers. It is the Drivers who accept ride requests that actually convey passengers.

### 1.   Uber is not "engaged in the business of transporting people" because it does not actually transport passengers.

To "engage" in an activity is to "become occupied" or "participate" in that activity. WEBSTER'S II NEW COLL. DICTIONARY 373 (1995) ("WEBSTER'S II"); *accord Navarro v. Encino Motorcars, LLC*, 845 F.3d 925, 931 (9th Cir. 2017). Which is to say, to be "engaged in" an activity means to be *personally*, *directly*, and *actually* involved in it. The word "transport" means "[t]o convey from place to another." WEBSTER'S II 1172. Taking it all together, as a matter of plain and ordinary language, an entity "engaged in the business of transporting people"

is an entity that personally, directly, and actually conveys people from one destination to another for a living or for money.[7]

The rest of Section 12184 proves this plain-language and common-sense reading.  The bulk of Section 12184(b) concerns what entities "engaged in the business of transporting people" must do when they "purchase or lease" various vehicles (like automobiles, vans, over-the-road buses, and rail passenger cars).  42 U.S.C. § 12184(b)(3)–(6).  That's because entities that actually convey passengers purchase and lease vehicles for their fleets all the time.  As applied to entities that don't actually convey passengers from one destination to another (like Uber), those statutory obligations make no sense.

Moreover, throughout Section 12184, Congress referred to "specified public transportation" that is "*provided by*" a covered entity.  42 U.S.C. § 12184(a), (b)(1), (b)(3), (b)(5)–(b)(7).  "Specified public transportation" is "transportation by bus, rail, or any other conveyance … on a regular or continuing basis."  42 U.S.C. § 12181(10).  Only entities that actually transport people "provide" transportation by a "conveyance."  Section 12181(7) sharpens the point; it defines "public accommodation" to include "a terminal, depot, or other station used for specified public transportation."  42 U.S.C. § 12181(7)(G).  Logically, if terminals, depots, and other types of stations are used for "specified public transportation," it follows that an entity that "provides" the "specified public transportation"—like a commercial bus or train company—actually transports people for commercial gain.

Opinions interpreting similar phrases in different statutes confirm that an entity "engaged in the business of transporting people" must personally, directly, and actually convey passengers

---

[7]    The object of the participle "engaged in" is "the business."  In context, that serves as a limitation. Occasional, casual, or hobby activities aren't "the business." Opinions from other contexts interpret the phrase "engaged in the business" to be limited to instances when an activity is undertaken "for the purpose of a livelihood or profit."  *Nat'l Coal. to Ban Handguns v. ATF*, 715 F.2d 632, 635 (D.C. Cir. 1983) (Scalia, J.); *accord Royal Foods Co. v. RJR Holdings, Inc.*, 252 F.3d 1102, 1107 (9th Cir. 2001).

from place to place.  For example, mechanics who "repair defective brakes" are "engaged in servicing automobiles."  *Navarro*, 845 F.3d at 931.  But people who sell auto parts are not, even though their work closely relates to servicing automobiles.  *Id.*; *accord McBeth v. Gabrielli Truck Sales*, 768 F. Supp. 2d 383, 388–89 (E.D.N.Y. 2010) (employees who fill orders for parts are not "primarily engaged in … servicing automobiles" because they do not actually service automobiles, even though they are, "in some broad sense, involved in the … service operation").

More on point is *Village of Bedford Park v. Expedia, Inc.*, 876 F.3d 296 (7th Cir. 2017), which involved a dispute over whether operators of Internet websites on which travelers can book rooms at third-party hotels—like expedia.com, hotels.com, and priceline.com—could be taxed as entities "engaged in the business of renting hotel rooms."  *Id.* at 305.  Because those websites merely *facilitate* hotel reservations, the Seventh Circuit held that the websites' operators are not "engaged in the business of renting hotel rooms." *Id.* at 299–300.  The court explained that "[t]o rent" hotel rooms "implies ownership and granting possession" of hotel rooms, but because the website operators "do not own hotels or hotel rooms, … they cannot independently grant customers access to hotel rooms," and "they cannot rent hotel rooms to customers."  *Id.*

The same result should obtain here.  The Uber App serves both sides of the two-sided ridesharing market, by networking Drivers and riders, like hotel-reservation websites serve both sides of the hotel-reservation market.  Uber does not own vehicles or provide transportation, just as hotel-reservation website operators do not own hotel rooms or rent them.  Thus, the aspect of Uber's business that is related to ridesharing—the Uber App—may have some relationship to transportation that others provide.  But under *Expedia*'s logic, that doesn't make Uber an entity "engaged in the business of transporting people."

### 2.      Uber's primary business is technology.

There is a fundamental difference between statutes that apply to entities "engaged in" the activity and statutes that apply to entities "*primarily* engaged in" the activity.  Unadorned, the phrase "'engaged in the business of' … speaks to the *type* of business" activity only; add the adverb "primarily" to the mix, and the phrase also speaks "to the *quantity* thereof."  *In re Magic Restaurants, Inc.*, 205 F.3d 108, 115 (3d Cir. 2000) (emphases in original).  An entity is primarily engaged in the activity that most occupies its resources.  *See, e.g.*, *Whidden Mem. Hosp. v. Sebelius*, 828 F. Supp. 2d 218, 229 (D.D.C. 2011); *Milton Hosp. Transitional Care Unite v. Thompson*, 377 F. Supp. 2d 17, 28–29 (D.D.C. 2005).

The word "primarily" connotes singularity, describing a verb "[p]rincipally" or "chiefly."  WEBSTER'S II 877.  While an entity may "engage in" lots of activities, it "primarily engages in" only one—its "main and not merely incidental activity."  *Protect Democracy Project v. Dep't of Defense*, 263 F. Supp. 3d 293, (D.D.C. 2017); *see, e.g.*, *Progress v. CFPB*, No. 17-686, 2017 WL 1750263, at *4 (D.D.C. May 4, 2017); *State Farm Mut. Auto Ins. Co. v. Schaefer*, No. 14-4149, 2014 WL 5844043, at *3 (W.D. Mo. Nov. 12, 2014) ("resides primarily" connotes a single, primary residence); *In re Green*, 360 B.R. 34, 42 (Bankr. N.D.N.Y. 2007) (vehicle may be "primarily manufactured" for a single purpose).

Uber is not "engaged in the business of transporting people" at all, much less "primarily engaged."  Uber's primary business is technology.  It develops and licenses sophisticated software, including but not limited to a smartphone application that enables riders to request rides, then transmits those requests to Drivers who, if they choose to accept a request, actually provide transportation.  FAC ¶¶ 43–46.  Uber leverages its technology in lots of ways—besides networking Drivers and riders, Uber networks restaurants and hungry people, as well as

commercial truck drivers and deliveries.  *See* UBER EATS (2017), http://www.ubereats.com/; UBER FREIGHT (2017), http://freight.uber.com/.

ERC does not allege otherwise.  It doesn't allege that Uber own vehicles used to provide transportation, employs Drivers, or actually transports passengers—*because Uber really doesn't*. The best ERC musters is an allegation that Uber has purchased vehicles for research and development (in connection with development of autonomous vehicle technology).  FAC ¶ 73. That doesn't make Uber a transportation company.  To the contrary, *it proves that Uber's primary business is technology*.

The business Uber is "primarily engaged in" can't be defined by myopically focusing on a rider's perspective.  The Uber App serves both sides of the ridesharing market; the other side— Drivers—is important.  From a Driver's perspective, there is no doubt Uber is a technology company, and is not "primarily engaged in the business of transporting people."  Drivers pay Uber for the right to use its software.  They don't use the Uber App to request transportation; they use it to find leads and connect with passengers who they transport from place to place.

## IV.   EVEN IF THE ADA PROVISIONS APPLIED, ERC STILL FAILS TO STATE A CLAIM UNDER TITLE III OF THE ADA.

### A.   Even If Section 12182 Applied, ERC Fails To State A Claim Because It Challenges The Mix Of Services Uber Offers.

Section 12182 does not require a covered entity "to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities." 28 C.F.R. § 36.307(a).  For example, while a physical place like "a book store cannot discriminate against disabled people in granting access," it "need not assure that the books are available in Braille as well as print."  *Weyer*, 198 F.3d at 1115.  For there is a fundamental difference between "the *mix of* goods and services offered" and complaints about *access to* the goods and services offered.  *Lenox v. Healthwise, Ltd.*, 149 F.3d 453, 457 (6th Cir. 1998)

(emphasis added). Title III regulates only "access" to a covered entity's goods and services, and not the "content" of the goods or services it offers. *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1047 (9th Cir. 2000).

Section 12182's concern with *access* to—and not the *content* of—a covered entity's goods and services dooms ERC's ADA claim. ERC asserts discrimination based upon the alleged mix of services it or its members may request via the Uber App from the Drivers that seek and accept ride requests. ERC doesn't allege that it or its members were denied access to those services or the Uber App itself; it contends its members who need WAVs can and would use the Uber App. ERC's grievance is that the supply of Drivers with WAVs who choose to seek and accept ride requests via the Uber App is not sufficiently calibrated to demand, and it looks to Uber to ensure greater a supply of such Drivers. *See, e.g.*, FAC ¶ 8 (urging that Uber must "requir[e] a reasonable number of [Drivers] cars to be wheelchair accessible"). That would turn Uber's software solution for the ridesharing industry—which networks riders and Drivers with all sorts of vehicles—into a solution that only networked riders and Drivers with one type of specially equipped vehicle, *i.e.*, a WAV. That is beyond the purview of the ADA.

> **B.      Even If Section 12184 Applied, ERC Fails To State A Claim Because A Lack Of Accessible Vehicles Is Not Discrimination As A Matter of Law.**

Section 12184 doesn't require entities primarily engaged in the business of transporting people to provide WAV service. To the contrary, the statute's definition of "discrimination" expressly excludes providing transportation services in "an automobile" that is not "readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." 42 U.S.C. § 12184(b)(3). In other words, providing transportation in a standard automobile is not discrimination.

As such, covered entities "are not required to purchase or lease accessible automobiles" or "purchase vehicles other than automobiles in order to have a number of accessible vehicles in [their] fleet[s]."  49 C.F.R. § 37.29(b).  As succinctly stated in the appendix to the implementing regulations, "[u]nder the ADA, *no private entity is required to purchase an accessible automobile*."  49 C.F.R., Pt. 37, App'x D (emphasis added).  For this reason, even "a taxi fleet consisting entirely of non-accessible vehicles would be in accord with the ADA."  *Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006); *accord Noel v. NYC Taxi & Limousine Comm'n*, 687 F.3d 63, 73 (2d Cir. 2012).  Simply put, companies that actually provide transportation in automobiles are not required to provide transportation in WAVs.  Thus, as a matter of law, Drivers who use the Uber App to connect with riders "are not required to purchase or lease accessible automobiles."  49 C.F.R. § 37.29(b).  Smartphone applications, like the Uber App, are not held to a more stringent standard than are those who actually provide transportation.

With vague allegations of "control" and "influence," ERC seeks to use this lawsuit to force Drivers to do what the law expressly says they do not have to do—purchase or lease WAVs.  FAC ¶¶ 64–75.  That tack is foreclosed by *Noel*, where the Second Circuit rejected a similar end-run attempt.  The plaintiffs in *Noel* sued the NYC Taxi and Limousine Commission ("TLC"), which "pervasively regulates" transportation services provided by independent transportation providers in New York City.  *Noel*, 687 F.3d at 73.  The plaintiffs sought to compel the TLC to "use its regulatory authority" to force taxi providers to offer WAV services, and claimed the TLC violated Title II of the ADA (which applies to public entities providing public services) because it had not done so.  *Id.*  The Second Circuit rejected that argument as "counter to the policy choice of the political branches."  *Id.* The court explained:  "If the TLC is required under [Title II] to ensure that the taxi industry provides a sufficient number of

accessible taxis, then private taxi owners would be required to purchase or lease accessible taxis even though [Title III of] the ADA explicitly exempts them from such requirements." *Id.* at 73–74 (citing 49 C.F.R. § 37.29(b)).  So, Title II could "not obligate the TLC to use its licensing and regulatory authority … to require that taxi owners provide" WAV services.  *Id.* at 74.

ERC's claim is weaker than even the claim rejected in *Noel*.  Uber doesn't have the "pervasive control" over Drivers who choose to seek and accept ride requests via the Uber App that the TLC has over transportation providers in New York City, and ERC does not (because it cannot) allege otherwise.  *Noel* teaches that whatever level of influence or control Uber might have is irrelevant.  For in no event may ERC's vague allegations of "control" circumvent Congress's decision to not require actual transportation companies to provide WAV services.

### C.     Forcing Uber To Provide WAV Services Is Not A Reasonable Modification.

ERC's vague accusation that Uber has "fail[ed] to make reasonable modifications" to its policies, FAC ¶ 128, lacks merit.  For one thing, ERC does not identify any policy that it believes is discriminatory.[8]  More fundamentally, Title III does not "require *all* accommodation at *any* cost for *all* disabilities."  *Toomer*, 443 F.3d at 1195 (emphases in original).  Prohibited "discrimination" under the ADA may include the "failure to make *reasonable* modifications in policies, practices, or procedures."  42 U.S.C. §§ 12182(b)(2)(A)(ii), 12184(b)(2)(A) (emphasis added).  An accommodation that requires a fundamental alteration of an essential aspect of the covered entity's business is not reasonable.  42 U.S.C. §§ 12182(b)(2)(A)(ii), 12184(b)(2)(A); *see Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987).

---

[8]     In its initial complaint, ERC confusingly alleged that a requirement that vehicles Drivers use to provide rides via the uberX option in the Uber App have at least four passenger seats somehow excluded WAVs.  In its motion to dismiss the initial complaint, Uber demonstrated that WAVs can—and usually do—have at least four passenger seats; ERC concedes the point by omitting that challenge from the amended complaint.

Thus, it is not reasonable to compel a business to enter a sector of a "market it did not intend to enter" in order to accommodate an individual with a disability. *Roberts ex rel. Roberts v. KinderCare Learning Ctrs.*, 896 F. Supp. 921, 926 (D. Minn. 1995) (forcing provider of group childcare services to provide one-on-one childcare services for an individual with a disability would fundamentally alter provider's business), *aff'd*, 86 F.3d 844 (8th Cir. 1996).  It is not reasonable to compel a hospital to administer medications to visitors, rather than patients, with disabilities. *Dryer v. Flower Hosp.*, 383 F. Supp. 2d 934, 940–41 (N.D. Ohio 2005).   And it is not reasonable to compel a covered entity to "change the entire focus" of its services. *Easly ex rel. Easly v. Snider*, 36 F.3d 297, 2015 (3d Cir. 1994).

The only way for Uber to guarantee that Drivers who accept ride requests via the Uber App do so with WAVs would be to purchase WAVs and employ drivers to drive them.  No law requires a private entity to take such extraordinary measures.  Indeed, forcing Uber to do so here would require it to fundamentally alter its business, which is primarily technology.  A critical component of Uber's business model is that it does not own vehicles or employ drivers.  Forcing Uber to purchase vehicles and/or employ drivers would, contrary to the ADA's requirements, force Uber into a "market [it] did not intend to enter." *Roberts*, 896 F. Supp. at 926.  ERC's ADA claim fails for this reason as well.[9]

---

[9]        ERC refers to the "equivalent service" concept that applies in limited circumstances under the ADA.  *See* FAC ¶ 77.  That standard is inapplicable here because it only applies to entities, unlike Uber, that are subject to Section 12182 (public accommodations) but not Section 12184 (business primarily engaged in transporting people), because they actually provide limited transportation service as an incidental part of their operations, such as hotels that operate airport shuttle services.  *See, e.g.*, *Ramos v. Uber Techs., Inc.*, No. 14-502, 2015 WL 758087, at *5 (W.D. Tex. Feb. 20, 2015); Statement of Interest of the United States, *NFB v. Uber Techs., Inc.*, No. 14-04086, ECF No. 29 at 6 n.5 (N.D. Cal., filed Dec. 23, 2014).  ERC's attempt to bootstrap that standard to Uber is precluded by Sections 12182 and 12184.

**D.      ERC's Allegations Regarding uberX Are Implausible And Irrelevant.**

ERC's various other attempts to manufacture discrimination with vague and inapt comparisons to uberX should be disregarded.  ERC alleges that "at least one driver with a WAV vehicle [sic] was told that he could not drive that vehicle for Uber because Uber was not accepting accessible vehicles into its fleet."  FAC ¶ 65.  ERC, however, does not identify this alleged "driver," and the allegation otherwise makes no sense.  For one thing, Uber doesn't have a "fleet."  For another, as ERC concedes throughout its complaint, two WAV-specific options—uberWAV and TAXI WAV—are available in the Uber App in Washington, D.C.  *E.g.*, FAC ¶¶ 10–11.  Uber wouldn't have those options if it didn't want Drivers with WAVs to register with, and seek and accept ride requests via, the Uber App.

ERC also contends that the difference in fares charged for rides via TAXI WAV and for rides via uberX is unlawful discrimination.  *Id.* ¶ 126.  ERC misses that the ADA prohibits discrimination *by* the operator of the place of public accommodation and *by* the entity primarily engaged in the business of transporting people.  42 U.S.C. §§ 12182(a), 12184(a).  *Uber* does not set the fares for rides Drivers provide via TAXI WAV, and so *Uber* cannot possibly have engaged in the allegedly discriminatory conduct.  As ERC concedes, when it comes to TAXI and TAXI WAV "Uber's role in pricing is simply to collect a $2 fee."  FAC ¶ 56.  The remainder of what the rider pays for rides via TAXI or TAXI WAV is based on "standard D.C. taxi fares," over which Defendants obviously have no control.  *Id.* ¶ 52; *see, e.g.*, *id.* ¶ 10 ("[T]he fares for individual trips are substantially higher for those who are forced to use *D.C. taxi services* rather than Uber's own service.") (emphasis added).

The regulation ERC cites (*id.* ¶ 126) prohibits transportation providers from "charging higher fares or fees for carrying individuals with disabilities and their equipment than are charged to other persons."  49 C.F.R. § 37.29(c).  That means the *same fares* must be charged for

33

the *same services*.  ERC alleges that Uber (and the D.C. taxi Drivers who accept ride requests via the TAXI and TAXI WAV options) do precisely that:  Uber charges the same $2 fee and taxi Drivers charge the same fares for rides via the TAXI and TAXI WAV.  FAC ¶ 52 (users who get rides via Taxi "must pay standard D.C. taxi fares … plus a $2 fee" and users who get rides via TAXI WAV "must pay standard D.C. taxi fares … plus a $2 fee").  ERC's comparison between uberX and TAXI WAV is apples and oranges.

That leaves ERC's claim that, even though uberX and uberWAV fares are identical, "in practice that is not always the case."  FAC ¶ 95.  Such an allegation may have a place in litigation brought by a plaintiff who had actually used uberWAV and had actually experienced discriminatory pricing.  That's not this case.  ERC's allegations do not even make its conclusory assertion of different pricing plausible.  ERC alleges that in one of several "matched pair tests" it conducted in November 2017—comparing uberX and uberWAV—the uberWAV tester "was *quoted* a higher price" than the uberX tester.  *Id.* ¶¶ 91–95 (emphasis added).  But ERC concedes that the uberWAV tester wasn't actually *charged* a higher price, and ERC doesn't allege to have observed any actual differences in uberX and uberWAV fares in any of its tests.  *Id.* ¶ 95.

## V.   ERC FAILS TO STATE A CLAIM UNDER THE DCHRA.

In the context of disability-based discrimination claims, the DCHRA is the District of Columbia's analog to Title III of the ADA; both statutes prohibit disability-based discrimination in "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, [and/or] accommodations of any place of public accommodation."   D.C. Code § 2-1402.31(a)(1); 42 U.S.C. § 12182(a).  The operative provisions of the two statutes are the same, and ERC's claim under the DCHRA is based on the same factual allegations and the same theories of liability advanced to support its ADA claim.  FAC ¶¶ 118–42.  Accordingly, ERC's DCHRA claim fails for all the same reasons its ADA claim fails.  *See, e.g.*, *Whitbeck v. Vital Signs, Inc.*,

116 F.3d 588, 591 (D.C. Cir. 1997) (Tatel, J.) (D.C. courts regularly construe DCHRA consistent with analogous federal statutes) (citing *Benefits Commc'n Corp. v. Klieforth,* 642 A.2d 1299, 1301–02 (D.C. 1994)); *Boykin v. Gray*, 895 F. Supp. 2d 199, 219 (D.D.C. 2012) (DCHRA "is applied in the same manner as the parallel federal antidiscrimination provisions").

The DCHRA claim fails for independent reasons, as well. For one, ERC's claim is time-barred. DCHRA claims must be filed within one year of the plaintiff's discovery of the alleged unlawful practice. D.C. Code § 2-1403.16(a). ERC discovered the allegedly incomparable service offered to individuals who use motorized wheelchairs as early as May 19, 2016. FAC ¶ 80. ERC commenced this action on June 28, 2017, more than one month after the limitations period expired. ECF No. 1. Thus, the DCHRA claim is untimely.

More fundamentally, consistent with the majority-view interpretation of the same phrase in Title III, the phrase "place of public accommodation" in the DCHRA refers only to actual, physical spaces. *See supra*, p. 17. The DCHRA defines the phrase as "all *places* included within the meaning of such terms as [a list of specific examples]." D.C. Code § 2-1401.02(24) (emphasis added). The connotations of the word "place" did not change between 1973, when the first iteration of the DCHRA was enacted, and 1990, when the ADA was enacted. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 1727 (unabr. 1961). And because any "place of public accommodation" under the DCHRA must be a "place," the D.C. Court of Appeals has held that the phrase doesn't apply to services untethered to "a building" or physical facility. *U.S. Jaycees v. Bloomfield*, 434 A.2d 1379, 1381 (D.C. 1981). For any other interpretation "ignore[s] the plain meaning of the statutory language, which has expressly defined the term 'place of public accommodation.'" *Id.*; *accord Samuels v. Rayford*, No. 91-0365, 1995 WL 376939, at *8 (D.D.C. Apr. 10, 1995) ("[T]o be a 'place of public accommodation' [under the DCHRA], a

challenged entity must first be a 'place.'").  The Uber App is not a real physical space, so it is not

a "place of public accommodation" under the DCHRA.

## **CONCLUSION**

For the foregoing reasons, ERC's amended complaint should be dismissed in its entirety.

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

Dated: January 12, 2018

s/ Anne Marie Estevez
Anne Marie Estevez (DC Bar No. 499841)
Beth S. Joseph (*pro hac vice*)
200 South Biscayne Boulevard, Suite 5300
Miami, FL 33131
T: (305) 415-3330
F: (305) 415-3001
annemarie.estevez@morganlewis.com
beth.joseph@morganlewis.com

Stephanie Schuster (DC Bar No. 1011924)
Clara Kollm (D.C. Bar No. 1029841)
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: (202) 739-3000
F: (202) 739-3001
stephanie.schuster@morganlewis.com
clara.kollm@morganlewis.com

*Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 12, 2018, I caused a true and correct copy of the

foregoing to be served by CM/ECF on all counsel of record, including:

Matthew K. Handley
Deepinder Goraya
WASHINGTON LAWYERS' COMMITTEE
    FOR CIVIL RIGHTS AND URBAN AFFAIRS
11 DuPont Circle, NW, Suite 400
Washington, DC 20036
matthew_handley@washlaw.org
deepa_goraya@washlaw.com

Megan Cacace
RELMAN, DANE & COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, DC 20036
mcacace@relmanlaw.com

                                      <u>s/ Anne Marie Estevez             </u>
                                        Anne Marie Estevez