## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| EQUAL RIGHTS CENTER,<br><br>                        Plaintiff,<br><br>      v.<br><br>UBER TECHNOLOGIES, INC., *et al.*,<br><br>                        Defendants. | Case No. 1:17-cv-01272-KBJ |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' <u>MOTION TO DISMISS</u>

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................7

I.     Law Applicable to a Rule 12(B)(6) Motion to Dismiss.................................................7

II.    ERC Has Standing Under the DCHRA to Remedy Damages to Itself........................8

     A.  *ERC Has Pleaded That It Suffered An Injury Conferring Article III Standing* ............8

     B.  *ERC Has A Right of Action to Remedy Organizational Harm Under the DCHRA* ....11

     C.  *Uber Has Caused ERC Injuries and Can Remedy Them*................................................12

III.   ERC Has Associational Standing.................................................................................15

     A.  *Heidi Case Has Standing* ..............................................................................................16

     B.  *No Other ERC Member Needs to Participate in This Litigation* ................................22

IV.   ERC Adequately Pleads That Uber Violated Title III of the ADA ...........................24

     A.  *ERC Pleads That Uber Violates § 12184* ....................................................................24

        1.  *Uber Violates § 12184 Because it is "Primarily Engaged in the Business of Transporting People" and Does Not Provide "Full and Equal Enjoyment"* ....... 25

        2.  *ERC's Challenge Is Unaffected By Regulations Pertaining to the Lease and Acquisition of Accessible Automobiles* ................................................................30

     B.  *ERC Pleads That Uber Violates 42 U.S.C. § 12182* ................................................... 32

        1.  *Uber is a "Travel Service" Covered By Title III* ..................................................32

        2.  *ERC Does Not Challenge Uber's "Mix of Services"* ...........................................40

        3.  *Uber's Fundamental Alteration Defense Cannot Be Adjudicated On This Motion and the Facts Properly Before the Court* ........................................................41

V.    ERC States a Valid and Timely DCHRA Claim ........................................................42

CONCLUSION..................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006) ...................................................................................9,11

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011) ...........................................................................................11

*Andrews v. Blick Arts Materials, LLC*, 268 F. Supp. 3d 381 (E.D.N.Y. 2017) ................36

*Andrews v. Blick Art Materials, LLC*, 17-CV-767,
2017 WL 3278898 (E.D.N.Y. Aug. 1, 2017) ....................................................................36

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..............................................................................7

*Barnes v. Marriott Hotel Servs., Inc.*, No. 15-CV-01409-HRL,
2017 WL 635474 (N.D. Cal. Feb. 16, 2017) ....................................................................21

*Boulton v. Inst. of Int'l Educ.*, 808 A.2d 499 (D.C. 2002)................................................44

*Bourbeau v. Jonathan Woodner Co.*, 549 F. Supp. 2d 78 (D.D.C. 2008) ........................12

*Brill v. Indianapolis Life Ins. Co.*, 784 F.2d 1511 (11th Cir. 1986) .................................43

*Buchannan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730 (D. Md. 2001) .......................10

*Carparts Distrib. Ctr., Inc. v. Automotive Wholesaler's Ass'n of Am.*,
37 F.3d 12 (1st Cir. 1994)........................................................................................34, 38

*Civil Rights Educ. & Enf't Ctr v. Hospitality Props. Tr.*,
867 F.3d 1093 (9th Cir. 2017) .........................................................................................20

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ........................................................21

*Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*,
765 F.3d 1205 (10th Cir. 2014) .......................................................................................19

*Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067 (N.D. Cal. 2015)..................................3, 6, 27, 28

*Ctr. for Law & Educ. v. U.S. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005)........................................................................................11

*Cullen v. Netflix, Inc.*, 600 F. App'x 508 (9th Cir. 2015) .................................................37

*Dean v. District of Columbia,* 653 A.2d 307 (1995) ............................................................1

*Del-Orden v. Bonobos, Inc.*, 17 Civ. 2744 (PAE),
2017 WL 6547902 (S.D.N.Y. Dec. 20, 2017) ................................................................36

*Disabled Ams. For Equal Access, Inc., v. Ferries Del Caribe, Inc.*,
405 F.3d 60 (1st Cir. 2005) ...........................................................................................18

*Doran v. 7-Eleven, Inc.*, 524 F.3d 1034 (9th Cir. 2008) ...............................................18

*Dudley v. Hannaford Bros. Co.*, 333 F.3d 299 (1st Cir. 2003) ........................................17

*Earll v. eBay, Inc.*, 599 F. App'x 695 (9th Cir. 2015) ...................................................37

*Equal Rights Ctr. v. Abercrombie & Fitch Co.*,
767 F. Supp. 2d 510 (D. Md. 2010) .............................................................................12

*Equal Rights Ctr. v. Hilton Hotels Corp.*, Civ. A. No. 07-1528 (JR),
2009 WL 6067336 (D.D.C. Mar. 25, 2009)...........................................................19, 20

*Equal Rights Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ..........................................................................8, 9, 10

*Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*,
749 A.2d 724 (D.C. 2000) ...........................................................................................12

*Ford v. Schering-Plough Corp.*, 145 F.3d 601 (3d Cir. 1998) .........................................39

*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011)...............................................17

*Holt v. Am. City Diner, Inc.*, No. 05-1745 (CKK),
2007 WL 1438489 (D.D.C. May 15, 2007).................................................................20

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977)............................15, 22

*Int'l Bhd. Of Teamsters v. United States,* 431 U.S. 324 (1977)........................................16

*J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356 (3d Cir. 2004) .....................................43

*Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006 (9th Cir. 2017).......................41

*Kim v. United States*, 632 F.3d 713 (D.C. Cir. 2011) .........................................................8

*Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184 (2d Cir. 2013)............................17, 20

*Lively v. Flexible Packaging Ass'n*, 830 A.2d 874 (D.C. 2003).......................................44

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ................................................................16

*Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530 (5th Cir. 2016) ..................39

*Mary Jo C. v. New York State and Local Ret. Sys.*,
707 F.3d 144 (2d Cir. 2013)................................................................................36, 42

*Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017)....................................................23

*Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33 (D.D.C. 2003)..................................................43

*Molovinsky v. Fair Emp't Council of Greater Wash. Inc.*,
683 A.2d 142 (D.C. 1996) ...................................................................................12

*Morgan v. Joint Admin. Bd., Ret. Plan of Pillsbury Co. & Am. Fed. Of Grain Millers,
AFL-CIO-CLC*, 268 F.3d 456 (7th Cir. 2001) .........................................................39, 40

*Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196 (D. Mass. 2012)............38, 42

*Nat'l Coal. to Ban Handguns v. Bureau of Alcohol, Tobacco & Firearms*,
715 F.2d 632 (D.C. Cir 1983) ................................................................................27

*Nat'l Fair Hous. All. v. Travelers Indem. Co.*,
261 F. Supp. 3d 20 (D.D.C. 2017) .........................................................................8, 10

*Nat'l Fed'n of the Blind v. Scribd, Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015)...........35, 36, 38

*Nat'l. Res. Def. Council v. E.P.A.*, 489 F.3d 1364 (D.C. Cir. 2007) ..........................15, 22

*Navarro v. Encino Motorcars, LLC*, 845 F.3d 925 (9th Cir. 2017).................................27

*Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063 (5th Cir. 1995).........................................27

*Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63 (2d Cir. 2012).....................32

*O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133 (N.D. Cal. 2015) ..............3, 6, 27, 29

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ..................................................35

*Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28 (2d Cir. 1999)......................................39, 40

*Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006 (6th Cir. 1997) .........................................34

*Parr v. L & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065 (D. Haw. 2000) ..............................21

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
797 F.3d 1087 (D.C. Cir. 2015)................................................................10

*PGA Tour, Inc. v. Martin,* 532 U.S. 661 (2001) ...............................24, 32, 33, 34

*Pickern v. Holiday Quality Foods, Inc.,* 293 F.3d 1133 (9th Cir. 2002) ..............17, 18, 44

*Pub. Citizen v. Fed. Trade Comm'n,* 869 F.2d 1541 (D.C. Cir. 1989)............................23

*Ramos v. Uber Techs., Inc.,* No. SA-14-CA-502-XR,
2015 WL 758087 (W.D. Tex. Feb. 20, 2015)................................................6, 27

*Ramos v. Uber Techs., Inc.,* Civ. A. No. SA-14-CA-502-XR,
2015 WL 222414 (W.D. Tex. Jan. 14, 2015) ..................................................18

*Reeves v. MV Transp., Inc.,* 845 F. Supp. 2d 104 (D.D.C. 2012)....................................25

*R.J. Reynolds Tobacco Co. v. U.S. Dep't of Agric.,*
130 F. Supp. 3d 356 (D.D.C. 2015).............................................................7

*Scherr v. Marriott Int'l, Inc.,* 703 F.3d 1069 (7th Cir. 2013) ...........................................20

*Spann v. Colonial Vill., Inc.,* 899 F.2d 24 (D.C. Cir. 1990) ......................................8, 9, 10

*Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111 (D.C. Cir. 2000)...................................7

*Spector v. Norwegian Cruise Line Ltd.,* 545 U.S. 119 (2005)................................5, 25, 36

*Tandy v. City of Wichita,* 380 F.3d 1277 (10th Cir. 2004) ...........................................17, 20

*Telecomm. Res. & Action Ctr. ex rel. Checknoff v. Allnet Commc'n Servs.,*
806 F.2d 1093 (D.C. Cir. 1986)...............................................................23

*Toomer v. City Cab,* 443 F.3d 1191 (10th Cir. 2006)......................................................32

*Turlock Irrigation Dist. v. F.E.R.C.,* 786 F.3d 18 (D.C. Cir. 2015) ..................................10

*Vill. of Bedford Park v. Expedia, Inc.,* 876 F.3d 296 (7th Cir. 2017)......................................28

*Walston-Jackson v. CCA of Tenn., Inc.,*
664 F. Supp. 2d 24 (D.D.C. 2009)...............................................................44

*Ward v. D.C. Dep't of Youth Rehab. Servs.,*
768 F. Supp. 2d 117 (D.D.C. 2011)..............................................................7

*Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104 (9th Cir. 2000)..................39

*Williams v. Savage*, 569 F. Supp. 2d 99 (D.D.C. 2008) ................................................37

*Wolff v. Beauty Basics, Inc.*, 887 F. Supp. 2d 74 (D.D.C. 2012) ...............................17

## **Statutes**                                                                    **Page(s)**

42 U.S.C. § 2000a ..........................................................................................33

42 U.S.C. § 12181(7) .....................................................................................33

42 U.S.C. § 12181(7)(F) ............................................................................5, 33

42 U.S.C. § 12181(10) ..................................................................................25

42 U.S.C. § 12182(a) ..............................................................27, 30, 32, 34,

42 U.S.C. § 12182(b)(2)(A)(ii) ....................................................................41

42 U.S.C. § 12183(a) ....................................................................................30

42 U.S.C. § 12184(a) ...........................................................5, 24, 25, 27, 29

42 U.S.C. § 12184(b) ....................................................................................30

42 U.S.C. § 12184(b)(3) ...............................................................................30

42 U.S.C. § 12188(a)(1) ..........................................................................12, 16

D.C. Code § 2-1401.02 ..................................................................................43

D.C. Code § 2-1403.16(a) .........................................................................12, 44

D.C. Code § 50-301.25 ..................................................................................31

D.C. Code § 50-301.25(c)(1)(C) .................................................................. 31

## **Regulations and Agency Materials**                                            **Page(s)**

28 C.F.R. § 36.307(a) .....................................................................................40

49 C.F.R. § 37.29(a) ..................................................................................25, 29

49 C.F.R. 37.29(b) .........................................................................................30

**<u>Other Authorities</u>**                                                                    **<u>Page(s)</u>**

Fed. R. Civ. P. 12(d) ............................................................................8

H. R. Rep. No. 101–485(II) (1990) .......................................................16

1990 U.S.C.C.A.N. 303 ........................................................................16

S. Rep. No. 101–116 (1989) .................................................................16

*The Taking Economy: Uber, Information, and Power*,
117 Colum. L. Rev. 1623 (2017) ..........................................................26

**INTRODUCTION**

This lawsuit challenges the continuing failure of Defendant Uber Technologies, Inc. ("Uber") to provide wheelchair users in the Washington, D.C. area with effective access to its ubiquitous ride-sharing service, which is now one of the area's primary means of transportation.[1] Plaintiff Equal Rights Center ("ERC") alleges that Uber's inaccessible service violates Title III of the Americans with Disabilities Act ("ADA") and the D.C. Human Rights Act ("DCHRA"). These laws collectively require entities "primarily engaged in the business of transporting people"; "travel services"; and "all public conveyances operated on land" to provide "full and equal enjoyment" of the services they offer. Title III, a key component of a landmark law, is meant to "afford people with disabilities equal access to the wide variety of establishments available to the nondisabled," *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 662 (2001). The DCHRA, meanwhile, is meant to be "a powerful, flexible, and far-reaching prohibition against discrimination of many kinds." *Dean v. District of Columbia*, 653 A.2d 307, 319 (D.C. 1995). Uber denies it is bound by these sweeping laws that require virtually all businesses open to the public to make their services accessible for people with disabilities, and it has acted consistent with this belief. ERC brings this suit to establish that Uber is not, in fact, above the law.

To say that Uber does not provide "full and equal enjoyment" of its service is a major understatement. When ERC filed this suit, Uber's 30,000-vehicle fleet in the D.C. area had *no* wheelchair accessible vehicles ("WAVs"); indeed, Uber's smartphone application ("app") provided no means by which to request an Uber-branded WAV, instead linking wheelchair users only to the inadequate supply of WAVs already in some D.C. taxicab fleets. Tests conducted by Plaintiff Equal Rights Center ("ERC") found that, whereas a non-wheelchair user typically

---

[1] Also Defendants are Rasier, LLC and Drinnen, LLC. Defendants are collectively referred to as Uber herein.

waited 3-6 minutes for a ride through Uber, wheelchair users waited 30-50 minutes for a Taxi WAV through Uber and had to pay more for the ride—if they could get a ride at all. After the inception of this suit, Uber belatedly introduced UberWAV, which in theory offers rides in Uber-branded WAVs. In practice, however, a wheelchair user calling an UberWAV remains lucky to wait "only" half an hour for a ride to arrive; often, such vehicles never show up at all. This unreliable and second-rate service is not remotely what Uber provides to non-wheelchair users.

The result is immense harm to wheelchair users, who are deprived of the benefits of a transportation service that could literally change their lives, permitting them to move freely about the D.C. area like other Uber customers. ERC, which, among other things, works to improve transportation options for people with disabilities, sues on behalf of itself and its members, including wheelchair user Heidi Case. For appointments, Ms. Case must arrange transportation hours or even a day in advance. She cannot spontaneously decide to go anywhere and simply arrive there (and be assured of return transportation). Ms. Case is eager for Uber to be accessible so she can gain the freedom and spontaneity in travel around town that others take for granted.

All of this is within Uber's power to remedy, as the First Amended Complaint ("Complaint" or "Compl.") lays out in detail. Uber exercises tight control over its drivers and the fleet of cars they drive. For example, Uber assists its drivers in financing and securing vehicles and prescribes which vehicles they can acquire and use in its service. It also regularly uses financial incentives to ensure that the supply of cars on the road meets demand. All Uber would have to do to ensure an accessible fleet is provide similar financial incentives for drivers to use WAVs, at an expense easily manageable for a company of Uber's magnitude. But it chooses not to do so. For any other major business, this would constitute a clear ADA violation. To avoid

liability, Uber claims exemption from the rules binding every other company and makes Complaint-defying (and reality-blinking) assertions that it is a bit player in its own business.

From the very first line of its Memorandum of Law in Support of Defendants' Motion to Dismiss First Amended Complaint ("MTD" or "Motion to Dismiss"), Uber spins out the alternate reality in which its Motion to Dismiss is set. This universe is quite different from the one described in the Complaint, which (unfortunately for Uber) must be treated as true.

In Uber's world, it is a mere "technology company," a developer of software and smartphone apps. Thousands of independent drivers just happen to be driving around in their own vehicles looking for riders, and Uber does nothing more than distribute software that facilitates the connection. Uber has nothing to do with the cars its drivers use, the ride requests they accept, or anything else regarding a service that, ultimately, drivers provide to riders.

Much can be said about the world of Uber's Motion, but what is most relevant for now is that it is not the world of the Complaint's allegations, *i.e.*, the real world for this Motion. Put simply, Uber moves to dismiss a very different complaint than the one ERC filed.

ERC's Complaint alleges that Uber extensively controls every aspect of the Uber-branded service. It advertises the service; facilitates (and controls) its drivers' car acquisitions; fields and distributes ride requests; and determines the fare (which is collected by Uber, not the driver). From the rider's perspective—the one relevant to a public accommodation claim—Uber is a transportation company, not a software company. "Uber does not simply sell software; it sells rides." *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1141 (N.D. Cal. 2015); *see also Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015) (calling "obviously wrong" Lyft's assertion that it "merely furnish[es] a platform that allows drivers and riders to connect").

Uber's failure to accept the Complaint's allegations (and, in some places, controlling law) pervades every aspect of its Motion, including with respect to ERC's standing. Many of Uber's arguments also are based on a misunderstanding of what relief the Complaint seeks.

**First**, under settled D.C. Circuit law governing organizational standing, ERC may seek redress for the harm Uber's conduct has caused it. ERC alleges that Uber's conduct frustrated its mission and caused it to divert resources into educating community leaders about Uber's discriminatory activity and its impact. These are activities of the sort that long have sufficed for Article III standing. Uber's argument that ERC claims only a "self-inflicted" injury simply regurgitates an argument that the D.C. Circuit already has rejected, while its contention that ERC claims standing for "lobbying" activity mischaracterizes the Complaint. *See* Section II.A.

Uber's argument that ERC lacks a private right of action to remedy its organizational harms fares no better. Uber focuses on language in Title III that, it claims, precludes organizational claims. But ERC relies on the DCHRA, not Title III, to redress organizational harm—and the DCHRA has the language that Uber contends Title III lacks. *See* Section II.B.

Relying on its alternative facts, Uber asserts that it does not cause its own service's inaccessibility, nor can it remedy that inaccessibility. This argument fails to acknowledge (let alone accept as true) the Complaint's key allegations. Similarly misplaced is Uber's contention that ERC must plead an injunction satisfying Federal Rule of Civil Procedure 65. ERC does not seek a preliminary injunction, and it is not required to plead one. *See* Section II.C.

**Second**, ERC has associational standing to represent its members' claims for injunctive relief. Member Heidi Case is eager to use Uber, and the Complaint explains why: accessible, on-demand transportation would change her life. This easily suffices for her standing—Uber's inaccessible service harms her, compelling Uber to become accessible would help her. Title III

specifically provides that she need not make the "futile gesture" of downloading Uber's app and attempting to call an UberWAV when she knows the service is inaccessible. *See* Section III.A.

Additional members need not participate in a claim seeking only injunctive relief. Uber's arguments to the contrary appear to be premised on the incorrect notion that ERC will seek individual damages for members, thus requiring a member-by-member inquiry into, among other things, whether each member agreed to arbitrate individual claims with Uber. But ERC is not asking for any such relief, so Uber's arguments are misplaced. *See* Section II.B.

**Third**, ERC pleads that Uber violates Title III of the ADA, as a "private entity that is primarily engaged in the business of transporting people," 42 U.S.C. § 12184(a), as a "travel service," 42 U.S.C. § 12181(7)(F), or both. Either way, Uber must provide "full and equal enjoyment" of its services. Uber does not contend that it does so. Instead, Uber—a company to which people pay money so they can be transported from one place to another—contends (maybe, but only maybe, with a straight face) that it is neither "primarily engaged in the business of transporting people" nor a "travel service." This proposition would surprise most Uber riders, from whose perspective Uber provides essentially the same service as a taxi. Attempting to defend it requires Uber to twist both the relevant statutory language and the Complaint's allegations beyond recognition. At the end of the day, the correct answer is the obvious one: Uber, like all other companies that charge people money for transport, must ensure equal enjoyment of its service for people with disabilities. *See Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 132 (2005) (cruise ships are "travel services;" alternative would be a "harsh and unexpected interpretation of a statute designed to provide broad protection for the disabled.").

Uber's arguments are premised on its alternative reality, where it merely "networks riders and Drivers." MTD at 24. The Complaint says otherwise. It alleges that riders contract with

Uber, not drivers, for transportation, and that Uber assumes control of fulfilling those requests. Uber and its ilk have repeatedly tried to escape the coverage of Title III and other laws based on such refusal to accept a complaint's description of their business, and courts have repeatedly (and correctly) held that such argument is improper on a motion to dismiss. *See O'Connor*, 82 F. Supp. 3d at 1141; *Cotter*, 60 F. Supp. 3d at 1078; *Ramos v. Uber Techs., Inc.*, No. SA-14-CA-502-XR, 2015 WL 758087, at *10 (W.D. Tex. Feb. 20, 2015) ("*Ramos* I").

Uber also gets the law wrong. It contends that Title III regulates only the entity that physically conveys passengers—*i.e.*, its drivers—but struggles unsuccessfully to square that with the plain language of Title III, which applies to entities "*in the business of* transporting people." And while Uber relies heavily on regulations exempting taxi companies from an obligation to purchase or lease accessible automobiles, it fails to explain how those regulations apply here. Uber is *not* a taxi company and this suit does *not* ask that Uber be required to purchase or lease automobiles, only that it provide accessible service. *See* Section IV.A.

Uber similarly errs in arguing that it cannot be a "travel service" simply because, in its view, it has insufficient physical presence. In drafting the ADA, before the Internet and smartphones, Congress used "place of public accommodation" as a catch-all term, not to limit a law meant to apply to virtually all businesses—and to continue doing so despite changes of technology—because an entity offers its services over a smartphone. To argue that precedent nonetheless calls for a result so contrary to Congress's clear intent, Uber reads overbroadly a series of cases that say nothing about websites or apps, but decline to extend Title III coverage to such unlikely subjects as insurance plans and vending machines. Whether or not Title III covers those services, it surely covers Uber's. *See* Section IV.B.

**Fourth**, Uber's DCHRA-specific arguments misunderstand that vital civil rights law. Far from exempting entities like Uber from coverage, it specifically regulates "public conveyances" such as Uber. Nor does a DCHRA claim disappear a year after discrimination is discovered (as Uber contends) when, as here, the discriminatory activity continues to this day. *See* Section V.

Uber's Motion to Dismiss should be denied.

## ARGUMENT

### I.     Law Applicable to a Rule 12(B)(6) Motion to Dismiss

Uber's Motion repeatedly fails to comport with the most fundamental rules governing Rule 12(b)(6) motions. It relies on facts not in the Complaint (or contrary to the Complaint) and resorts to drawing inferences against the Plaintiff. None of this is proper in a motion to dismiss.

To survive a motion to dismiss, a complaint need only "'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *R.J. Reynolds Tobacco Co. v. U.S. Dep't of Agric.*, 130 F. Supp. 3d 356, 370 (D.D.C. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This minimal plausibility threshold is met so long as "the pleaded factual content 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *R.J. Reynolds Tobacco Co.*, 130 F. Supp. 3d at 370 (quoting *Iqbal*, 556 U.S. at 678). The court must treat the complaint's factual allegations as true and afford the plaintiff "'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted).

In ruling on a 12(b)(6) motion, the trial court may consider only facts contained within the four corners of the complaint. It may not consider matters, documents, or other materials beyond the pleadings. *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119-20 (D.D.C. 2011). A trial court may only consider materials outside the pleadings by converting the

motion into one for summary judgment, *Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011), and it may not do that unless "[a]ll parties [are] given a reasonable opportunity to present all the material that is pertinent to [a Rule 56] motion." Fed. R. Civ. P. 12(d).

The arguments below, unlike Uber's, are based on the Complaint's allegations, with relevant allegations referenced as necessary.

## II.     ERC Has Standing Under the DCHRA to Remedy Damages to Itself

### A.  *ERC Has Pleaded That It Suffered an Injury Conferring Article III Standing*

ERC pleads facts that, under this Circuit's precedent, establish its Article III standing to challenge Uber's conduct. An organization may challenge discrimination that prompts the organization to devote extra resources (independent of investigating and maintaining the lawsuit) to combat the effects of the defendant's violations. *See Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (R.B. Ginsburg, J.). For an organization, "the key issue is whether it suffered a concrete and demonstrable injury to its activities rather than a mere setback to its abstract social interests" as a result of the defendant's actions. *Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 25 (D.D.C. 2017) (internal quotations and brackets omitted) (citing *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015)). That is exactly what ERC alleges happened here.

Uber's refusal to make its service accessible to wheelchair users frustrates ERC's mission, which includes ensuring that people with disabilities have equal choices and opportunities. *See* Compl. ¶¶ 14, 17, 105-106. Uber does not appear to argue that ERC fails to adequately plead frustration of its mission, nor would such an argument have merit.

As a result of this mission frustration, ERC diverted time and resources into counteracting Uber's discriminatory conduct. Compl. ¶ 106. For example, ERC engaged in outreach to community leaders and public officials, educating them on the inaccessibility of Uber's service and its impact on transportation options for people with disabilities. *Id.* ¶ 107. These discussions educated various interested people about Uber's inaccessibility and the implications for D.C. wheelchair users, to ensure that wheelchair users know available transportation options in light of Uber's inaccessibility and the general public (as well as D.C. leadership) knows how Uber's inaccessibility fits into that larger picture. They did not involve lobbying for specific measures. *Id.* ERC also expended time and resources investigating the extent of Uber's inaccessibility. Compl. ¶ 108. This included surveying ERC members to fully understand the impact that Uber's inaccessibility has on them. *Id.* As a result of this diversion of resources caused by Uber's conduct, ERC was unable to pursue other important initiatives that would further ERC's mission, thus causing additional harm.[2] *Id.* ¶¶ 111-115. The bottom line is that ERC was forced to take action to educate the public because of the "direct conflict between the defendant's conduct and the organization's mission." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).

Under Circuit precedent, ERC has standing based on "alleged diversion of resources to programs designed to counteract the injury to its interest" in equal access for people with disabilities. *Equal Rights Ctr.*, 633 F.3d at 1140. It similarly is settled that "increased education and counseling" are activities that confer diversion-of-resources standing. *Spann*, 899 F.2d at 28. That should end the argument. Uber makes little effort to explain why ERC's allegations do not fit into the *Equal Rights Center-Spann* rule described above, choosing instead to largely ignore

---

[2] Uber does not appear to contest that ERC has adequately alleged this point.

that rule and suggest (wrongly) that an organization never has standing to challenge discriminatory behavior that frustrates its mission and requires it to divert resources.

For example, Uber suggests—citing an out-of-circuit district court case—that ERC cannot claim harm "because it chose to channel its funds this way." MTD at 8 (quoting *Buchannan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 737 (D. Md. 2001)). But the D.C. Circuit rejected this argument. *See People for the Ethical Treatment of Animals*, 797 F.3d at 1096-97 ("That an organization 'voluntarily or willfully . . . diverts its resources, however, does not automatically mean that it cannot suffer an injury sufficient to confer standing.'"). The question is not if resources were diverted "voluntarily," but if they were diverted (1) in response to the defendant's conduct; and (2) prior to litigation. *Id.* at 1097; *Equal Rights Center*, 633 F.3d at 1140-42; *Nat'l Fair Hous. All.*, 261 F. Supp. 3d at 27. The allegations here meet both criteria.

Uber also asserts that ERC's education and advocacy efforts are "lobbying" and cannot form the basis for standing. MTD at 8. This contradicts the Complaint, which expressly alleges that the specified activities were *not* lobbying and served a different function. Compl. ¶ 107. Lobbying involves influencing office-holders to take a particular action on an issue, such as by submitting comments to an agency or testifying before a legislature. *Turlock Irrigation Dist. v. F.E.R.C.*, 786 F.3d 18, 24 (D.C. Cir. 2015); *see id.* at 25 (collecting cases). That is not what ERC did here. Rather, ERC engaged with community leaders (only some of whom held office), not to ask for policy changes, but to educate "the broader public" about Uber's inaccessibility. Compl. ¶ 107. That is, ERC engaged with these community leaders to ensure that, when those leaders communicated with the public, they were providing accurate information regarding Uber's inaccessibility and its implications. *Id.* This is the sort of diversion of resources to community education that long has been held sufficient to confer standing. *Spann*, 899 F.2d at 27.

That some (but not all) of the community leaders involved happened to hold office does not transform these educational activities into lobbying. As the D.C. Circuit has recognized, many cases recognizing organizational standing entail diversion of resources to activities that, in a colloquial sense, "could just as easily be characterized as advocacy—and, indeed, sometimes are." *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 27 (D.C. Cir. 2011); *see, e.g. Abigail All.,* 469 F.3d at 132-33 (resources devoted to "helping its members and the public address the unduly burdensome requirements" challenged regulations were not "self-inflicted injury" because they did not amount to "challeng[ing] the regulation itself"). Sometimes those activities even involve interacting with government officials and agencies. *See, e.g., People for the Ethical Treatment of Animals*, F.3d at 1095-96 (activities included submitting complaints to state and federal agencies). That does not make them the "pure issue-advocacy" that is not a cognizable injury, *Ctr. for Law & Educ. v. U.S. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005), and the Complaint here *says* they were not. Moreover, ERC alleges that these activities diverted its time and resources from projects that include member counseling and education as well as advocacy. Compl. ¶¶ 111-115; *see Abigail All.*, 469 F.3d at 133 (under such circumstances, organizations fairly allege "that their *activities* have been impeded," in addition to their mission) (emphasis added). Uber may challenge these allegations in discovery, but on this Motion, taking them as true, its arguments fail.

### B.  ERC Has a Right of Action to Remedy Organizational Harm Under the DCHRA

Uber argues that Title III does not provide ERC with a private right of action to vindicate its organizational rights (as opposed to those of its members). This is so, it contends, because Title III provides a private right of action to any person "being subjected to discrimination on the

basis of disability." 42 U.S.C. § 12188(a)(1). MTD at 11-12. This argument misunderstands ERC's allegations and seeks dismissal of a claim that ERC does not bring.

Because the DCHRA, unlike Title III, provides a damages remedy, it is the law under which the ERC seeks to remedy its own damages here. ERC has established associational standing under Title III (to seek injunctive relief on behalf of its members)[3] and organizational standing under the DCHRA (to seek damages for its own injuries). It does not *also* seek organizational standing under Title III, which would add nothing.

To the extent Uber means this argument to apply to ERC's actual organizational standing claim, under the DCHRA, it is wrong. Uber generically asserts that ERC's DCHRA claim fails "for the same reasons," MTD at 5, 34, as ERC's ADA claim, but the language of DCHRA's private right of action is worded differently, making Uber's argument inapplicable. The DCHRA's private right of action extends to "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice." D.C. Code § 2-1403.16(a). This language, which admits to no prudential standing limitations, permits organizational standing, as courts routinely hold. *See Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 732-33 (D.C. 2000); *Molovinsky v. Fair Emp't Council of Greater Wash. Inc.*, 683 A.2d 142, 146 (D.C. 1996); *Equal Rights Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 530 (D. Md. 2010); *Bourbeau v. Jonathan Woodner Co.*, 549 F. Supp. 2d 78, 85 (D.D.C. 2008).

### C.  Uber Has Caused ERC Injuries and Can Remedy Them

Uber also contends that ERC's injuries are not caused by Uber's actions, nor can this Court remedy them with an order against Uber. That is so, Uber says, because it is *drivers* who refuse to acquire and use WAVs, and this Court can neither order the drivers to obtain WAVs

---

[3] Uber does not contend that ERC cannot enforce its *members'* Title III rights via associational standing.

nor force them to accept ride requests from wheelchair users desiring to travel in WAVs. MTD at 9. This "argument" amounts to ignoring ERC's well-pleaded allegations in favor of Uber's alternative reality that is not properly before this Court on a 12(b)(6) motion.

Uber assures that it has done, and continues to do, everything in its (sadly limited) power to get WAVs into its fleet. The problem, Uber says, is that WAVs "present uniquely challenging issues." MTD at 2. But not to worry: Uber is trying its best to make UberWAV work. *Id.* Ultimately, Uber reassures this Court, "Uber shares ERC's laudable goal of seeking to improve the lives of individuals with disabilities, and its actions prove it." *Id.* at 3. (Uber does not try to reconcile the obvious tension between saying its drivers alone are responsible, on the one hand, and assuring that Uber is solving the problem, on the other.)

Perhaps Uber's actions do "prove" the level of its commitment to improving the lives of people with disabilities. And those actions, as alleged in the Complaint—and which must, therefore, be taken as true—bear little resemblance to the happy story Uber tells in its brief.

The Complaint alleges that Uber has actively caused the lack of WAVs in its current fleet. For example, Uber has long refused—and continued to refuse until after this litigation began—to include an option on its app for D.C. wheelchair users to call for a non-taxi WAV, thus preventing drivers from realizing any benefit from such a vehicle. Compl. ¶¶ 35, 53. It has forced at least one driver who wanted to use a WAV to replace it. *Id.* ¶ 31.[4] And it has given drivers no reason to think that they *could* use WAVs, let alone *should* do so. *Id.* ¶ 65.

The Complaint also alleges that Uber can remedy the resulting inaccessibility of its service by using the many tools it routinely uses for other purposes to cause its D.C. fleet to include more WAVs. Compl. ¶ 30. The Complaint alleges that Uber exercises considerable

---

[4] Uber asserts that this allegation is "implausible," but does not back that up. For example, Uber asks why it would do such a thing when it offers UberWAV—ignoring that this incident occurred before UberWAV. *See* MTD at 33.

control over the vehicles its drivers use and acquire, including by providing financial incentives

to use certain vehicles and by helping to finance the acquisition of certain vehicles. Indeed, Uber

contends that it is taking steps to add WAVs to its fleet now, albeit half-heartedly, Compl. ¶ 38.

The Complaint further alleges, among other things, that:

- Uber dictates which car models can be used. Compl. ¶ 37.

- Uber "recommends" the use of certain car models for UberX, none WAVs. Compl. ¶ 65.

- Uber provides financial assistance to drivers in acquiring certain vehicles, none of which
  is wheelchair accessible. Compl. ¶ 37, 70.

- Uber has partnerships with rental car companies to assist drivers in obtaining weekly
  rentals, but these deals do not cover WAVs. Compl. ¶ 72.

- Uber is investing heavily to put more cars and options on the road. Compl. ¶ 32.

-  Uber uses driver incentives to ensure that its fleet has features accommodating other
  rider needs, such as car seats for riders with small children. Compl. ¶ 33.

- Uber otherwise moves aggressively to ensure that its drivers fully satisfy customer
  demand, Compl. ¶ 32, but it has failed to do so for wheelchair users even though WAVs
  would unleash "a vast and growing demand." Compl. ¶ 36.

Finally, the Complaint alleges that Uber has begun directly purchasing cars for the next

generation of its fleet, Compl. ¶ 37, and even partnering with manufacturers in the development

of self-driving cars. Compl. ¶ 73. That is, Uber's actions now will determine whether the next

generation of its fleet incorporates WAVs—and whether its vast market power will encourage or

discourage the production of WAVs more generally in next-generation cars.

Thus, the Complaint's allegations support, at the least, a reasonable inference (as must be

granted to ERC in this posture) that Uber has contributed to the lack of WAVs. If Uber believes

14

otherwise, it does not say; it largely ignores these allegations. Nor would any injunction have to run against Uber's drivers, because one against Uber can remedy the alleged discrimination. MTD at 10. Uber offers no argument otherwise that engages with the actual allegations of the Complaint, but instead chooses to rely on its own "facts" to contend that it is Uber's drivers' "intervening choices" that are to blame for the lack of WAVs in its fleet. MTD at 9.

Uber also complains, for no obvious purpose, that the Complaint fails to include requested final injunctive relief that is sufficiently specific to meet the requirements of Federal Rule of Civil Procedure 65. MTD at 10. But ERC is not asking for a preliminary injunction, and so is not yet required to plead the exact terms of the injunction it may later seek. Like much of the rest of Uber's Motion, this is not properly the subject of a motion to dismiss.

### III.    ERC Has Associational Standing

The ERC has associational standing to seek relief on behalf of its members. To have associational standing, an organization must demonstrate that (1) at least one member would have standing under Article III to sue in his or her own right; (2) the interests it seeks to protect are germane to its purposes; and (3) neither the claim asserted nor the relief requested requires that an individual member participate in the lawsuit. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Nat'l. Res. Def. Council v. E.P.A.*, 489 F.3d 1364, 1370 (D.C. Cir. 2007). Uber's Motion touches only on the first and third of these requirements, leaving uncontested (as it must) that ERC is seeking to protect interests germane to its mission of promoting accessibility for individuals with disabilities. Uber argues (1) that the ERC member named in the Complaint, Heidi Case, does not have standing and (2) that this lawsuit requires the participation of other ERC members. Both arguments are wrong.

### A. *Heidi Case Has Standing*

The Complaint describes in straightforward terms precisely how Uber's inaccessibility harms Ms. Case and how a favorable decision in this case would redress that harm, which is all that is required. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Ms. Case has a mobility disability and uses a motorized wheelchair. Compl. ¶ 99. Her current transportation options are woefully inadequate, and so she would like to use Uber's services, which would provide her new freedom to travel easily and spontaneously around the city. *Id.* ¶¶ 99-100. Ms. Case knows that Uber does not provide accessible service and has communicated with ERC regarding this issue. *Id.* ¶¶ 100-102, 106, 108.  Because signing up for Uber would not help her, she has not taken the futile steps of downloading Uber's app or trying to request a car through Uber. *Id.* ¶ 101. Ms. Case remains "eager" to use Uber once it is accessible. *Id.* ¶¶ 102-103.

All of this easily confers standing. Title III provides that someone in Ms. Case's position need not "engage in a futile gesture" such as trying to request a car through Uber before suing. *See* 42 U.S.C. § 12188(a)(1). This "futile gesture" language is taken directly from *Int'l Bhd. Of Teamsters v. United States,* 431 U.S. 324, 367-68 (1977), which held that plaintiffs who did not apply for promotions could nevertheless challenge the employer's racially discriminatory seniority system if they would have applied for the job but for the challenged practices. *See* H. R. Rep. No. 101–485(II) at 82–83 (1990) *reprinted in* 1990 U.S.C.C.A.N. 303, 365 ("The Committee intends for this doctrine to apply to this title"); S. Rep. No. 101–116, at 43 (1989). Congress thus recognized the unfortunate reality that people with disabilities are regularly shut out of access to public accommodations and should not be put to the demeaning and pointless task of rolling up to each obviously blocked door to enforce their rights.

Based on this rule, courts regularly hold that a person with a disability has standing to seek injunctive relief under the ADA based on knowledge that a service is inaccessible, an expression of intent to use the service once it becomes accessible, and an explanation of the *reason* for that intent, all of which Ms. Case has provided here. No more is necessary.

With this understanding, courts have explained that "under the ADA, once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury." *Pickern v. Holiday Quality Foods, Inc.,* 293 F.3d 1133, 1136–37 (9th Cir. 2002) (finding that plaintiff, who knew that supermarket was inaccessible, and was accordingly deterred from going, had suffered injury). This "futile gesture" rule means a plaintiff need not pointlessly try to enter inaccessible buildings. *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 188–89 (2d Cir. 2013) (customer had standing to sue inaccessible restaurant though he never attempted to enter). It means there is no requirement to roll up to inaccessible sidewalks. *Frame v. City of Arlington*, 657 F.3d 215, 236 (5th Cir. 2011). It applies (as in *Teamsters*, where it originated) to excuse plaintiffs from making pointless applications. *See Wolff v. Beauty Basics, Inc.*, 887 F. Supp. 2d 74, 77–78 (D.D.C. 2012) (individual who did not apply to cosmetology school after learning that school would not provide ESL interpreter suffered injury sufficient for standing). It excuses plaintiffs from asking for service at an establishment where they know from experience they will be turned away. *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 305 (1st Cir. 2003).

The futile gesture rule applies where a barrier does not exclude a person from *any* access to a service, but diminishes the service's utility enough to make it discriminatory. For example, in a case with facts closely analogous to these, the Tenth Circuit found it sufficient that a wheelchair user expressed the intent to use a bus system several times per year if chronically

17

malfunctioning wheelchair lifts were fixed. *See Tandy v. City of Wichita*, 380 F.3d 1277, 1284–85 (10th Cir. 2004). The bus system was *sometimes* usable for her, but too unreliable to plan around, because the lifts malfunctioned twenty to thirty percent of the time. *Id.* She was found to have standing without continuing to make futile attempts to use the bus system. Similarly, a wheelchair user had standing to sue a cruise ship company where he could literally board the ship and receive *some* service, but the lack of ramps, accessible restrooms, and other problems severely diminished his enjoyment of it. *Disabled Ams. For Equal Access, Inc., v. Ferries Del Caribe, Inc.*, 405 F.3d 60 (1st Cir. 2005). Under those circumstances, the plaintiff had standing based on expressed intention to use the service once it was accessible; he did not have to use the service while it was *inaccessible* to confirm that intent. *Id.* at 64-65.

Against this background, another district court ruled that a wheelchair user need not actually try to use Uber's service and be denied in order to sue. *See Ramos v. Uber Techs., Inc.*, Civ. A. No. SA-14-CA-502-XR, 2015 WL 222414, at *2–4 (W.D. Tex. Jan. 14, 2015) ("*Ramos II*"). As *Ramos II* correctly found, this is a straightforward application of the futile gesture rule: "If the plaintiff knows a business has no accessible entrance, the plaintiff should not be forced to go to the building and sit outside. The injury—being unable to enter the building—exists either way." *Id.* at *4. Though this case is directly on point, Uber does not mention it.

What ERC has pleaded here is precisely what is required under the futile gesture rule: (1) knowledge of the barrier and (2) a sufficiently concrete desire to use the public accommodation, but for the barrier. *See Pickern*, 293 F.3d at 1135. Such knowledge need not derive from first-hand experience; a plaintiff can, as here, learn of the barrier from someone else. *See Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1046 (9th Cir. 2008) (plaintiff has standing to challenge not only barriers he personally encountered, but also others he has learned about). Uber does not appear to

question Ms. Case's knowledge of its inaccessible service, other than to note that its service has evolved since Ms. Case first learned of its inaccessibility. MTD at 14. Of course, the Complaint also alleges that Ms. Case is in close contact with ERC, Compl. ¶ 102, which in turn has continued to work closely with the disability community to stay up-to-date as to Uber's accessibility. *Id.* at ¶¶ 106, 108. And, in any event, it also alleges that Ms. Case remains unable to use Uber for her desired purposes though she is eager to do so, and so her alleged knowledge (that Uber still lacks the WAVs necessary for accessible, non-discriminatory service) remains correct. *Id.* ¶ 102. Uber wisely does not press the point. Indeed, the Complaint's explanation of Ms. Case's personal knowledge, obtained through her friends and contacts, far exceeds what was found sufficient at the pleading stage in *Equal Rights Ctr. v. Hilton Hotels Corp.*, Civ. A. No. 07-1528 (JR), 2009 WL 6067336, at *3 (D.D.C. Mar. 25, 2009), where an individual's knowledge could be inferred from generally pled allegations of a hotel's inaccessibility.

Uber more vigorously argues that Ms. Case lacks a concrete desire to use its service once it is accessible. MTD at 13-15. This argument is laughable. Ms. Case is not merely *interested* in using Uber; she is "eager" to do so. Compl. ¶ 102. And the Complaint explains why: Uber would be a game-changer for Ms. Case's life. It would vastly expand her transportation options and make it possible for her to do things others take for granted. Currently, she must schedule rides hours or even a full day in advance, and she has no ability to spontaneously decide to travel. Accessible and reliable Uber service would change all that. *Id.* ¶¶ 99-102.

Uber ignores these allegations, wrongly asserting that Ms. Case's expressions of interest are conclusory. Even if it did challenge the sufficiency of the relevant allegations, any such argument would fail. Ms. Case expresses a more concrete desire to use Uber's service than is necessary at the pleading stage. *See Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*,

765 F.3d 1205, 1211 (10th Cir. 2014) (pleading that plaintiff will likely go to mall six times a

year and intends to return to specific store when she does so is sufficient); *Hilton Hotels Corp.*,

2009 WL 6067336, at \*3 (pleading that an individual "has a continuing desire to vacation at the

Hilton Oceanfront Resort" is sufficient); *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074–76

(7th Cir. 2013) (enough that plaintiff would like to stay at Overland Park Courtyard Marriott, her

extended family lives near hotel, and her cousin is getting married in that area); *Tandy*, 380 F.3d

at 1284–85 (stated desire to use Wichita Transit's buses "several times per year" sufficient);

*Kreisler,* 731 F.3d at 187–88 (plaintiff alleged he would like to go to a restaurant, he passes by it

three to four times a week, and he frequents other restaurants in the neighborhood); *Civil Rights*

*Educ. & Enf't Ctr v. Hospitality Props. Tr.*, 867 F.3d 1093, 1099 (9th Cir. 2017) (plaintiffs'

allegations that they "intend to visit the relevant hotels, but have been deterred from doing so"

were sufficiently "concrete and particularized" to demonstrate injury even though plaintiffs had

never visited the hotels at issue). In none of these cases did any individual express a stronger

motive for taking the intended action than that alleged here.

     This case thus is nothing like *Holt v. Am. City Diner, Inc.*, No. 05-1745 (CKK), 2007 WL

1438489, at \*4–8 (D.D.C. May 15, 2007), on which Uber heavily relies—and even *Holt* would

not support dismissal on the pleadings. In *Holt*, a district court granted summary judgment to the

defendant, finding that plaintiff failed to demonstrate a genuine desire to eat at an inaccessible

diner. The only relevant evidence plaintiff introduced was that he was in the "area" three times a

week and had the "intent" to dine at the restaurant. *Id.* at \*6. That might suffice on a motion to

dismiss, *Holt* found, but to survive summary judgment the plaintiff had to adduce more concrete

evidence, such as that he enjoys diner food, or specify how close he would be to the diner. That

is, plaintiff did "not indicate why he would like to return to the American City Diner

Restaurant," making his bare statement of intent conclusory. *Id.* at *8. Here, by contrast, Ms. Case explains in significant detail why she is so "eager" to use Uber. Uber's other cited cases similarly are nothing like this one and do not support its position.[5]

Unable to point to cases denying standing on comparable facts (even at the summary judgment stage, let alone on the pleadings), Uber resorts to faulting ERC for failing to plead that Ms. Case would take each constituent step required to sign up for and then use Uber. According to Uber, ERC was required to plead that Ms. Case (1) has (or would acquire) a smartphone; (2) has (or would acquire) "an active App Store or Play Store account"; (3) has a credit card or other payment method; (4) would provide her e-mail address, phone number and payment method; (5) would download the Uber app; and (6) would agree to Uber's terms of use. MTD at 14-15. One wonders why Uber stops there. Under its analysis, surely ERC should also plead that Ms. Case would search among the available apps to find the Uber app in the App or Play Store, then would hold her phone in one hand and press the screen with the other to download the app.

Unsurprisingly, Uber cannot cite a single case requiring the pleading of remotely this level of detail. A statement that someone intends to download and use Uber naturally implies intent to take each of the actions required to do so—particularly when each step is so simple and obvious that there is no reason to doubt the ability and intent to take it. For example, stated intent to visit a store or restaurant has been held sufficient in all the cases cited above, without also pleading that the plaintiff owns shoes and therefore can meet the establishment's "No Shoes, No

_____

[5] *See, e.g., Parr v. L & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1079–80 (D. Haw. 2000) (assessing intent to return where plaintiff did *not* invoke the futile gesture doctrine and finding sufficient where plaintiff had only visited the location at issue once, but liked the larger restaurant chain to which the challenged establishment belonged and lived a "reasonable distance" from the restaurant); *Barnes v. Marriott Hotel Servs., Inc.*, No. 15-CV-01409-HRL, 2017 WL 635474, at *8–9 (N.D. Cal. Feb. 16, 2017) (finding insufficient evidence at summary judgment stage of intent to return where plaintiff lived over 100 miles from the hotel, testified that she has no intention of returning to the hotel, and had not been back in the region for four years); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013) (concern that the government could intercept the plaintiff's communications through Foreign Intelligence Surveillance Act wiretaps in the future insufficient to establish imminent injury).

Service" policy. To the extent that Uber impugns Ms. Case's credibility on the basis that she has

not taken futile actions such as downloading the Uber app and attempting to summon a WAV,

*see* MTD at 15, it is merely complaining about Title III's futile gesture rule, the existence of

which is not up for debate. None of this comes close to undermining the plausibility of Ms.

Case's stated intent to use Uber or her standing to challenge Uber's inaccessible service,

particularly at the pleading stage, where inferences must be taken in ERC's favor.

While Uber wisely refrains from explicitly making such an argument, its briefing

suggests that there is something unusual or untoward about an association proceeding on behalf

of only one named member. Far from it. As courts have declared many times, associational

standing requires a showing only that "*at least one member* would have standing under Article

III to sue in his or her own right." *Nat. Res. Def. Council*, 489 F.3d at 1370 (emphasis added).

Thus, it is not ERC's burden to eventually prove—let alone plead—that additional members

would have standing at all, let alone whether they would be bound by an arbitration clause.

### B.  No Other ERC Member Needs to Participate in This Litigation

Uber similarly errs in arguing that ERC cannot litigate on behalf of its members because

the members must personally participate in this litigation. MTD at 15-17. Its arguments

misunderstand ERC's associational standing claims and what facts are relevant to them.

Contrary to Uber's assertion, *see* MTD at 15, ERC does not seek damages on behalf of its

members. Rather, it seeks damages only to remedy its *own* harm—*i.e.*, in the capacity for which

it claims organizational standing, not associational standing. Thus, Uber weakens its own

position by correctly pointing out that, in determining whether individual members must

participate in litigation, the pursuit (or non-pursuit) of damages is highly relevant. Injunctive

relief, such as ERC seeks for its members here, does not require individual participation. *See*

22

*Hunt*, 432 U.S. at 343 (finding that declaratory and injunctive relief do not require individual participation); *Pub. Citizen v. Fed. Trade Comm'n*, 869 F.2d 1541, 1545–46 (D.C. Cir. 1989) (finding that declaratory and injunctive relief do not require individual participation).

Uber then asserts that any member harmed by Uber's inaccessibility agreed to Uber's terms of service and would have to arbitrate her individual claim. MTD at 16-17. This is demonstrably untrue, as evidenced by Ms. Case, who has standing (as described above) and has not agreed to Uber's terms of service.[6] Moreover, the Complaint does not mention any arbitration clause, making arguments based on such a clause improper on this Motion. That other cases discuss Uber's arbitration clause, *see* MTD at 16 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 71 (2d Cir. 2017)), does not make it fair game on a Rule(12)(b)(6) motion.[7]

Uber's arbitration-based arguments fail at the outset, yet it marches on, arguing, first, that organizations cannot litigate on behalf of members bound to arbitrate their own claims, and second, that litigating this case will require sorting through ERC's members to determine who is bound to arbitrate. MTD at 16. These arguments appear to be based on the misplaced notion that ERC is seeking individualized damages for each injured member, which it is not. *See* MTD at 17 (citing *Telecomm. Res. & Action Ctr. ex rel. Checknoff v. Allnet Commc'n Servs.*, 806 F.2d 1093, 1095-1096 (D.C. Cir. 1986), which holds that associational standing may not be used to seek damages for individual members rather than using class certification). It is otherwise hard to

---

[6] While ERC does not and need not point to any other member with standing, it is not surprising that other ERC members (who know from ERC that Uber's service is inaccessible) similarly have been deterred from signing up with Uber but would like to do so should the service become accessible and reliable for them. The same holds true for anyone else who uses a wheelchair and desires to ride in an Uber with a friend, family member, or co-worker who is an account-holder, as non-wheelchair users do all the time.

[7] Uber does not make a motion to compel arbitration or any other motion that would permit it to introduce evidence beyond the pleadings. Indeed, it does not even put the text or other details of the supposedly relevant arbitration agreement before this Court, but just states as a "fact"—rather than a legal conclusion that it must prove—that its users are required to arbitrate claims such as these.

23

fathom why Uber thinks a member-by-member inquiry is necessary (it does not say). In truth, there is no such need in a suit seeking injunctive relief benefiting every member simultaneously.

## IV.    ERC Adequately Pleads That Uber Violated Title III of the ADA

ERC alleges that Uber violates Title III of the ADA under two different theories. First, and most obviously, Uber violates 42 U.S.C. § 12184(a), which bars disability discrimination by an entity "primarily engaged in the business of transporting people." That perfectly describes Uber's business model, as alleged in the Complaint. Uber's only arguments for escaping § 12184 coverage rely on changing the alleged facts—such that it is not actually in the business of transporting people, but is a mere software developer—or on changing the law, such that it applies only to *entities that transport people* rather than those *in the business of transporting people*. Neither argument is convincing.

In the alternative, ERC alleges that Uber violates 42 U.S.C. § 12182, which bars disability discrimination by any "place of public accommodation." That term of art is defined to include a "travel service," which fits Uber's self-description, *i.e.* a broker between rider and driver. Uber argues that, even if it otherwise acts as a "travel service," it cannot be a "place of public accommodation" without a physical "place." This ignores the unusually broad way in which Congress defined "place of public accommodation" to cover all of the "wide variety of establishments available to the nondisabled." *PGA Tour, Inc.*, 532 U.S. at 662.

### A.   ERC Pleads That Uber Violates § 12184

Title III bars disability discrimination "in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people." 42 U.S.C. § 12184(a). Uber argues, first, that it is not "primarily engaged in

the business of transporting people," and second, that its failure to provide an accessible fleet does not constitute "discrimination." Both arguments are wrong.

> **1.  *Uber Violates § 12184 Because It is "Primarily Engaged in the Business of Transporting People" and Does Not Provide "Full and Equal Enjoyment"***

Title III's non-discrimination requirements apply to any entity "that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a). Such an entity may not discriminate on the basis of disability "in the full and equal enjoyment of specified public transportation services." *Id.* A service that provides the general public with on-demand, point-to-point rides—as Uber's does—is a "specified public transportation" service. *See* 42 U.S.C. § 12181(10) (term includes any "conveyance" provided to "the general public . . . on a regular or continuing basis"); *see also* 49 C.F.R. § 37.29(a) ("taxi service" is covered); *Reeves v. MV Transp., Inc.*, 845 F. Supp. 2d 104, 106 (D.D.C. 2012) (paratransit service provider covered). Indeed, Uber's service—which closely resembles a taxi service—is a far more paradigmatic example of "specified public transportation" than others found covered. *See Spector*, 545 U.S. at 129 ("no serious doubt" cruise ships qualify).

As a preliminary matter, Uber does not (and could not) dispute that it provides wheelchair users with nothing resembling "full and equal enjoyment" of its transportation services. It does take misguided potshots at allegations about fares wheelchair users pay and are charged, but only succeeds in wounding itself. For example, Uber complains that ERC relies on the quoted fare for an UberWAV ride rather than the actual fare charged. *See* MTD at 34. As the Complaint explains, this is because the UberWAV never showed up. Compl. ¶ 95. ERC readily concedes Uber's point that it is difficult to reliably test the fares of a service that does not work.[8]

---

[8] Uber similarly misses the mark regarding the Complaint's comparison of Uber and taxi fares. *See* MTD at 33-34. ERC does not blame Uber for the generally higher price of taxis; rather, ERC holds Uber responsible for the fact that wheelchair users using its service are relegated to higher-priced taxis because Uber does not serve their needs. ERC

Instead, Uber—which people pay to transport them from one point to another—makes the astonishing claim that it is not "in the business of transporting people," and thus need not provide full and equal enjoyment of its services to people with disabilities.[9] Uber appears to concede that its *drivers* are in that business, but contends that it is merely "a technology company that networks riders and Drivers." MTD at 24. This argument may well fail on its own terms; a company that merely "networks riders and Drivers," such as Uber describes itself, certainly sounds like it is "in the business of transporting people." But more fundamentally, Uber's argument fails because it is premised on a self-description of Uber's business model that is inconsistent with the Complaint's allegations, which must be taken as true on this Motion.

Uber, not its drivers, advertises its transportation services—including with ads targeted to people with disabilities that do not require the use of WAVs. Compl. ¶ 34. It makes claims—a person in any D.C.-area neighborhood can get an Uber anytime—that only Uber as a unified service, not an individual driver, could make. Compl. ¶¶ 4, 63. Uber determines the fee for those services and accepts payment directly from riders. *Id.* ¶ 46, 55. Uber tells its drivers whom to pick up (in Uber-branded vehicles), where to pick them up, and how to get there. *Id.* ¶¶ 45, 62.[10] Uber assists drivers in securing vehicles and controls vehicle selection. *Id.* ¶¶ 6, 7, 8, 37, 64-75. Uber offers services that require the use of certain specialized vehicles, such as luxury or oversized vehicle services, and then sets corresponding ride pricing. *Id.* ¶¶ 29, 33, 49. And Uber uses surge pricing and other tools to ensure that driver supply meets demand. *Id.* ¶¶ 55, 62.

---

agrees with Uber that UberX and TAXI WAV are "apples and oranges." *Id.* at 34. That is the point: Wheelchair users get oranges while others get apples.

[9] Uber does not contend that its operations do not affect commerce, nor would such a contention be viable.

[10] Uber does not tell its drivers where they are taking their passengers until rides begin, in order to ensure that drivers exercise no independent volition. *See* Ryan Calo & Alex Rosenblatt, *The Taking Economy: Uber, Information, and Power*, 117 Colum. L. Rev. 1623, 1661 (2017).

Put simply, riders contract with Uber, not individual drivers, for transportation services, and Uber assumes control of fulfilling those requests. It is hard to imagine being more "in the business of transporting people." As one court aptly put it, "Uber does not simply sell software; it sells rides." *O'Connor*, 82 F. Supp. 3d at 1141; *see also Cotter*, 60 F. Supp. 3d at 1078 (calling "obviously wrong" Lyft's assertion that it "merely furnish[es] a platform that allows drivers and riders to connect"). Uber is the transportation provider, the driver a mere sub-contractor. This Court should reject Uber's argument that it is not "in the business of transporting people," as other courts have, as one that must await discovery and presentation of factual evidence on summary judgment. *See Ramos I*, 2015 WL 758087 at *10 (W.D. Tex. Feb. 20, 2015).

Uber is as wrong on the law as it is on the facts. It rewrites the ADA's text so as to carve itself out. The actual text covers entities "primarily engaged *in the business of* transporting people." 42 U.S.C. § 12184(a) (emphasis added). That is, coverage depends on whether transportation is a company's primary business. That surely includes Uber, the entity that is *profiting from* and *directing* the transportation.[11] Nonetheless, Uber says the statute covers only the entity "actually conveying passengers from place to place." MTD at 24. This reads the words "in the business" out of the phrase "in the business of transporting people."[12]

Uber points to cases construing employment laws that do not include such language. These cases just illustrate why Congress chose to formulate Title III's text differently. MTD at

---

[11] That drafting choice in § 12184, which pertains specifically to transportation services, is consistent with the general rule for public accommodations: the non-discrimination requirement extends to "any person who owns, leases (or leases to), *or operates* a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added); *see Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063, 1066 (5th Cir. 1995) (to "operate" a public accommodation is to "control or direct the functioning of" it, not to own it).

[12] Uber offers a convoluted analysis of "engage" and "transport" that still does not account for "in the business of." MTD 24-25. It addresses the inconvenient "in the business" only in a footnote, asserting that the term rules out "[o]ccasional, casual, or hobby activities" and requires the activity to be "undertaken 'for the purpose of a livelihood or profit.'" MTD at 25 n.7 (quoting *Nat'l Coal. to Ban Handguns v. Bureau of Alcohol, Tobacco & Firearms*, 715 F.2d 632, 635 (D.C. Cir 1983)). It is unclear what the relevance of this is, since Uber is alleged to be doing all of this for profit, not hobby.

25-26. In *Navarro v. Encino Motorcars, LLC*, 845 F.3d 925, 931 (9th Cir. 2017), the question was whether certain *employees* were "engaged in servicing automobiles" and therefore exempted from overtime requirements. In that context—employees' rights—it mattered whether those employees were doing the servicing. Here, Congress chose to make Uber's non-discrimination mandate turn on whether it is in the business of transportation, not who does the transporting.

When Uber does cite a case involving "in the business of" language—*Village of Bedford Park v. Expedia, Inc.*, 876 F.3d 296 (7th Cir. 2017)—it ignores the court's actual reasoning, which hurts Uber's case rather than helping it. In *Village of Bedford Park*, hotel bookers such as expedia.com were not "engaged in the business of renting hotel rooms" under municipal tax ordinances. *Id*. At 305. But that was because they are not "operators" of the rental business. *Id.* at 304-05. Rather, bookers assist in a transaction that is independent of the core rental business, which (the court found) requires ownership or control of the property. *Id.* at 303. With or without the bookers' involvement, the hotels would rent rooms and perform attendant tasks (such as room cleaning and customer service); bookers provide them a service but are not in the same business. *Id.* But here, Uber is the business "operator" calling the shots. It is not a mere broker of transportation services in the way that expedia.com is a broker of hotel rentals. *See Cotter*, 60 F. Supp. 3d at 1078 (rejecting Lyft's similar attempt to equate itself as mere broker, rather than operator, of transportation services). Without Uber's involvement, there would be no service. There would be no Uber drivers on the road and no way for riders to connect with them.

Uber also relies on *other* statutory provisions not at issue in this case. It reasons that, because it does not engage in *other* activities that Title III regulates, such as purchasing or leasing certain vehicles and operating terminals or depots, it must not be subject to the broader non-discrimination requirement for transportation services. MTD at 25. This misunderstands the

28

structure of § 12184, which broadly bans discrimination "in the full and equal enjoyment" of transportation services, *see* 42 U.S.C. § 12184(a), and then specifies practices that banned discrimination "includes," § 12184(b). That Uber does not engage in each specified practice does not immunize it from the broader requirement to provide full and equal enjoyment of its services.

Finally, Uber argues that it is not *primarily* engaged in the business of transportation. MTD at 27-28. Most of this argument just amounts to fighting the Complaint's allegations in the same way described above, *i.e.*, characterizing itself as the mere creator of a smartphone app that passively accepts and distributes ride requests rather than the entity controlling the ride, *see* MTD at 27, and so it fails for the same reasons. Uber also goes beyond the Complaint in a different fashion, contending that forays into such ventures as Uber Eats (which is, of course, not mentioned in the Complaint) make transportation not its *primary* business. MTD at 27-28. It does not claim that these ventures now dwarf its transportation business, and, in any event, none of these non-alleged "facts" can be considered here.

Uber gives away the game in complaining that ERC is "myopically focusing on a rider's perspective." MTD at 28. Just so. And from the rider's standpoint, there is little difference between booking a ride through Uber or through a taxi service, and the latter incontestably *is* "primarily engaged in the business of transporting people." *See* 49 C.F.R. § 37.29(a). How Uber structures its operations *internally*—i.e., by using drivers whom Uber does not deem to be its employees, and by having its drivers lease cars in their names rather than in Uber's—changes nothing for the rider and has no obvious significance here.[13] Uber misses the point in alluding to ERC's allegations regarding Uber's beginning to directly purchase vehicles. MTD at 28. The point is not that such direct purchases turn Uber into a transportation company; the point is that

---

[13] ERC expresses no view on whether Uber's drivers are independent contractors rather than employees for purposes of employment law. *Cf. O'Connor*, 82 F. Supp. 3d 1133 (finding that status question of fact for trial).

Uber *already* is a transportation company, such that directly purchasing cars (and, indeed, controlling their research and development) is fully compatible with the services it offers.

### 2. *ERC's Challenge Is Unaffected by Regulations Pertaining to the Lease and Acquisition of Accessible Automobiles*

Uber also argues that its conduct is not covered by 42 U.S.C § 12184 and its implementing regulations because "providing transportation in a standard automobile is not discrimination," MTD at 29, and "covered entities 'are not required to purchase or lease accessible automobiles.'" MTD at 30 (quoting 49 C.F.R. 37.29(b)). This argument misreads both the plain language of § 12184 and the legal theory underlying this Complaint. Title III contains certain carve-outs from the general requirement to provide "full and equal enjoyment" of transportation services, but the services that Uber provides do not fall within any of them.

Uber first argues that § 12184's "definition of 'discrimination' expressly excludes providing transportation services in" an inaccessible vehicle. MTD at 29 (citing 42 U.S.C. § 12184(b)(3)). But that is not so. The statutory provision Uber cites, 42 U.S.C. § 12184(b), does not "expressly exclude[]" *anything* from the definition of discriminatory service. Rather, it provides that "discrimination *includes*," among other things, the "purchase or lease" of certain vehicles. 42 U.S.C. § 12184(b)(3) (emphasis added). That is, this provision *expands* the reach of the catch-all requirement of "full and equal enjoyment" of transportation services by barring transportation providers from certain vehicle acquisitions *regardless of how or whether those vehicles are used in service*. It governs the acquisition of automobiles, not provision of services.

This distinction between *service provision* and *vehicle acquisition* comports with one of the animating principles of the ADA, which throughout the statute and its implementing regulations imposes separate requirements for *service provision* and *facility construction*. For example, Title III independently requires public accommodations to provide accessible services,

30

*see* 42 U.S.C. § 12182(a), and to build new facilities in an accessible manner, *see* 42 U.S.C.

§ 12183(a). A public accommodation violates Title III if it builds a new facility inaccessibly

even if it never uses that facility in its service. And it violates Title III if it provides inaccessible

service even if its facilities are old and, as a result, not independently required to be made

accessible. These are related but independent obligations; that a public accommodation does not

violate one of them does not immunize it from compliance with the other.

It thus is irrelevant that the ADA and its implementing regulations do not impose on taxi

service providers the independent duty to purchase or lease accessible automobiles. *See* MTD at

30 (citing 49 C.F.R. § 37.29(b)). Uber misstates the scope of the regulation it cites, which speaks

not to all "covered entities," MTD at 30, but only to providers of "taxi service." It uses this

sleight of hand to rely on this regulatory exclusion without conceding it provides "taxi service"

and bears all the attendant responsibility.[14] While Uber's services *compete* with taxi services in

the provision of on-demand transportation service, ERC does not contend that they *are* taxi

services. With neither party arguing that Uber provides taxi services, a regulation limited to taxi

services is simply irrelevant to Uber's obligation to comply with § 12184.

In any event, even if taxi regulations applied here, ERC's allegations are fully consistent

with them. ERC does not allege that Uber violates a stand-alone duty to "purchase or lease

accessible automobiles." 49 C.F.R. § 37.29(b). Rather, ERC alleges that Uber fails to provide

full and equal enjoyment of its on-demand transportation services, a duty that Uber *could* fulfil

by purchasing or leasing accessible vehicles but *also* could fulfil in other ways.[15] Uber errs in

---

[14] If Uber *did* provide taxi service, it would be subject to D.C.'s demanding accessibility requirements for such service. *See* D.C. Code § 50-301.25. Among other requirements, D.C. requires taxicab fleets with 20 or more taxicabs to make 20 percent of their fleets wheelchair accessible by the end of this year. *Id.* § 50-301.25(c)(1)(C).

[15] For example, Uber could provide incentives for existing drivers of WAVs to join its fleet. Or it could partner with paratransit services or taxi companies, which have WAVs that Uber drivers could use during off-hours. Or it could promote WAV-usage by including WAVs among its "recommended" cars or offering similar incentives for drivers to lease WAVs, as it does for other types of vehicles. The options continue. In a multitude of ways, Uber could

conflating that possible remedy with the alleged violation itself. Veering even more wildly from ERC's actual allegations, Uber accuses ERC of trying to force its *drivers* to purchase or lease accessible vehicles. MTD at 30. But ERC does not seek to force *drivers* to do anything.

Uber's argument assumes taxi service regulations directly apply here, but they do not. Uber makes no effort to explain why *taxi services*' exemption from having to *purchase or lease* accessible automobiles matters for an entity that is not a taxi service and does not need to lease or own automobiles to provide full and equal services to people with disabilities.[16]

### B. ERC Pleads That Uber Violates 42 U.S.C. § 12182

#### 1. Uber is a "Travel Service" Covered by Title III

Uber is also a "travel service" subject to the anti-discrimination requirements Title III imposes on all public accommodations. Congress gave Title III a broad sweep, to "afford people with disabilities equal access to the wide variety of establishments available to the nondisabled." *PGA Tour, Inc.*, 532 U.S. at 662. Accordingly, Title III prohibits discrimination in the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). A "public accommodation" is, in turn, defined by reference to twelve broad categories, one of which is "service establishment." 42

---

remedy the issue without directly purchasing or leasing WAVs, if it is only forced to confront accessibility as a legal requirement that takes high priority.

[16] Whatever the merits of federal regulators' decision with respect to taxi services' purchasing and leasing obligations, it would be a very different decision to exempt the Uber services at issue here from the ADA's general obligation to operate transportation services accessibly—and that latter decision is one that federal regulators have *not* made. For one thing, taxi services (unlike Uber) already are subject to local regulation, including but not limited to with respect to accessibility. *See Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63, 66 (2d Cir. 2012) (describing New York City's regulatory scheme for taxis, including condition placed on some taxi medallions that accessible vehicles be used). For another, many taxi services (unlike Uber) are small, local entities with just a few cars, and so federal regulators may have believed that Title III—which does not require modifications imposing undue burden—would not, as a rule, impose on them the requirement of purchasing accessible vehicles. *See Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006) (upholding taxi regulation in light of undue burden exemption).

U.S.C. § 12181(7). Title III does not define the term "service establishment," but does set forth illustrative examples, one of which is "travel service." 42 U.S.C. § 12181(7)(F).

The services Uber offers are consistent with those of a "travel service," even under Uber's inconsistent-with-the-Complaint description of its own business model. That is, even if it were true that Uber offered no more than a brokering service that helped riders connect with drivers (and this is not what ERC alleges), that would be entirely consistent with the service provided by a travel agent that assists customers in booking flights, hotels, and ground travel. Uber does not contend otherwise. It appears to concede that, if its customers went to a brick-and-mortar office to order a ride—or even if they called that office over the phone—it would be a travel service subject to Title III's requirements.

Uber's entire argument instead amounts to assigning talismanic significance to the fact that its customers interact with a smartphone app before receiving the same service. MTD at 17-24. To exempt the single largest provider of on-demand transportation from Title III's protection for that reason cannot be squared with Congress's intent that Title III "afford people with disabilities equal access to the wide variety of establishments available to the nondisabled," *PGA Tour, Inc.*, 532 U.S. at 662, and Uber does not try to do so. Instead, Uber relies solely on the notion that Title III's text mandates this result. But it does not.

Nothing in Title III explicitly limits its reach to services delivered at "physical spaces." MTD at 17. Uber asserts that Congress "intended" such a limitation when it used the phrase "place of public accommodation," MTD at 17, 20, but nothing Congress did or said evidenced any such intent. Rather, Congress carried over the phrase "place of public accommodation" from Title II of the Civil Rights Act, which bars race discrimination at a few specified types of public accommodations such as restaurants and hotels. *See* 42 U.S.C. § 2000a. And then Congress

defined that phrase much more broadly in Title III, by reference to twelve broad categories that it intended to cover the "wide variety of establishments available to the nondisabled." *PGA Tour, Inc.*, 532 U.S. at 662. It thereby used the phrase "place of public accommodation" as a term of art that extends far beyond the more limited version of the phrase that had been used in prior law.

Many of these categories, and their representative examples (such as "travel service") are phrased in terms of their services or other public offerings, not whether they "have physical structures for persons to enter." *Carparts Distrib. Ctr., Inc. v. Automotive Wholesaler's Ass'n of Am.*, 37 F.3d 12, 19 (1st Cir. 1994). Uber correctly notes that *some* of Title III's categories, such as "place of lodging" and "place of gathering," are phrased in term of "place," MTD at 20, but it misunderstands the import of that. This indicates that *those* categories are properly conceptualized in terms of physical place, but *others*—such as "travel services"—are not. Uber's reading renders superfluous the use of "place" for some categories but not others.[17]

Moreover, Congress did not limit Title III's regulation of "places of public accommodation" to physical places. It did not bar only discrimination *at* places of public accommodation, but rather barred discrimination in all goods and services *of* places of public accommodation. 42 U.S.C. § 12182(a). Under Uber's reading, its service offered via smartphone only escapes Title III regulation because Uber declines to *also* offer brick-and-mortar service. It is unlikely that a Congress trying to confine Title III's regulatory reach to physical spaces would make coverage turn on the relevant entity's *other* operations rather than the service at issue.

---

[17] In dicta, a Sixth Circuit panel tried to account for these textual distinctions, but its reasoning is circular and unconvincing. That panel stated that "it is likely that Congress simply had no better term than 'service' to describe an office where travel agents provide travel services and a place where shoes are repaired." *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997). This only makes sense if it is *assumed* that Congress meant to confine Title III's reach to physical offices. And it concedes that this is inconvenient text that must be somehow explained away to reach such a conclusion.

All of this suggests that, in drafting the landmark ADA legislation years before the proliferation of technologies such as smartphones or websites, Congress intended "place of public accommodation" not as any sort of limitation, but rather as a broad catch-all term, having to somehow sweep in this country's diverse set of commercial and non-commercial entities, only some of which Congress specifically named in 42 U.S.C. § 12181(7). *See Nat'l Fed'n of the Blind v. Scribd, Inc.*, 97 F. Supp. 3d 565, 572 (D. Vt. 2015) ("Congress likely used the word 'place' because there was no other less cumbersome way to describe businesses that offer those particular goods or services to the public."). Some of the statutory exemplars listed in § 12181(7) are difficult to conceptualize except as physical places, including hotels, restaurants, stadiums, lecture halls, zoos, and golf courses. But others do not require a physical presence now that their essential functions can be (and frequently are) performed remotely. That is true of not only the travel service at issue here, but also others, such as libraries and schools. Congress may well have *assumed* (incorrectly) that such functions would be performed at physical locations, but it gave no hint that it intended the term "place of public accommodation" to *mandate* that for Title III coverage (nor is there any reason why it would want that result). It did not, as Uber suggests, impose an *additional* requirement exempting an entity such as a "travel service" that otherwise would be covered simply because it offers service through modern technology.

Implicitly conceding that the word "place" now can readily include cyberspace,[18] Uber relies on pre-Internet definitions of "place" to suggest that it excludes "anything incorporeal or digital." MTD at 20. But it offers no reason to think Congress was referring to "place" circa 1990

---

[18] Indeed, the Supreme Court used the word that way just last year, in recognizing that digital "places" are now some of the most important in society: "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (citation omitted).

as opposed to "place" as an evolving concept. To the contrary: Congress intended the ADA to

keep up with "the rapidly changing technology of the times," H.R. Rep. 101-485(II), at 108

(1990); *Scribd*, 97 F. Supp. 3d at 574, not to develop loopholes and arbitrage opportunities over

time. Uber's cramped conception of Title III's reach flies in the face of congressional intent that

the ADA "be broadly construed to effectuate its purpose of providing a clear and comprehensive

national mandate for the elimination of discrimination against individuals with disabilities."

*Mary Jo C. v. New York State and Local Ret. Sys.*, 707 F.3d 144, 160 (2d Cir. 2013); *cf. Spector*,

545 U.S. at 132 (exempting cruise ships from "travel services" would be a "harsh and

unexpected interpretation of a statute designed to provide broad protection for the disabled").

For all these reasons, the recent trend is for courts to find that Title III covers services

offered electronically, such as through websites and smartphone apps. *See, e.g.*, *Andrews v. Blick*

*Arts Materials, LLC*, 268 F. Supp. 3d 381, 393 (E.D.N.Y. 2017); *Del-Orden v. Bonobos, Inc.*, 17

Civ. 2744 (PAE), 2017 WL 6547902, at *1 (S.D.N.Y. Dec. 20, 2017); *Andrews v. Blick Art*

*Materials, LLC*, 17-CV-767, 2017 WL 3278898 (E.D.N.Y. Aug. 1, 2017). As one influential

decision put it, the alternative is "arbitrary" disparities in Title III's coverage, given the ubiquity

of electronic commerce today. *Scribd*, 97 F. Supp. 3d at 572. That case found that Title III

requires an entity that sells a subscription service to books and other publications online and

through apps to make its service accessible to people with visual impairments. After walking

through the textual analysis described above, it oberved that the ADA is intended to be

landmark, sweeping legislation, and reasoned: "Now that the Internet plays such a critical role in

the personal and professional lives of Americans, excluding disabled persons from access to

covered entities that use it as their principal means of reaching the public would defeat the

purpose of this important civil rights legislation." *Id.* at 575. Just so here.

Uber nonetheless suggests the "majority view" supports its position that Title III does not cover services offered through websites or smartphone apps. MTD at 17. This assertion crumbles under scrutiny. The appellate precedent it cites pertains to much different subject matter, such as insurance plans and vending machines. Indeed, most of the cases upon which Uber relies are from before electronic commerce became ubiquitous; not only did they not decide Title III's application to a service like Uber's, they did not contemplate Uber's existence. To suggest otherwise, Uber relies on two non-precedential summary orders from the Ninth Circuit. *See* MTD at 17-18. Both cases found summarily that the court's prior precedent precluded Title III claims against e-commerce companies, without analysis or explanation. *See Earll v. eBay, Inc.*, 599 F. App'x 695, 696 (9th Cir. 2015); *Cullen v. Netflix, Inc.*, 600 F. App'x 508, 509 (9th Cir. 2015). They are not controlling authority in the Ninth Circuit, let alone here, and there is quite literally nothing in them that amounts to persuasive authority. The cases that Uber cites from this district, too, are inapposite. *See* MTD at 19. They pertain to other topics such as insurance; they contain no relevant reasoning; or both. *See, e.g.*, *Williams v. Savage*, 569 F. Supp. 2d 99, 110 n.8 (D.D.C. 2008) (insurance case; plaintiff did not even contend that Title III applied).

Uber, thus, is left to over-read stray language from old cases regarding very different facts that, it argues, collectively amount to a broad rule that Title III applies only to physical places. While some of these cases do contain such language, none gives any thought to a service such as Uber's or has persuasive reasoning as applied to today's realities. While Uber would have this Court weigh in on what it characterizes as a circuit split, in fact this Court can find that Uber is a "travel service" subject to Title III without opining on the correctness of cases involving vending machines and insurance plans. This is a much easier case.

Uber offers essentially the same service as entities that indisputably are "travel services," and a physical "place" has never been the *sine qua non* of a travel service, even before the Internet. *See Carparts*, 37 F.3d at 19 ("Many travel services conduct business by telephone or correspondence without requiring their customers to enter an office in order to obtain their services."); *Scribd*, 97 F. Supp. 3d at 572 ("Even in 1990 it was entirely plausible that a travel service might operate no physical location open to the public but instead would conduct all business over the phone or by mail."). Uber's argument, if taken seriously, would mean that Title III also does not cover travel services (or other businesses) that do business by mail or phone. It has to take this position because Uber's customers interact with it the same way many travel service customers always have—remotely. That Uber's interactions go through a computer server (which, presumably, sits in a "physical place") rather than a telephone operator (who similarly sits in a "physical place") is immaterial.

 Uber does not point to any court that has actually applied such a restrictive definition of "travel service," nor would such a definition make sense. *See Carparts*, 37 F.3d at 19 (it would be "irrational" if "persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not."); *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 201–02 (D. Mass. 2012) (Title III must cover entities "that provide services to a customer's home—such as plumbers, pizza delivery services, or moving companies"—though they would fail Uber's "physical place" test). Rather, the courts focusing on Title III's use of the term "place" have done so in cases involving vending machines, insurance plans, and other things where the lack of a physical place suggests that they are not in the relevant "public accommodation" category (e.g., "sales establishment") at all.

That a vending machine is not a "place"—but is something found *inside* a place—helped confirm it is not a discrete "sales establishment." *See Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534 (5th Cir. 2016). Similarly, that an insurance plan an employer offers to its employees is neither a discrete "place" nor something an insurance company offers the public at its physical office indicates that the plan is not part of a covered "service establishment," but rather is a benefit offered to an employee (thus regulated by Title I of the ADA rather than Title III). For that reason, the majority of courts considering this question have been able to agree that Title III does not cover employer-sponsored insurance plans, even as they disagree as to the extent to which Title III coverage requires a physical presence.[19] All of these outcomes are entirely consistent with Congress's use of "place of public accommodation" as a catch-all term that may require focus on the proper entity (the one that actually provides a "public accommodation") but does not impose a limitation based on the technology through which that entity offers its services. To read into them a "circuit split" as to the subject of *this* case is to attach undue significance to stray words divorced from the cases' facts and holdings, *i.e.*, dicta.

Moreover, Uber is not simply asking this Court to follow even the most aggressive possible reading of the cases it cites—it is asking for a dramatic extension of them, in the form of a *per se* rule that Title III only regulates "physical spaces" even for entities and services that otherwise fit squarely within Title III's recognized categories. That goes far beyond not only the holdings but also any stated reasoning of the decisions that Uber cites. Even if a vending machine is not a "sales establishment" in part because it is not a "place," it does not follow that

---

[19] *See Morgan v. Joint Admin. Bd., Ret. Plan of Pillsbury Co. & Am. Fed. Of Grain Millers, AFL-CIO-CLC*, 268 F.3d 456, 459 (7th Cir. 2001) (insurance plan not covered but no "physical site" required); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114-15 (9th Cir. 2000) (insurance plan covered but physical site requirement suggested); *accord Ford v. Schering-Plough Corp.*, 145 F.3d 601, 612-13 (3d Cir. 1998) (same); *but see Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28, 34 (2d Cir. 1999) (Title III covers insurance underwriting).

something that *is* a sales establishment must *also* be a physical "place" to be covered by the Act, or that its transactions must take place in a physical "place." Otherwise, entities named in Title III would escape its reach for many standard business transactions, contrary to Congress's intent. *See Pallozzi*, 198 F.3d at 33 (rejecting requirement that item sold by public accommodation must be used *within* public accommodation, because such rule would exclude entities such as bakeries that are specifically named); *Morgan*, 268 F.3d at 459 ("The site of the sale is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services.").

Uber asks this Court to create that loophole—a "physical place" requirement abstracted from the services at issue and instead centering on the technology through which the service is offered. But ERC does not contend that a smartphone app is a discrete "place of public accommodation," *see* MTD at 18, 20. Nor, for that matter, does ERC even challenge Uber's smartphone app as inaccessible. Rather, ERC contends that *Uber's transportation service* violates Title III—and Uber's service is a lot more than a smartphone app. It is a complex service that involves physical cars carrying physical people from one physical place to another, all managed by a rather large physical office. To the extent that Title III requires a service to include a physical presence to be a "place of public accommodation," that should be enough. Nothing about a travel service intrinsically requires or even suggests that any greater physical presence is required (regardless of whether that is true for other entities covered by Title III).

### 2. ERC Does Not Challenge Uber's "Mix of Services"

Uber also argues that ERC is improperly asking Uber to "alter its inventory to include accessible or special goods" that it would not otherwise carry. MTD at 28 (quoting 28 C.F.R. § 36.307(a)). This argument misunderstands the scope of that regulation, which pertains only to

*sellers* of goods. Uber has no "inventory" for sale to riders. Rather, it has a fleet of drivers (and their cars) at its disposal for delivering rides. Its customers buy the ride, not the car.

The "mix of services" regulation does not exempt an entity from reasonable steps to make *services* accessible and non-discriminatory, including acquiring necessary equipment. It does not exempt movie theaters from captioning because they must acquire captioning devices, or exempt car dealerships from ensuring that people with disabilities can test-drive their cars, even if the dealerships must acquire a set of hand controls to make that possible. *See Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1016-17 (9th Cir. 2017). The same analysis applies here. To the extent that doing so proves reasonable and not an undue burden, Uber must provide the same ride to people with disabilities that it does to others. That is not providing "special goods"—it is providing the same service, even if by means of different technology.

### 3. Uber's Fundamental Alteration Defense Cannot Be Adjudicated on This Motion and the Facts Properly Before the Court

Uber also contends that any relief this Court may order to redress its violations would constitute a "fundamental alteration" of its business. MTD at 31. This argument both depends on facts not properly before the Court at this time and misrepresents ERC's requested relief.

Title III provides that a covered entity must make "reasonable modifications in policies, practices, or procedures" to make its services available to individuals with disabilities, "*unless the entity can demonstrate* that making such modifications would fundamentally alter the nature" of those services. 42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added). Thus, the burden is on that entity, as an affirmative defense, to demonstrate that modifications would fundamentally alter its services. Where, as here, the defendant raises this argument on a motion to dismiss, the proper question is whether the allegations of the Complaint make it plausible that the defendant will fail

41

to make such a showing. *See Mary Jo C.*, 707 F.3d at 161. That is more than plausible here, considering that Uber's arguments fail to engage with the Complaint's allegations.

Uber's argument is premised on the notion that, to provide accessible service, it must "purchase WAVs and employ drivers to drive them." MTD at 32. But ERC does not demand such relief, nor is Uber's assertion consistent with ERC's factual allegations. Rather, the Complaint alleges—and this Court must take as true—that Uber exercises sufficient control over the composition of its fleet and its drivers' activities that it could readily achieve the requested accessibility *without* fundamentally changing its business model. *See, e.g.*, Compl. ¶ 39, 75. That should begin and end the inquiry for now. *See Nat'l Ass'n of the Deaf*, 869 F. Supp. 2d at 202-03 (on motion to dismiss, plaintiff adequately pleaded that defendant had sufficient control of service to ensure accessibility; defendant could raise argument that allegations were incorrect on summary judgment but "this question is not properly before the court now").

Accordingly, this argument fails because (like most of Uber's arguments) it sidesteps the Complaint's allegations and relies on alternative facts. Uber is, of course, free to contend after discovery that it cannot feasibly make its services accessible without changing its business model. It cannot make that argument based on the record properly before this Court now.

## V.       ERC States a Valid and Timely DCHRA Claim

With respect to ERC's DCHRA claim, Uber primarily relies (in some places erroneously) on the notion that its Title III arguments apply with equal or stronger force. As described above, it erroneously assumes that its arguments with respect to the scope of Title III's private right of action apply to the DCHRA. Uber raises only two DCHRA-specific arguments. Both are wrong.

First, Uber gets it backwards in arguing that it is not a "place of public accommodation" under the DCHRA because, in its view, the DCHRA has a more restrictive physical "place"

requirement. *See* MTD at 35. With respect to this claim, at least, the opposite is true. The DCHRA explicitly defines a covered "place of public accommodation" to include not only "travel or tour advisory services" but also "all public conveyances operated on land or water or in the air." D.C. Code § 2-1401.02. There can be no question that Uber operates a "public conveyance," since its service is closely analogous to a taxi service, the archetypal public conveyance. *See, e.g.*, *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 361-63 (3d Cir. 2004) (finding airplane service sufficiently analogous to taxi service); *Brill v. Indianapolis Life Ins. Co.*, 784 F.2d 1511, 1514 (11th Cir. 1986) (same findings for chartered helicopter service). There is thus no need to delve into broader questions about the DCHRA's definition of "place of public accommodation," since the statute's more specific language answers any such question. DCHRA has been applied to discrimination by taxi services, *see Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 47 (D.D.C. 2003), and it likewise applies here.

And for good reason. Uber's argument, if accepted, would blow a gaping hole in D.C.'s anti-discrimination law. It would mean that taxis and other "public conveyances" not operated in a set physical place (a common situation, since the business is on wheels) would have free license to discriminate not only based on disability, but also based on race, sexual orientation, and more. That is not the law, nor should it be.

Uber's statute of limitations argument is equally meritless. Citing no supporting case authority and selectively omitting half of the relevant statutory language, Uber asserts that ERC's DCHRA claim is time-barred because ERC "discovered" Uber's discrimination on May 19, 2016, when it first tested Uber's services. MTD at 35. Uber makes no effort to conform this argument to the statute, the governing caselaw, or the facts.

Under the DCHRA, a claim "must be brought within one year of the last discriminatory act *or* discovery of the discrimination." *Walston-Jackson v. CCA of Tenn.*, *Inc.*, 664 F. Supp. 2d 24, 26 (D.D.C. 2009) (emphasis added); D.C. Code § 2-1403.16(a). Uber's policy of failing to provide accessible services continues to this day. *See* Compl. ¶¶ 6-7, 12, 96. There has been no "last discriminatory act," so it is irrelevant when ERC discovered the discrimination. "[T]he discovery rule was designed to extend the time during which a plaintiff may bring a suit, and not to contract it." *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 891 (D.C. 2003); *see Pickern*, 293 F.3d at 1136 (ADA challenge timely although plaintiff sued "more than a year … after he first became aware" of inaccessible condition, because condition still existed and caused injury).

Moreover, ERC challenges a continuing practice, not a discrete action. The DCHRA permits a challenge to "the maintenance of a discriminatory system both before and during the statutory period." *See Boulton v. Inst. of Int'l Educ.*, 808 A.2d 499, 503–04 (D.C. 2002). Such a claim alleges "damages flowing from the act as a whole rather than from each individual act." *Id.* (quotations and punctuation omitted). ERC brings that sort of claim here—against Uber's continuing policy of denying accessible services to wheelchair users, day after day, week after week, up to the present day. And even if there were any "reasonable doubt" on that score, it must be "resolve[d] in favor of the Complaint standing and against the challenge." *Lively*, 830 A.2d at 887 (internal quotation and citation omitted).[20]

---

[20] In any event, Uber's argument would fail even on its own terms. Uber did not even announce that it had commenced UberWAV service in D.C. until after this lawsuit was filed in July 2017, and so ERC could not have "discovered" its inaccessibility in 2016. Compl. ¶ 90.

## CONCLUSION

The Motion to Dismiss should be denied.

Dated:  February 9, 2018

Respectfully submitted,

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion (DC Bar 1026113)
Megan Cacace (DC Bar No. 981553)
Michael G. Allen (DC Bar. No. 409068)
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)
ssamberg-champion@relmanlaw.com
mcacace@relmanlaw.com
mallen@relmanlaw.com

/s/ Matthew Handley
Matthew Handley (D.C. Bar No. 489946)
Deepa Goraya (D.C. Bar No. 1025395)
WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS
11 DuPont Circle, NW, Suite 400
Washington, D.C. 20036
Phone: (202) 319-1000
Fax: (202) 319-1010
matthew_handley@washlaw.org
deepa_goraya@washlaw.org