**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EQUAL RIGHTS CENTER, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )    No. 17-cv-1272 (KBJ) |
| UBER TECHNOLOGIES, INC., *et al.*, | ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION

Providers of public transportation services have long been subject to federal and state regulation with respect to the provision of accommodations for people with physical disabilities.  *See, e.g.*, 42 U.S.C. § 12184; D.C. Code §§ 2-1402.31(a)(1), 2-1401.02(24).  In the instant action, plaintiff Equal Rights Center ("ERC") alleges that defendant Uber—a company that maintains a ride-sharing application ("app") that connects users to drivers—systematically discriminates against those disabled individuals in the District of Columbia who use non-foldable wheelchairs, because Uber's wheelchair accessible ride-share services are allegedly far less reliable and predictable than its non-wheelchair accessible offerings.  (*See* Am. Compl., ECF No. 22, ¶¶ 2–12.)  ERC also alleges that Uber requires wheelchair users to pay higher fares and endure longer wait times than people who use Uber's standard transportation service.  (*See id.* ¶¶ 79–96.)  In the two-count complaint that ERC has filed against Uber in the instant case, ERC claims that Uber qualifies as a public transportation service for the purpose of federal and local law, and, therefore, that the identified

disparities amount to unlawful discrimination under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*  (*See id.* ¶¶ 117–42.)

Before this Court at present is Uber's motion to dismiss ERC's claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  (*See* Defs.' Mot. to Dismiss 1st Am. Compl. ("Defs.' Mot."), ECF No. 25; Mem. in Supp. of Defs.' Mot. to Dismiss 1st Am. Compl. ("Defs.' Mem."), ECF No. 25-1.)  As a threshold jurisdictional issue, Uber argues that ERC lacks Article III standing to sue, either on its own behalf or on behalf of its members.  (*See* Defs.' Mem. at 18–28.)[1]  Uber maintains further that ERC has not plausibly alleged that the ADA and DCHRA apply to its app, and that even if those statutes do apply, Uber's services do not constitute discrimination and cannot be reasonably modified.  (*See id.* at 28–45.)  Uber also asserts that the DCHRA claim is barred by that statute's one-year limitations period.  (*See id.* at 46.)

Ever mindful of the fact that all that is required at this early stage of the litigation is for ERC to make *plausible* claims of liability, this Court must reject Uber's dismissal arguments, for the reasons explained fully below.  As a threshold matter, the Court finds that ERC has associational standing to bring the complaint's ADA and DCHRA discrimination claims on behalf of its members.  The Court also concludes that the complaint contains plausible allegations concerning Uber's eligibility for regulation under section 12184 of Title III of the ADA and the DCHRA; that ERC has alleged circumstances that plausibly sustain discrimination claims under the cited statutes; and that ERC's DCHRA claim is timely.  Therefore, Uber's motion to dismiss ERC's

---

[1] Page numbers herein refer to those that the Court's electronic case-filing system automatically assigns.

complaint will be **DENIED**.  A separate Order consistent with this Memorandum
Opinion will follow.

I.   **BACKGROUND**

   A.  **ERC's Allegations Regarding Uber's Services**

   ERC is a non-profit corporation that focuses, among other things, on combatting
discrimination against people with disabilities in the public and private transportation
sectors.  (*See* Am. Compl. ¶¶ 14, 17.)  According to ERC's complaint, Uber operates a
ridesharing service that enables people to "secure rides more swiftly, reliably, and
conveniently—and then ride more cheaply—than was possible under taxi service
alone."  (*Id*. ¶ 1.)  Uber delivers its service via a smartphone app through which users
can "hire a private vehicle for transportation in any region in which Uber operates" (*see
id.* ¶ 43), including in the District of Columbia, where Uber's services have been
available since 2011 (*see id*. ¶ 4).

   In order to use Uber, a person must download the app and create an account,
which requires providing a phone number and credit card information.  (*See id.* ¶ 44.)
The user can then request rides through the app; specifically, users identify pick-up and
drop-off locations, and thereby provide information about their whereabouts and
destination, and Uber's software system then uses that information to "determine[]
which nearby drivers will have the opportunity to respond and direct[] the request to
[the drivers]."  (*Id.* ¶ 45.)  When a driver accepts a request, Uber "notifies the user of
the driver's name, phone number, vehicle make and model, license plate number,
estimated time of arrival, and customer satisfaction rating[,]" and the user can track that
vehicle's progress as it makes its way to the pick-up location.  (*Id.*)  Moreover, at the

end of the trip, Uber "automatically processes payment with the user's credit card information." (*Id.* ¶ 46.)  Uber then takes a 20 to 25 percent cut of the total payment, giving the rest to the driver.  (*See id.*)

Uber "has approximately 30,000 active drivers in the D.C. area" who collectively provide users with a variety of ride options.  (*See id.* ¶ 59.)  UberX, which uses standard vehicles, is "Uber's most popular service."  (*Id.* ¶ 48.)  Uber's other options include UberBlack, which involves "'high-end rides with professional drivers'"; UberXL, which provides "seating capacity for up to six passengers"; and UberSUV, which uses "luxury SUVs with seating capacity for up to six passengers."  (*Id.* ¶ 49.)  Uber also currently provides two wheelchair accessible user options: TAXI WAV, which allows riders to hail D.C. taxi cabs through the Uber app (*see id.* ¶ 9), and UberWAV, a relatively new service that uses Uber drivers' own vehicles (*see id.* ¶ 11).

To ensure there are enough drivers on the road to meet demand, Uber "uses a variety of methods[.]"  (*See id.* ¶ 62.)  For example, Uber "regularly informs drivers as to where demand is or is likely to become high" and modifies rates through "'surge pricing' to give drivers the incentive to work during times and places of heavy demand."  (*Id.*)  In addition, to increase efficiency, Uber uses an algorithm for matching drivers and riders that allows drivers to have "the next ride lined up even as one passenger is being dropped off."  (*Id.*)  Thus, even though drivers "determine when and where they work," Uber influences drivers' schedules through its policies and practices. (*See id.*)

Beyond managing supply and demand, Uber also prescribes the types of vehicles that its drivers may use.  (*Id.* ¶ 64.)  While each driver is responsible for obtaining his

own vehicle, Uber imposes certain criteria regarding which vehicles can be used for which services.  (*See id.*)  For instance, drivers participating in UberX "must use a '4-door car or minivan' that is in good condition, seats at least four passengers in addition to the driver, and has a model year of 2007 or later."  (*Id.* ¶ 65.)  Uber also circulates a list of recommended vehicles for UberX and helps drivers who do not already own such vehicles to lease or rent them through "special programs" with its subsidiary, Xchange Leasing, LLC.  (*See id.* ¶¶ 65, 67–68.)  Similarly, Uber offers discounted rentals through partnerships with local rental car companies.  (*See id*. ¶ 72.)

### B.  ERC's Allegations Concerning Uber's Services For Persons Who Use Wheelchairs

At the time that ERC filed its first complaint in this action in June of 2017, Uber provided only TAXI WAV for wheelchair users, meaning that the company had no wheelchair accessible vehicles in its own 30,000-vehicle fleet.  (*See id.* ¶ 29.)  As indicated above, Uber now offers UberWAV—a service involving drivers who own and use wheelchair accessible vehicles—as well.  (*See id.* ¶ 53.)  However, ERC alleges that it has conducted an investigation into Uber's wheelchair accessible services, and that both TAXI WAV and UberWAV are "woefully inadequate" to provide full and equal enjoyment of Uber's services.  (*See id.* ¶ 11.)  To demonstrate the alleged disparities, in the summer of 2016, ERC conducted four "matched pair tests" that assessed the reliability of Uber's TAXI WAV service.  (*Id.* ¶ 80.)  In each test, a TAXI WAV user and an UberX user requested rides "within five minutes of one another[,]" using the same pick-up and drop-off locations, and ERC then measured the difference in the wait times and costs of each ride.  (*Id.*)  ERC also conducted a follow-up comparison between these two services in May of 2017 (*id*. ¶ 85), as well as a matched pair test

between UberWAV and UberX in November of 2017 (*id.* ¶ 92).  Additionally, on November 29, 2017, ERC asked a tester to request rides from UberWAV during the "morning rush hour" and in the afternoon, and ERC recorded the time it took for the cars to arrive.  (*Id.* ¶¶ 93–94.)

Based on the results of its investigation, ERC alleges that both service rates and waiting times for Uber's wheelchair accessible services are significantly greater than those of Uber's standard services.  With respect to rates, ERC found that TAXI WAV users are charged an average of $6.81 more per ride than UberX users (*id.* ¶¶ 80–81), in part because TAXI WAV allegedly requires users to pay standard D.C. taxi fares instead of Uber fares (*see id.* ¶ 52), and there is a "vast disparity in the per-mile and per-minute rates" of those two services (*id.* ¶ 57).  In May of 2017, for instance, ERC found that UberX cost $0.17 per minute and $1.02 per mile, compared with D.C. taxi charges of $0.58 per minute and $3.25 for the first mile, with $2.16 for every subsequent mile.  (*See id.*)  ERC also alleges that the disparity between the rates of TAXI WAV and UberX is further exacerbated by the fact that Uber charges a $2.00 booking fee for TAXI WAV rides, compared to a $1.35 booking fee for UberX rides. (*Id.* ¶ 80.)  As for UberWAV, ERC maintains that users similarly pay more for this service than for Uber's standard option, even though "Uber claims that its new UberWAV service is priced the same as UberX[.]"  (*See id.* ¶ 95.)  For example, in the matched pair test that ERC conducted in November of 2017, ERC observed that "[t]he user who requested UberWAV was quoted a higher price than the user who requested UberX for an equivalent ride."  (*Id.*)[2]

---

[2] ERC was not able to calculate the actual (paid) difference in the costs of the rides, because "no UberWAV ever showed up."  (Am. Compl. ¶ 95.)

With respect to waiting times, ERC alleges that both TAXI WAV and UberWAV take longer to serve users than UberX.  Starting with TAXI WAV, ERC asserts that, during the matched pair tests that it conducted in 2016, the person who requested a TAXI WAV had to wait an average of 34.25 minutes longer than the UberX user.  (*See id.* ¶ 81.)  And in a follow-up test that ERC conducted in May of 2017, the TAXI WAV requester allegedly struggled to find a wheelchair accessible ride at all: he was matched with a driver who then cancelled the ride because he was too far away, and the user subsequently could not get a ride for an additional 45 minutes.  (*See id.* ¶ 85.)

UberWAV allegedly suffers from the same "speed and reliability" defects as TAXI WAV.  (*Id.* ¶ 91.)  For instance, during the matched pair test that ERC conducted on November 13, 2017, the UberWAV user was allegedly "unable to secure a ride in 45 minutes of trying."  (*Id.* ¶ 92.)  Similarly, when a tester attempted to book UberWAV later that month during morning rush hour, it took him two tries to connect with a car, and once he did, he had to wait 36 minutes for the car to arrive.  (*Id.* ¶ 93.)  Additionally, when the tester attempted to book an UberWAV that afternoon, he waited over two hours to be matched with a car, which then took 16 minutes to arrive after accepting the request.  (*Id.* ¶ 94.)

In light of these observations, ERC maintains that neither TAXI WAV nor UberWAV provides services anywhere close to that of UberX.  (*See id.* ¶¶ 89, 96.)  However, in ERC's view, the documented deficiencies in Uber's wheelchair accessible services are by no means unavoidable.  Uber allegedly "has the ability to ensure that the supply of wheelchair accessible vehicles in its fleet meets demand better than what is currently provided in the D.C. area" (*id.* ¶ 39), but has opted instead to continue to

"impose vehicle-type restrictions that actively discourage its drivers from acquiring and operating wheelchair accessible vehicles" (*id.* ¶ 8). In fact, according to ERC's complaint, Uber "has told at least one individual that he could not drive for Uber if he used a wheelchair accessible vehicle[,]" prompting that driver to replace his wheelchair accessible vehicle with a non-accessible one in order to work for Uber. (*Id.* ¶ 31.) Moreover, although Uber now has some wheelchair accessible vehicles in its fleet through UberWAV, it does not include wheelchair accessible vehicles on its list of recommended vehicles for UberX drivers, nor does it offer special financing programs for wheelchair accessible vehicles. (*See id.* ¶¶ 65, 70; *see also id.* ¶ 72 (noting that discounts through Uber's partnerships are "either entirely unavailable or not readily available for wheelchair accessible vehicles").) Thus, ERC claims that Uber's choices concerning wheelchair accessible vehicles and services violate both federal and D.C. law.

### C. Procedural History

ERC filed the instant lawsuit on June 28, 2017 (*see* Compl., ECF No. 1), and amended its complaint on December 8, 2017 (*see* Am. Compl.). In the amended two-count complaint, ERC generally alleges that Uber Technologies, Inc., and also its subsidiaries Rasier, LLC, and Drinnen, LLC, have adopted policies regarding Uber vehicles that "systematically deny wheelchair users full and equal enjoyment of Uber's service in the District of Columbia and surrounding areas." (*Id.* ¶ 12; *see also id.* ¶¶ 20–21.) ERC maintains that Uber's failure to ensure that "a meaningful number of wheelchair accessible vehicles" are provided has undermined ERC's mission and has "forced ERC to postpone or abandon other projects and services." (*Id.* ¶¶ 36, 105, 110.)

ERC also alleges that Uber's actions have harmed ERC's members, many of whom use wheelchairs.  (*See id.* ¶¶ 13, 103.)

In Count I, ERC asserts a claim on behalf of its members under section 12184 of the ADA, which makes it unlawful to discriminate against disabled individuals in "the full and equal enjoyment" of certain transportation services.  (*Id.* ¶ 118.)  ERC alleges that the "[in]sufficient number of wheelchair accessible vehicles available through any of [Uber's] offerings" (*id.* ¶ 125), along with Uber's refusal "to make reasonable modifications to [its] policies, practices, and procedures" concerning its fleet (*id.* ¶ 128), injures wheelchair-reliant individuals by generating higher fares and longer wait times for such individuals than people who use Uber's standard non-accessible options, such that individuals who use wheelchairs are being denied the full and equal enjoyment of Uber's services (*see id.* ¶¶ 125–28).  In the alternative, ERC alleges that Uber has violated section 12182 of the ADA, which prohibits discrimination in places of public accommodation.  (*See id.* ¶ 122; *see also* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 27, at 32.)

In Count II, ERC asserts a claim on behalf of itself and its members under the DCHRA, which similarly "makes it unlawful to deny any person the full and equal enjoyment of the services of a place of public accommodation on the basis of disability." (Am. Compl. ¶ 132.)  Count II alleges that Uber's inferior wheelchair accessible options unlawfully deprive individuals with disabilities of the full and equal enjoyment of its services (*see id.* ¶¶ 135–38); that Uber's conduct is intentional and discriminatory (*see id.* ¶ 139); and that Uber's actions "constitute[] an ongoing and

continuing violation of the DCHRA that has injured Plaintiff ERC and its members" (*id.* ¶ 141).

For relief, ERC requests that the Court not only declare that Uber's policies and practices violate both the ADA and the DCHRA, but also, *inter alia*, enjoin Uber "from denying people who use non-folding wheelchairs full and equal enjoyment of [its] services" and require Uber "to develop and implement policies, practices, and procedures that afford people who use non-folding wheelchairs full and equal enjoyment of [its] services[.]" (*Id.*, Prayer for Relief, (a)–(c).) ERC also seeks an award of compensatory and punitive damages under the DCHRA, as well as reasonable attorney's fees and costs. (*Id.*, Prayer for Relief, (d)–(e).)

On January 12, 2018, Uber filed the motion to dismiss that is before this Court at present, pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Defs.' Mot.; Defs.' Mem.) In contesting the Court's jurisdiction to hear this case, Uber first argues that ERC does not have standing to sue, either on behalf of its members or on behalf of itself. (*See* Defs.' Mem. at 15.) In this regard, Uber asserts that ERC lacks associational standing to sue on behalf of its members because ERC's members themselves lack standing, and that, regardless, the participation of individual members is necessary to determine which members have already downloaded the Uber app and which members lack the necessary equipment and credit card information to do so. (*See id.* at 23–28.) With respect to ERC's organizational standing, Uber argues that ERC itself has not suffered a cognizable

injury under Article III, and that even if it has, Uber did not cause ERC's alleged injury, nor can a judgment against Uber redress the alleged injury.  (*See id.* at 18–22.)[3]

As for the merits of ERC's claims, Uber insists that because it is a technology company that is not engaged in the business of transporting people, much less primarily so, section 12184 of the ADA is not applicable to the instant circumstances.  (*See id.* at 35–39.)  Furthermore, Uber maintains that even if section 12184 does apply to its business, section 12184 does not cover the kind of discrimination that ERC alleges (*see id.* at 40–42), and requiring Uber to provide wheelchair accessible services would fall outside the realm of the "reasonable modifications" that the statute contemplates (*see id.* at 42–43).[4]

With respect to ERC's DCHRA claim, Uber similarly insists that the phrase "place of public accommodation" does not cover its services since Uber does not own or operate any public conveyances.  (*See id.* at 45–47.)  And it also mounts an attack based on the DCHRA's statute of limitations, maintaining that ERC's claim is time-barred because such claims must be filed within one year of the plaintiff's discovery of the unlawful conduct, which ERC failed to do.  (*See id.* at 46.)

---

[3] In the realm of standing-like arguments, Uber also asserts that the participation of ERC's members is necessary for monetary damages to be awarded in this litigation (*see* Defs.' Mem. at 26–27), but ERC has subsequently clarified that it does not seek damages for its individual members; it seeks damages only for itself under the DCHRA (*see* Pl.'s Opp'n at 20).  Likewise, Uber argues that ERC cannot sue on its own behalf because it has no private right of action under the ADA, given that ERC—as an organization—was not subjected to any allegedly discriminatory conduct.  (*See* Defs.' Mem. at 22–23.)  Here too, ERC has explained that it is not bringing its ADA claim on behalf of itself, and as a result, Uber appears to have dropped its right-of-action argument.  (*See* Pl.'s Opp'n at 19–20; *see also* Defs.' Reply to Pl.'s Opp'n ("Defs.' Reply"), ECF No. 28.)

[4] Because this Court rejects Uber's merits argument for now, and concludes that ERC has stated a claim under section 12184 for purposes of Count I, *see infra* Part III.B, it need not address Uber's argument that its services do not constitute a place of public accommodation under section 12182.  The parties' arguments concerning section 12182 are preserved, and may be re-raised, if necessary, at a later stage of the proceedings in this case.

The parties appeared before this Court on May 10, 2018, for a hearing concerning Uber's motion to dismiss, during which Uber argued that ERC's complaint does not adequately demonstrate that Heidi Case—an ERC member whose allegations ERC relies upon for associational standing—has any knowledge of the new UberWAV service, and, therefore, ERC cannot establish that Case has an injury in fact.  (*See* Mot. Hr'g Tr., ECF No. 34, at 40:6–11, 43:25–44:16.)  Because there was no record evidence concerning the matter, the Court provided ERC with the opportunity to file an affidavit or other evidence demonstrating Case's knowledge (*see* Order of Aug. 2, 2018, ECF No. 35), and ERC submitted a declaration from Case (hereinafter "Case Declaration") on August 14, 2018 (*see* Notice of Filing Heidi Case Decl., ECF No. 36, at 1).  On September 7, 2018, by leave of the Court, Uber filed a supplemental brief in response to the Case Declaration (*see* Defs.' Suppl. Br. in Further Supp. of Mot. to Dismiss ("Defs.' Resp. to Case Decl."), ECF No. 39), and ERC filed a reply on September 17, 2018 (*see* Pl.'s Suppl. Mem. in Further Opp'n to Defs.' Mot to Dismiss, ECF No. 40).

In addition, both before and after the motion hearing, the parties filed multiple notices of supplemental authority and responses thereto.  (*See* Pl.'s Notice of Suppl. Auth., ECF No. 29; Defs.' Resp. to Pl.'s Notice of Suppl. Auth., ECF No. 30; Pl.'s 2d Notice of Suppl. Auth., ECF No. 31; Defs.' Resp. to Pl.'s 2d Notice of Suppl. Auth., ECF No. 32; Defs.' Notice of Suppl. Auth., ECF No. 41; Pl.'s Resp. to Defs.' Notice of Suppl. Auth., ECF No. 42; Defs.' 2d Notice of Suppl. Auth., ECF No. 44; Pl.'s Resp. to Defs.' 2d Notice of Suppl. Auth., ECF No. 45; Pl.'s 3d Notice of Suppl. Auth., ECF No. 46; Defs.' Resp. to Pl.'s 3d Notice of Suppl. Auth., ECF No. 48; Pl.'s 4th Notice of

Suppl. Auth., ECF No. 49; Defs.' 3d Notice of Suppl. Auth., ECF No. 50; Pl.'s Resp. to

Defs.' 3d Notice of Suppl. Auth., ECF No. 51.)

Uber's motion to dismiss has now been fully and extensively briefed and argued,

and is ripe for this Court's review.

## II.   LEGAL STANDARDS

### A.  Motions To Dismiss Under Rule 12(b)(1)

A motion to dismiss brought pursuant to Rule 12(b)(1) of the Federal Rules of

Civil Procedure challenges a court's subject matter jurisdiction—that is, a court's

power to hear a plaintiff's legal claims.  When a defendant files a Rule 12(b)(1) motion,

"the plaintiff bears the burden of establishing [the court's] jurisdiction by a

preponderance of the evidence."  *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48,

53 (D.D.C. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  In

deciding whether or not to grant the motion, a district court must "'accept all of the

factual allegations in [the] complaint as true,'" *Jerome Stevens Pharms., Inc. v. Food &

Drug Admin.*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005) (quoting *United States v.

Gaubert*, 499 U.S. 315, 327 (1991)), and "may consider materials outside the pleadings"

when making its determination, *id.* at 1253.  Moreover, "[b]ecause Rule 12(b)(1)

concerns a court's ability to hear a particular claim, the court must scrutinize the

plaintiff's allegations more closely when considering a motion to dismiss pursuant to

Rule 12(b)(1) than it would under . . . Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police

Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011).

### B.  Motions To Dismiss Under Rule 12(b)(6)

A motion to dismiss brought pursuant to Rule 12(b)(6) tests the sufficiency of a complaint's factual allegations in support of a plaintiff's legal claims.  *See Howard Univ. v. Watkins*, 857 F. Supp. 2d 67, 71 (D.D.C. 2012).  Thus, courts considering a motion to dismiss under Rule 12(b)(6) must accept as true all of the plaintiff's allegations of fact and must also "grant [a] plaintiff the benefit of all inferences that can be derived from the facts alleged[.]"  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citation omitted).  To withstand a Rule 12(b)(6) motion, the complaint must set forth sufficient factual allegations to "state a claim to relief that is plausible on its face[,]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning that the complaint's "factual content [must] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Unlike Rule 12(b)(1), Rule 12(b)(6) "places th[e] burden on the moving party" to show that the complaint is legally insufficient.  *Cohen v. Bd. of Trs. of the Univ. of D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016) (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2015)).  A court assessing whether a complaint states a claim upon which relief can be granted is limited to a review of the four corners of the complaint, as well as any "documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies[.]"  *Page v. Mancuso*, 999 F. Supp. 2d 269, 275 (D.D.C. 2013) (internal quotation marks and citations omitted).

14

### III.   ANALYSIS

Uber insists that ERC lacks both associational standing and organizational standing to bring the instant discrimination claims in federal court, and thus, that ERC's claims must be dismissed under Rule 12(b)(1).  (*See* Defs.' Mem. at 15.)  In the alternative, Uber maintains that ERC has failed to state either an ADA claim or a DCHRA claim for the purpose of Rule 12(b)(6), primarily because, according to Uber, its ride-coordination services do not qualify as public transportation services that are subject to regulation under either statute.  (*See, e.g.*, *id.* at 28–39, 45–47.)  With respect to its evaluation of Uber's threshold standing argument, the Court must apply the legal standards that pertain to Article III standing to sue as it relates to organizations, and, in particular, the well-established principle that an organization is generally authorized to bring claims in federal court on behalf of its members so long as at least one member has standing in her own right.  *See, e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  The Court is also fully cognizant of the fact that an ADA or DCHRA plaintiff at this early stage of the litigation needs only standing and a *plausible* claim that the defendant's conduct amounts to discrimination in violation of those statutes' standards; that is, certainty regarding the meritorious nature of the plaintiff's legal claims is not required.

For the reasons explained below, this Court concludes that the discrimination claims that ERC has brought against Uber must be allowed to proceed, at least for now, because ERC has associational standing to pursue its ADA and DCHRA claims on behalf of its members, and because the facts alleged in the complaint give rise to viable and timely claims under the ADA and the DCHRA.  Therefore, Uber's motion to dismiss will be denied.

## A. ERC Has Associational Standing

### 1. An Organization Can Bring Legal Claims On Behalf Of Its Members And/Or Itself

Article III of the Constitution limits "federal-court jurisdiction to actual cases or controversies[,]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)), and fundamental to a federal court's determination of whether it has been presented with a proper case or controversy is whether "plaintiffs [have] establish[ed] that they have standing to sue[,]" *id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). Article III standing thus ensures that plaintiffs have "such a personal stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction." *New Eng. Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 155 (D.D.C. 2016) (emphasis omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

The "'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan*, 504 U.S. at 560). First, the plaintiff must have suffered an injury in fact that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[.]" *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted). Second, there must be a "causal connection" such that the plaintiff's injury is fairly traceable to the defendant's challenged conduct. *Id.* (citation omitted). And, third, it must be likely that the plaintiff's "injury will be redressed by a favorable [judicial] decision." *Id.* at 561 (internal quotation marks and citation omitted). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the

16

successive stages of the litigation." *Id.* Accordingly, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss" courts assume "that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotation marks and citation omitted).

Notably, an organization has more than one option with respect to establishing Article III standing: it may bring a claim on behalf of its members under an "associational" theory, or it may bring the claim on behalf of itself, under an "organizational" theory of standing. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 100–01 (D.C. Cir. 2019). To demonstrate associational standing at the pleading stage, the organization must plausibly allege that: "(1) at least one of [its] members has standing, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Am. Libr. Ass'n v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005); *see also Hunt*, 432 U.S. at 343. Meanwhile, to support the allegation that there is organizational standing, the organization must, "like an individual plaintiff, . . . show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *See PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (internal quotation marks and citation omitted). And in demonstrating that the organization itself has experienced an injury in fact, the organization must "allege more than a frustration of its purpose"; it must plausibly allege that it has "suffered a concrete and demonstrable injury to its

activities." *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (internal quotation marks, citation, and alteration omitted).

In the instant case, ERC has asserted both standing theories: it alleges that one member, Heidi Case, has standing in her own right, and that the organization has itself suffered an injury that is sufficient to support both its claims for injunctive relief under the ADA and the DCHRA and its claim for damages resulting from Uber's alleged violation of the DCHRA.  (*See* Am. Compl. ¶¶ 97–116; *see also* Pl.'s Opp'n at 16, 23; Mot. Hr'g Tr. at 7:1–5, 54:22–24.)  As relevant here, Uber insists that associational standing is unavailable because Case has not averred to have even downloaded the Uber app, much less attempted to use Uber's services (*see* Defs.' Mem. at 15), and the complaint is devoid of any other references to members who actually would have standing to sue in their own right (*see id.*).  Uber also argues that the nature of ERC's claims and requested relief requires the participation of individual members in this suit. (*See id.* at 23–28.)[5]

Neither of Uber's arguments concerning the lack of associational standing are persuasive, for the following reasons.

---

[5] Because the Court ultimately finds that ERC has associational standing to pursue its claims (*see infra* Parts A.2, A.3), it need not address whether ERC has suffered a sufficient injury to ground its alternative claim of organizational standing, and has not done so.  *See, e.g.*, *Nucor Steel-Ark. v. Pruitt*, 246 F. Supp. 3d 288, 292 n.3 (D.D.C. 2017) ("In order to demonstrate that it has standing to sue, a plaintiff needs to identify only one type of cognizable injury-in-fact, and therefore, a court 'need not address' alternative theories of injury once one injury-in-fact is established." (quoting *Sierra Club v. EPA*, 755 F.3d 968, 976 n.2 (D.C. Cir. 2014))).  Of course, insofar as ERC seeks *damages* to remedy its *own* injuries under the DCHRA (*see* Pl.'s Opp'n at 20), a demonstration that ERC has organizational standing to seek such relief, assuming it succeeds on the merits of its DCHRA claim, may be required. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (explaining that a plaintiff must "demonstrate standing separately for each form of relief sought").  But the Court, and the parties, will cross that bridge if we get to it.  For now, it suffices for purposes of the Court's subject matter jurisdiction that ERC has associational standing to bring the claims it asserts in the complaint, and the Court will address organizational standing to pursue monetary damages, if necessary, after it has reached a conclusion concerning the merits of those claims.

2.  <u>ERC Member Heidi Case Has Standing To Sue In Her Own Right,
Under The Circumstances Presented Here</u>

Heidi Case is an ERC member and "long-time disability rights advocate" who uses a non-folding wheelchair.  (Decl. of Heidi Case ("Case Decl."), ECF No. 36-1, ¶¶ 2, 4.)  In the declaration that ERC submitted on her behalf, Case attests to her knowledge of Uber's inaccessibility based on her "active engagement on accessibility issues" in the transportation sector, and the fact that she has had "regular conversations (at least once a month) with people specifically about the accessibility" of Uber's services.  (*Id.* ¶¶ 6, 10.)  In particular, Case asserts that she is intimately familiar with TAXI WAV's inadequacies, because she "worked for years to increase the number of [wheelchair accessible vehicles] in D.C.'s taxi fleets."  (*Id.* ¶ 11.)  Case also avers that, before the instant lawsuit was filed, she learned that "ERC's tests confirmed that accessible taxis hailed through Uber routinely were unavailable or took a very long time to arrive (if at all) and that such rides also were more expensive than Uber-branded rides."  (*Id.* ¶ 12.)

With respect to her knowledge of UberWAV, Case avers that she heard from "countless friends and contacts" who had attempted to use UberWAV that either no wheelchair accessible vehicles were available or that, after connecting to a driver, they had to wait extended periods of time before the driver ultimately cancelled or failed to show up.  (*See id.* ¶ 16.)  In addition, "[o]n multiple occasions," Case was allegedly present while someone attempted to call an UberWAV, which permitted her to "witness[] first-hand [UberWAV's] inaccessibility" and to see how the app frequently reflected that no UberWAVs were available in the area, or how, "even when a

19

connection is made to an UberWAV, that car does not reliably respond in [a] timely fashion." (*Id.* ¶ 17.)

Given these experiences, and due to other stories that Case has heard from people in her network, Case avers that she "know[s] Uber's service is not accessible and not a viable transportation option for . . . a user of a motorized wheelchair[,]" and that, as a result, she "ha[s] not downloaded the [Uber] app[.]" (*Id.* ¶ 22.) Moreover, according to Case, the unreliability of Uber's wheelchair accessible services is particularly problematic for her, because if an accessible Uber vehicle failed to show up in a timely manner, she "would be left stranded with no way of getting to where [she] needed to go at the time [she] needed to be there[,]" and there would be insufficient time to opt for an alternative accessible transportation option for wheelchair users, since the alternatives require people to schedule rides in advance. (*Id.* ¶ 26.) Case asserts nevertheless that she "absolutely would download the Uber app if Uber became a viable, reliable transportation option[,]" because, if she were able to "use Uber as non-wheelchair users do," she could "arrange transportation in [a] spontaneous fashion[.]" (*Id.* ¶ 28.)

The following analysis of the elements of the Article III standing inquiry demonstrates that allegations such as these are sufficient to support the conclusion that Case has suffered an injury in fact that is fairly traceable to Uber's conduct and that is likely to be redressed by an injunction or declaratory judgment. *See Lujan*, 504 U.S. at 560–61.

>    a. *Case has an injury in fact because she was plausibly deterred from using Uber's app as a result of her knowledge of Uber's alleged unlawful discrimination*

It is true that, to demonstrate injury in fact, a plaintiff who seeks injunctive relief must ordinarily "establish a real and immediate threat" of having her rights violated in the future. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). But in the context of the ADA, plaintiffs need *not* establish that they would have otherwise actually or imminently visited and/or patronized a place with accessibility barriers, because the ADA does not "require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by [Title III of the ADA] does not intend to comply with its provisions." 42 U.S.C. § 12188(a)(1); *see also Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 363, 365–66 (1977) (establishing the futile gesture doctrine in the context of Title VII). Thus, "to have standing to sue under Title III of the ADA, a plaintiff must simply allege that he or she has 'become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation.'" *White v. Bank of Am., N.A.*, 200 F. Supp. 3d 237, 243 (D.D.C. 2016) (quoting *Equal Rts. Ctr. v. Hilton Hotels Corp.*, No. 07-cv-1528, 2009 WL 6067336, at *3 (D.D.C. Mar. 25, 2009)).

Heidi Case has cleared that bar. Her sworn declaration attests to the fact that she is "aware of discriminatory conditions existing at [Uber], and is thereby deterred from . . . patronizing [Uber]." *Id.* (internal quotation marks and citation omitted). Moreover, and notably, several other courts that have considered the injury issue with respect to ADA claims brought against Uber have likewise found that knowledge of the inaccessibility of Uber's service is sufficient to demonstrate an injury under the ADA,

regardless of whether the plaintiff has actually downloaded the Uber app.  *See, e.g.*, *Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136, 1141 (N.D. Cal. 2020); *O'Hanlon v. Uber Techs., Inc.*, No. 19-cv-00675, 2019 WL 5895425, at *5 (W.D. Pa. Nov. 12, 2019); *Access Living of Metro. Chi. v. Uber Techs., Inc. ("Access Living I")*, 351 F. Supp. 3d 1141, 1150 (N.D. Ill. 2018), *aff'd*, 958 F.3d 604 (7th Cir. 2020); *Crawford v. Uber Techs., Inc.*, No. 17-cv-02664, 2018 WL 1116725, at *2 (N.D. Cal. Mar. 1, 2018); *Ramos v. Uber Techs., Inc.*, No. 14-cv-00502, 2015 WL 758087, at *7 (W.D. Tex. Feb. 20, 2015).  Under the circumstances presented here, this Court, too, is persuaded that requiring Case to take steps toward actually using Uber's services (*e.g.*, by downloading the app) would amount to the type of "futile gesture" that is not required to pursue a claim under the ADA.  *See* 42 U.S.C. § 12188(a)(1).

Uber vigorously contests this result.  To start, Uber argues that Case's declaration does not reflect her knowledge of Uber's accessibility at the relevant time— *i.e.*, at the time that ERC filed her declaration—and that Case is relying on outdated information about accessibility that is simply "wrong."  (*See* Defs.' Resp. to Case Decl. at 4 & n.1.)  But the relevant state of affairs for the purpose of determining standing to sue in the context of a motion to dismiss are facts known to the plaintiff at the time the complaint is filed, regardless of what may have transpired in the interim.  *See Garnett v. Zeilinger*, 323 F. Supp. 3d 58, 64 (D.D.C. 2018) (assessing "whether the plaintiffs had standing at the initiation of the suit").  Moreover, and in any event, the purportedly erroneous nature of Case's allegations about known facts is a matter that is properly addressed at the summary judgment stage, not on a motion to dismiss where the

22

plaintiff's allegations must be taken as true.  *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

Uber next asserts that Case has made statements regarding her experiences with wheelchair accessible taxis that make her contentions about being deterred from using Uber "implausible."  (*See* Defs.' Resp. to Case Decl. at 6.)  In this regard, Uber points to the fact that Case has admitted to having previously ordered wheelchair accessible taxis directly from taxi companies, "even though she believes there are too few of them, and even though she believes they often take too long to respond to her requests."  (*See id.*)  Uber argues that this stated fact renders it implausible that similar alleged flaws in Uber's services have actually deterred Case from using Uber (*see id.*), but this argument misses the intended mark as well, because it is clear from Case's declaration that, when she requests wheelchair accessible rides from taxi companies, she schedules that transportation *in advance* (*see* Case Decl. ¶ 25), and her experience with planned taxi rides despite their alleged unreliability says little about whether her knowledge of the unavailability of Uber's wheelchair accessible services has deterred her from attempting to use the Uber app in the "spontaneous fashion" that is available to persons who do not use wheelchairs.  (*See, e.g., id.* ¶¶ 25–28 (emphasizing that it would be especially difficult for her to use Uber, because if the Uber vehicle did not show up or did not arrive in a timely manner, Case would be unable to get to her intended destination using alternative forms of transportation given the need to pre-arrange such services).)

Finally, to the extent that Uber contends that Case's alleged injury is not sufficiently particularized or concrete to satisfy Article III (*see* Defs.' Resp. to Case Decl. at 5), this Court disagrees.  In making this argument, Uber relies primarily on a

recent case from the Seventh Circuit in which the court found that the plaintiff lacked standing to challenge Uber's accessibility under the ADA in the absence of certain specific averments.  *See Access Living of Metro. Chi. v. Uber Techs., Inc. ("Access Living II")*, 958 F.3d 604, 615 (7th Cir. 2020).  The panel in that case suggested that, in order to demonstrate a particularized injury, the individual plaintiff was required to allege facts concerning her "individualized needs and circumstances, including where [she] lives, what time of day she orders a [wheelchair accessible vehicle], where she wishes to travel to, and the like."  *Id.*  For the panel, it was not enough that the plaintiff had seen the app on another user's phone and had observed that no UberWAVs were available even when her home address was used as the pick-up location.  *See id.* at 614. Instead, the panel suggested that the plaintiff had to plead "particular facts and circumstances illustrating how she would personally experience unequal access if she ordered a [wheelchair accessible vehicle,]" because "[i]t is too attenuated to conclude that the mere act of downloading Uber's app and opening an account—without more— would subject her to harm from discrimination."  *Id.* at 615.

In this Court's view, such heightened pleading requirements are difficult to square with the ADA's futile gesture doctrine.  As previously explained, it is well established that in order to identify an injury in fact in an ADA case, it is sufficient to ask whether the plaintiff had notice of the defendant's alleged noncompliance with the ADA and was deterred from using the defendant's services based on that information. *See White*, 200 F. Supp. 3d at 243; *see also Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1136–37 (9th Cir. 2002).  Yet, the Seventh Circuit now apparently requires disabled plaintiffs who are aware of documented accessibility problems, and who have

been plausibly deterred from relying on the defendant's services based on that knowledge, to *further* specify either the circumstances under which they personally might have otherwise sought to use the inaccessible services or detail the facts that give rise to their contention that the defendant's services are likely to be unavailable to them in particular.  This is more than is ordinarily required at the pleading stage to establish standing to sue for alleged disability discrimination.  And if the alleged known facts about the defendant's lack of compliance with the ADA are such that a reasonable, similarly situated person would be deterred from seeking to avail themselves of the defendant's services, it is not clear *why* such a detailed and individualized accounting of the plaintiff's own thwarted desires is necessary to establish an injury in fact.

The tension between the Seventh Circuit's opinion and the futile gesture doctrine becomes even more apparent when one considers the Supreme Court's language in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977)— a Title VII race discrimination case that Congress expressly relied upon when it enacted the ADA.  *See* H.R. Rep. No. 101-485, pt. 2, at 83 (1990) ("The Committee intends for [the *Teamsters*' futile gesture] doctrine to apply to [Title III of the ADA].").  In *Teamsters*, the Supreme Court explained that, in order to suffer a cognizable injury, a person need not submit an application for and be denied a particular position when he is aware of the employer's discriminatory hiring practices, such as "consistent discriminatory treatment of actual applicants, [] the manner in which [the employer] publicizes vacancies, [the employer's] recruitment techniques, [the employer's] responses to casual or tentative inquiries, and even [] the racial or ethnic composition of that part of [the employer's] work force from which [the employer] has discriminatorily

excluded members of minority groups." 431 U.S. at 365.  Not one of the factors outlined in *Teamsters* is particularized to the applicant; instead, these factors are considerations that relate to the defendant's discriminatory practices *as experienced by other people*, and as known to the plaintiff.  What is more, the *Teamsters* Court plainly asserted that "[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Id.* at 365–66.[6]  Thus, the Supreme Court's analysis stands in stark contrast to the Seventh Circuit's suggestion that, despite any knowledge of the inaccessibility of Uber's services for persons who use wheelchairs, a plaintiff must nevertheless download the Uber app, and either attempt to call an Uber or be prepared to describe in detail the precise circumstances under which she *would* have used the service but for her knowledge of its alleged inaccessibility, in order to demonstrate an injury in fact.[7]

---

[6] Relying on language in *dicta*, Uber cites *Teamsters* for the proposition that a plaintiff must show she would have suffered "the humiliation of explicit and certain rejection" had she taken the allegedly futile action.  (*See* Defs.' Resp. to Case Decl. at 5 (quoting *Teamsters*, 431 U.S. at 365).)  But the *Teamsters* Court merely sought to describe the specific circumstances involved in that case; it by no means suggested that "humiliation of explicit and certain rejection" was a required element of the futile gesture doctrine.  *See* 431 U.S. at 365–68.

[7] The Seventh Circuit's particularity requirement is also troubling insofar as downloading the Uber app may itself have ramifications for the rights of individuals to litigate their claims (including claims brought under the ADA).  *See Access Living II*, 958 F.3d at 614–15.  That is, presumably, all users of the Uber app must accept the company's terms of service, and those terms typically include an agreement to submit legal claims to mandatory arbitration.  *See id.* at 614.  (*See also* Defs.' Mem. at 16.)  Thus, the Seventh Circuit's standing analysis creates a Catch-22: to establish Article III standing to sue Uber for an ADA violation, plaintiffs must download the Uber app, but by doing so, they sign away their right to litigate their claims in court.  This set of circumstances not only makes little practical sense, but it is also manifestly inconsistent with Congress's express intent to allow plaintiffs to challenge public accommodations that are not in compliance with the ADA *even if* such plaintiffs did not personally encounter the discriminatory barriers themselves.  *See* 42 U.S.C. § 12188(a)(1) (stating that "a person with a disability" is not required "to engage in a futile gesture if such person has actual notice that a person or organization covered by [Title III of the ADA] does not intend to comply with its provisions").

The bottom line is this: in this Court's view, Case's allegations concerning her knowledge of Uber's unreliable and often unavailable services for those who use motorized or non-folding wheelchairs are a sufficient basis to support the conclusion that she knew all about Uber's alleged accessibility deficits at the time the complaint was filed, and that, based on such knowledge, she was plausibly deterred from attempting to use Uber's service. Accordingly, Case has a sufficient injury in fact to support a finding that she has standing to sue in her own right.

b.    *The causation requirement is satisfied because the complaint plausibly alleges that Case's injury is fairly traceable to Uber's actions*

Undaunted, Uber argues that Case lacks standing because her injuries are caused by the drivers' "intervening choices[,]" not by any actions of the company itself. (Defs.' Mem. at 20.) This is so, Uber argues, because the company is primarily a technology platform that does not and cannot "dictate whether, when, where, or how frequently Drivers who have chosen to invest [in] [wheelchair accessible vehicles] choose to use them to seek [and] accept ride requests via the Uber App." (*Id.*) But in making this argument, Uber selectively ignores various allegations in the complaint that speak directly to the extent to which Uber *does* exert influence over its drivers with respect to the vehicles that are used.

Indeed, ERC's complaint specifically and plausibly asserts that Uber has "practices and policies" that prescribe "which car models will be used" in its UberX fleet, and "how much financial assistance [Uber will] provide [to] drivers in acquiring" such cars. (Am. Compl. ¶ 37.) And ERC provides examples: it alleges that Uber has "special programs for leasing and renting vehicles" to its drivers (*id.* ¶ 67)—including Xchange Leasing, LLC, an Uber subsidiary that helps Uber drivers secure financing for

27

a "designated list of car models"—none of which can fit a non-folding wheelchair (*id.* ¶¶ 68, 70).  The complaint also alleges that Uber uses "a variety of methods to ensure that the drivers" can meet demand, such as informing drivers where and when demand will be high, operating "surge pricing" to incentivize drivers to work during high demand periods, and allowing drivers who are completing a ride to line up their next one.  (*Id.* ¶ 62.)  However, according to ERC, Uber has *not* deployed this successful incentive scheme to increase the supply or deployment of wheelchair accessible vehicles, and has instead "chosen to use [its] power to discourage and sometimes outright prevent drivers from acquiring wheelchair accessible vehicles[.]"  (*Id.* ¶ 37.)

These allegations must be taken as true at this stage of the proceedings.  *See Jerome Stevens Pharms.*, 402 F.3d at 1253–54.  And, when taken together, such assertions are more than sufficient to demonstrate causation for the purpose of Article III standing, because ERC plausibly alleges that these types of policies and practices have caused there to be far fewer vehicles available for those who use non-foldable wheelchairs than are necessary to ensure that such persons have equal access to Uber's services, and that the inadequate supply of such vehicles renders Uber's wheelchair accessible services incomparable to its standard, non-accessible offerings.

   c. *The complaint plausibly alleges that an injunction or declaration from this Court could redress Case's asserted injury*

Uber's final argument with respect to Case's alleged lack of standing is its contention that the complaint fails to make plausible allegations that Case's injury can be redressed by a favorable court decision.  (*See* Defs.' Mem. at 21.)  Uber's redressability argument rests on two main contentions.  First, Uber claims that ERC's requested declaratory and injunctive relief is too "vague" and "imprecise" to be

"meaning[ful] as directed to Uber."  (*Id.*; *see also* Am. Compl., Prayer for Relief, (a)-(c) (seeking (1) a declaration that Uber has violated the ADA and the DCHRA, (2) an injunction prohibiting Uber "from denying people who use non-folding wheelchairs full and equal enjoyment of [its] services[,]" and (3) an injunction requiring Uber to "develop and implement policies, practices, and procedures that afford people who use non-folding wheelchairs full and equal enjoyment of [its] services").)  Second, Uber insists that the only way to redress Case's alleged injury would be to force Uber drivers to change their behavior, which this Court cannot do since those drivers are "independent third-parties not before the Court."  (*See* Defs.' Mem. at 21.)

With respect to the first concern, Uber argues that ERC has not "explain[ed] how this Court would craft (let alone monitor and enforce) an appropriate injunction[,]" despite the fact that Federal Rule of Civil Procedure 65(d)(1) requires injunctions to "'describe in detail . . . the act or acts restrained or required.'"  (*See id.* (quoting Fed. R. Civ. P. 65(d)(1)).)  But the Federal Rules do not require a plaintiff to specify exactly how the Court would craft an appropriate injunction at this juncture in the proceedings. And ERC's plausible allegations that Uber exerts substantial influence over its drivers through its policies and practices are likewise sufficient to dispose of Uber's second point, since an injunction that requires Uber to use its influence to enhance the supply of wheelchair accessible vehicles could plausibly redress Case's injury without directing the drivers themselves to take (or not take) any particular actions.  Put another way, it suffices that based on the allegations in ERC's complaint, it is plausible that the Court could fashion an appropriate remedy that would redress Case's asserted injury.

29

Consequently, this Court finds that ERC has adequately alleged that Case has suffered an injury in fact that is "fairly traceable" to Uber's conduct and that is redressable "by a favorable judicial decision."  *See Spokeo*, 136 S. Ct. at 1547.  As a result, Case has Article III standing in her own right, such that there is a sufficient basis for determining that ERC has associational standing.

### 3.  This Lawsuit Does Not Require The Participation Of ERC's Members

Uber argues that associational standing is unavailable nevertheless, because individual participation is required in the instant case.  (*See* Defs.' Mem. at 27.)  The basis for this contention is the fact that some ERC members are apparently bound to arbitrate their claims due to their having downloaded the Uber app (*see id.*), and in this regard, Uber largely relies on cases from outside of this circuit that hold that an organization may lack associational standing if some of its members are bound by arbitration clauses (*see id.* (citing *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 713 F. Supp. 2d 734, 744 (N.D. Ill. 2010); *In re Managed Care Litig.*, No. 00-MD-1334, 2003 WL 22410373, at *10 (S.D. Fla. Sept. 15, 2003))).  Upon further review, the Court notes that the cited cases arise in the context of motions to compel arbitration, and the plaintiffs were seeking damages, and they are plainly distinguishable on that basis alone.  Moreover, at least one of the courts indicated that an association would *still* have standing to litigate on behalf of its non-bound members.  *See Pa. Chiropractic Ass'n*, 713 F. Supp. 2d at 745 n.6.  Thus, the cases that Uber cites to support the proposition that individual members must participate in this lawsuit do

little to persuade the Court that the existence of arbitration agreements alone requires individual participation so as to defeat associational standing.[8]

It is also important to note that ERC seeks only *declaratory* and *injunctive* relief on behalf of its members, and unlike damages, those remedies do not require individualized proof.  *See Hunt*, 432 U.S. at 344 ("[N]either the interstate commerce claim nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context.").  As such, the Court concludes that ERC need only show that one ERC member would have downloaded and used the app but for the allegedly unlawful inadequacies in Uber's wheelchair accessible services, and it has satisfied that requirement through Heidi Case's allegations.  (*See* Case Decl. ¶¶ 22, 28.)  Therefore, ERC has associational standing to pursue its ADA and DCHRA claims for declaratory and injunctive relief on behalf of its members.

**B. ERC Has Stated Plausible Claims Under Both Section 12184 Of The ADA And The DCHRA**

Turning to Uber's arguments regarding the merits of ERC's claims, it is clear that Uber's primary assertion is that the anti-discrimination provisions of the ADA and DCHRA simply do not apply to its services.  According to Uber, the company does not even plausibly qualify as "an entity whose principal business is actually conveying passengers from place to place" within the meaning of section 12184 of the ADA (Defs.' Mem. at 35 (citing 42 U.S.C. § 12184(a))); and, in any event, "providing transportation in a standard automobile" instead of a wheelchair accessible one "is not

---

[8] The Court observes further that the present record also fails to support Uber's contention that its arbitration agreement does, in fact, encompass ERC's claims, because Uber's arbitration clause is not included in the parties' filings.  And while the Court is permitted to review materials outside of the pleadings when it considers standing in the context of a motion to dismiss under Rule 12(b)(1), such review is still limited to those materials that are attached to the parties' briefs.

discrimination" (*id.* at 40).  Uber also asserts that its services are not covered by section 2-1402.31 of the DCHRA, because its app does not qualify as "a place of public accommodation" under that statute (*see id.* at 46–47), nor do the alleged flaws in the provision of its ride-share services amount to the unlawful denial of its services in violation of that statute (*see id.* at 45–46).  Uber further contends that ERC's DCHRA claim is untimely under the applicable one-year statute of limitations.  (*See id.* at 46 (citing D.C. Code § 2-1403.16(a)).)

As explained below, this Court finds that (1) it is at least plausible that Uber's services as alleged in the complaint fall within the scope of the ADA and the DCHRA based on the plain language of the asserted statutory provisions, and (2) ERC's complaint alleges sufficient facts to support a plausible conclusion that Uber has discriminated against individuals with disabilities within the meaning of the ADA and the DCHRA.  The Court also credits the complaint's allegation that the alleged discrimination is ongoing and continuous, and thus rejects Uber's contention that the DCHRA claim is not timely.

1. The ADA And DCHRA Plainly Prescribe Anti-Discrimination Principles That Apply To "Public Transportation Services" And/Or "Places Of Public Accommodation," And Uber Plausibly Qualifies As Such Under The Particular Statutory Provisions At Issue

When Congress enacted the ADA in 1990, its overarching goal was to "'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' [through] 'strong, consistent, [and] enforceable standards[.]'" *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 265 (D.D.C. 2015) (quoting 42 U.S.C. § 12101(b)(1)–(2)).  To that end, the ADA "forbids discrimination against disabled individuals in major areas of public life," including public

accommodations and services operated by private entities. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). The DCHRA shares a similar objective: that legislation was intended to be a "broad remedial statute," *Blodgett v. Univ. Club*, 930 A.2d 210, 218 (D.C. 2007), and it expressly prohibits, among other things, discrimination in the "goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" on the basis of disability, D.C. Code § 2-1402.31(a)(1).

As relevant here, the ADA and the DCHRA expressly protect individuals with disabilities from *discrimination with respect to public transportation*. *See* 42 U.S.C. § 12184; D.C. Code §§ 2-1401.02(24), 2-1402.31(a)(1). For example, in Title III of the ADA, Congress sought to ensure that disabled individuals would have full and equal access to "specified public transportation services[,]" including those offered by certain private entities. *See* 42 U.S.C. § 12184(a) (stating that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce").

Moreover, and importantly, Congress has determined that the *types* of public transportation that are subject to regulation under the ADA—*i.e.*, the "specified public transportation" for ADA purposes—are "transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." *Id.* § 12181(10). In addition, Title III's implementing regulations explicitly make section 12184's anti-discrimination principles applicable to private "[p]roviders of taxi

service[,]" 49 C.F.R. § 37.29, which the regulations broadly define as "transportation services that involve calling for a car and a driver to take one places[,]" *id.* pt. 37 app. D.  However, section 12184 also provides a caveat: to be subject to regulation concerning the provision of public transportation services, such a private entity must have "operations [that] affect commerce" and must be "primarily engaged in the business of transporting people[.]"  42 U.S.C. § 12184(a).

For its part, the DCHRA prohibits the denial of "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations[,]" D.C. Code § 2-1402.31(a)(1), and the D.C. Council has defined a "place of public accommodation" to include "all public conveyances operated on land or water or in the air," *id.* § 2-1401.02(24).  Thus, courts have applied this provision to entities like taxi cabs, which provide transportation services to members of the public.  *See, e.g.*, *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 47–49 (D.D.C. 2003); *see also Am. Council of the Blind, Inc. v. Grand Cab Co.*, 2015 D.C. Super. LEXIS 16, at *21–22 (D.C. Super. Ct. Sept. 3, 2015).

Despite these legal frameworks, Uber argues that ERC's claims must be dismissed for failure to state a claim upon which relief can be granted because its services do not plausibly qualify for regulation under either statute.  For example, Uber asserts that it does not "provide" a specified public transportation service under section 12184 of the ADA, because "[o]nly entities that actually transport people 'provide' transportation by a 'conveyance.'"  (Defs.' Mem. at 36.)  Uber apparently derives this interpretation of the statute from the "plain" meaning of the text, as well as the fact that the ADA "defines 'public accommodation' to include 'a terminal, depot, or other

station used for specified public transportation.'"  (*Id.* (citing 42 U.S.C.

§ 12181(7)(G)).)  And, according to Uber, that definition is telling, because "if

terminals, depots, and other types of stations are used for 'specified public

transportation,' it follows that an entity that 'provides' the 'specified public

transportation'—like a commercial bus or train company—actually transports people

for commercial gain."  (*Id.*)

Uber has not provided the Court with any reason to adopt such a narrow reading

of the statute, especially at this early stage of this case.  To the contrary, the "plain" or

"ordinary" meaning of the word "provide" is merely "to supply *or make available*[.]"

*See Provide*, Merriam-Webster Collegiate Dictionary (online ed. 2021) (emphasis

added).  And under *that* definition, an entity can "provide" a public transportation

service without actually conveying or transporting people itself.  What is more, based

on the plain language of the text of section 12184, all that is required to count as the

provision of "specified public transportation" for purposes of that provision is that what

is being provided is "transportation by bus, rail, or any other conveyance (other than by

aircraft)[,]" and the entity must also be one that "provides the general public with

general or special service (including charter service) on a regular and continuing basis."

42 U.S.C. § 12181(10).  ERC's complaint alleges that Uber specifically "represents that

at any time of day, a person in any neighborhood in the D.C. area can use Uber's

smartphone application to connect with a vehicle in Uber's fleet" and "[t]hat vehicle

generally will . . . take the person to any other location in the metropolitan area at a

pre-determined price" (Am. Compl. ¶ 4), and in this Court's view, it is entirely

plausible that an entity that offers such a service "provide[s]" a "specified public

transportation service[]" within the meaning of section 12184 of the ADA, 42 U.S.C. § 12184(a).  Indeed, according to the complaint, Uber advertises its service as having "'[t]ap a button, get a ride'" convenience (Am. Compl. ¶ 43 (citing Uber's website)), and that description indisputably entails providing transportation to the general public "on a regular and continuing basis[,]" 42 U.S.C. § 12181(10).

The Court also concludes that ERC has plausibly alleged that Uber is "primarily engaged in the business of transporting people[.]"  *See id.* § 12184(a).  According to ERC's complaint, Uber has "approximately 30,000 active drivers in the D.C. area who provide rides" (Am. Compl. ¶ 59), and, as explained above, Uber allegedly has substantial control over these drivers' services: it influences the cars they drive (*see id.* ¶ 37), the way they finance their cars (*see id.* ¶¶ 37, 68–69), and the times and locations at which they accept rides (*see id.* ¶ 62 (detailing Uber's "surge pricing" incentives)).  Uber also allegedly enforces mandatory standards that its drivers must meet in order to drive with Uber, including that a driver must "be 21 years of age, have a valid driver's license, [and] have a year of driving experience (or three years if the driver is under 23 years old)[.]"  (*Id.* ¶ 60.)[9]

Uber's assertion that it is *not* "'engaged in the business of transporting people'"—either because it is simply a technology company that acts as a conduit between drivers and riders (Defs.' Mem. at 36–37 (citing 42 U.S.C. § 12184)), or because it primarily "develops and licenses sophisticated software" rather than

---

[9] The ADA's implementing regulations also make clear that taxi services are subject to the provisions pertaining to "private entities primarily engaged in the business of transporting people[,]" 49 C.F.R. § 37.29, and the regulations' definition of a taxi service as a "service[] that involve[s] calling for a car and a driver to take one places[,]" *id.* pt. 37 app. D, squarely applies to Uber's alleged services.

providing transportation (*id.* at 38)—is not a given, and as such, that characterization is insufficient to render ERC's ADA claim implausible.  To bolster this contention, Uber first analogizes itself to "Expedia.com"—a website that helps users rent hotel rooms— and points to a recent Seventh Circuit case finding that Expedia.com and other online travel agencies were not "engaged in the business of renting hotel rooms."  (*Id.* at 37 (citing *Vill. of Bedford Park v. Expedia, Inc.*, 876 F.3d 296, 305 (7th Cir. 2017)).)  But this analogy is both limited and unpersuasive, insofar as the Seventh Circuit's decision in *Village of Bedford Park* did not pertain to the meaning of a "public transportation service" under section 12184, and it also turned largely on the panel's interpretation of the word "rent."  *See, e.g.*, 876 F.3d at 305 (finding that the online travel agencies' activities did not fall under the municipal ordinances at issue, because "renting implies ownership and granting possession of property[,]" which the agencies lack the power to do).  Furthermore, in this Court's view, the services that online travel agencies provide bear little resemblance to Uber's.  Companies like Expedia.com merely *facilitate* hotel reservations; they do not supply hotel rooms, much less set the underlying prices, and "hotels can cease offering rooms through [Expedia.com] at any time."  *See id.* at 300. By contrast, Uber's drivers are part of the Uber workforce, and they operate within a market that Uber itself created; Uber drivers do not exist independent of Uber's app, and this Court is hard-pressed to imagine how Uber drivers could continue to operate without the Uber app (or a competitor's service).  Uber also controls the pricing of its drivers' services, and it allegedly asserts far more control over its drivers than any traditional brokering service has over the relevant service providers.  Thus, based on the

allegations in ERC's complaint, Uber is much more than a mere "conduit" between riders and drivers.

Nor can Uber escape potential ADA regulation at the motion to dismiss stage by maintaining that it is not *primarily* engaged in the business of transporting people, and instead is more akin to a software developer that employs its product for a number of uses outside of the transportation sector, including for "network[ing] restaurants and hungry people" through Uber Eats, and networking "commercial truck drivers and deliveries" through Uber Freight.  (*See* Defs.' Mem. at 38–39.)  This is because any information regarding the non-ridesharing aspect of Uber's services goes beyond the four corners of the complaint and thus is not properly before the Court at this time.  *See Page*, 999 F. Supp. 2d at 275.  Moreover, and similarly, the extent of Uber's control over its drivers, and/or the degree to which it is actually engaged in the business of transporting people, as opposed to other pursuits, are matters of fact that cannot be relied upon by a defendant at this point in the proceedings, as other courts have noted. *See Crawford*, 2018 WL 1116725, at *4.  For now, the Court must take ERC's allegations concerning Uber's business activities as true, and, as discussed herein, the Court finds that ERC's allegations concerning the manner in which Uber connects its own designated drivers with app users plausibly establish that Uber is a public transportation service that is primarily engaged in the business of providing transportation to the general public.

The complaint's allegations also make it plausible that Uber qualifies as a "place of public accommodation" within the meaning of the DCHRA.  This is because, by definition, a "place of public accommodation" includes an entity that provides public

transportation on land, *see* D.C. Code § 2-1401.02(24), and given the allegations in

ERC's complaint, such transportation is the *sine qua non* of Uber's service (*see, e.g.*,

Am. Compl. ¶ 4 (explaining that Uber drivers transport members of the public by car

from one location to another)).

Furthermore, to the extent that the D.C. Court of Appeals has suggested that the

DCHRA does not "apply to services untethered to 'a building' or  physical facility"

(Defs.' Mem. at 46 (quoting *U.S. Jaycees v. Bloomfield*, 434 A.2d 1379, 1381 (D.C.

1981))), this Court is not persuaded that the lack of "a real physical space" associated

with the Uber app necessarily means that Uber cannot plausibly be considered a "place"

under the DCHRA (*id.* at 47).  For one thing, Uber misreads the D.C. Court of Appeals

decision upon which it relies.  In *Bloomfield*, the D.C. Court of Appeals rejected a trial

court's determination that, whether or not a voluntary membership organization

operated from a building, the organization's provision of a "vast network of services" to

the public was enough to qualify as a place of public accommodation under the

DCHRA.  *See* 434 A.2d at 1381 (internal quotation marks omitted).  As the D.C. Court

of Appeals explained, the trial court's analysis overlooked the fact that the DCHRA

explicitly defines "place of public accommodation" to include a number of enumerated

"places"—such as banks, swimming pools, and parks—none of which remotely

resemble an organization that does not "operate from any particular place within the

District of Columbia" and "whose primary function is to render community service and

instill a sense of service to the community in [its] members[.]"  *Id.*

In finding that the organization at issue did not fall within the DCHRA's

purview, the D.C. Court of Appeals in *Bloomfield* did not announce any bright-line rule

requiring a "place of public accommodation" to have a "building or physical facility[,]" as Uber here maintains.  (Defs.' Mem. at 46 (internal quotation marks omitted).) Instead, that court simply applied the statutory definition to the particular facts at hand, and thereby rejected the application of the statute to the type of amorphous entity at issue in that case.  *See Bloomfield*, 434 A.2d at 1381–82; *cf. Boy Scouts of Am. v. D.C. Comm'n on Hum. Rts.*, 809 A.2d 1192, 1196 n.4 (D.C. 2002) (assuming without deciding that a membership organization qualified as a "place of public accommodation" under the DCHRA, because the question was a "complex one" even after *Bloomfield*).  Consequently, *Bloomfield* does not provide an answer to the question of whether the DCHRA plausibly applies to the facts at issue here.

Even more importantly, nothing in the DCHRA itself suggests that only entities that are tethered to a brick-and-mortar building qualify as "place[s] of public accommodation[]" within the meaning of D.C. Code § 2-1402.31(a)(1).  To the contrary, because the definition of "place of public accommodation" expressly includes "all public conveyances operated on land or water or in the air," D.C. Code § 2-1401.02(24), the DCHRA clearly contemplates that some places of public accommodation will not involve stationary, physical facilities.  There is also nothing in the statute's text that supports Uber's view that its *app* cannot be conceived of as a "place" for the purpose of the DCHRA, or that its app—and not the transportation function the app provides—is the relevant focal point for determining whether the DCHRA applies.  Indeed, the DCHRA broadly prohibits denial of "the full and equal enjoyment" of the "services" of "any place of public accommodations[,]" D.C. Code § 2-1402.31(a)(1), and it is at least plausible that Uber's app *itself*—which one must go

40

to via a smartphone in order to schedule a ride, as alleged in the complaint—can be considered to be such a place, to the extent that it serves the public with respect to the coordination of rides.  In any event, a public conveyance that is operated on land clearly counts as a "place of public accommodation" within the meaning of the DCHRA, D.C. Code § 2-1401.02(24), and thus any entity that "directly or indirectly" denies disabled individuals the full and equal enjoyment of *that* public conveyance (*i.e.*, *that* place of public accommodation) is at least plausibly liable under the statute, regardless of whether the entity operates its business out of a brick-and-mortar facility.[10]

Uber's final effort to circumvent the DCHRA's reach is its argument that, even if public conveyances can exist independently of buildings for purposes of the DCHRA, Uber "does not operate any 'public conveyance[,]'" because "Drivers own [and] operate their own vehicles[.]"  (Defs.' Reply at 22.)  This argument fails at this stage of the proceedings for much the same reason that the Court previously rejected Uber's insistence that it is merely a software company that connects existing drivers with members of the public who need rides.  That is, all that is required to qualify as a place

---

[10] In insisting that its app cannot be considered a "place of public accommodation," Uber relies primarily on the arguments in its motion pertaining to section 12182 of the ADA, which, like the DCHRA, "prohibit[s] disability-based discrimination in the full and equal enjoyment of the . . . services . . . of any place of public accommodation."  (Defs.' Mem. at 45 (internal quotation marks and citation omitted).)  According to Uber, many circuit courts have suggested that an entity lacking a physical space cannot be a place of public accommodation under section 12182 of the ADA (*see id.* at 28, 46), and because "D.C. courts regularly construe" provisions in the DCHRA to be "consistent with analogous federal statutes[,]" this Court should hold that ERC's claims are barred under both section 12182 of the ADA and the DCHRA (*see id.* at 45–46 (citing *Whitbeck v. Vital Signs, Inc.*, 116 F.3d 588, 591 (D.C. Cir. 1997))).  For the reasons discussed in footnote 4, *supra*, the Court has no need to address the parties' arguments regarding section 12182 at this stage of the proceedings.  Even if it had addressed such arguments, however, any analysis under section 12182 would not be dispositive as applied to the DCHRA, because unlike the DCHRA, section 12182 does not explicitly define "place of public accommodation" to include public conveyances, nor does it refer to direct and indirect acts of discrimination in such broad terms.  *Compare* 42 U.S.C. § 12182, *and id.* § 12181(7), *with* D.C. Code § 2-1402.31(a), *and id.* § 2-1401.02(24).  Thus, the Court rejects Uber's attempt to simply import its arguments concerning section 12182 to the DCHRA context.

of public accommodation under the DCHRA is to provide public transportation that operates on land, *see* D.C. Code § 2-1401.02(24), and given the allegations in ERC's complaint, it is plausible that Uber does just that: as already discussed, ERC alleges that Uber offers a service that provides "cheap, door-to-door transportation" to "millions of riders" both across the country and in D.C. (Am. Compl. ¶¶ 3–4), and that Uber exerts substantial control over the drivers through its policies and practices (*id.* ¶ 7).  Thus, the complaint's allegations plausibly describe a place of public accommodation for the provision of land-based transportation to members of the public, and Uber has fallen short of establishing that neither the ADA or DCHRA applies to its services categorically and as a matter of law such that ERC's complaint must be dismissed for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

>2.  <u>ERC's Complaint States A Plausible Claim For Discrimination In Violation Of The ADA And The DCHRA</u>

Even if the ADA and the DCHRA apply to Uber's services, Uber takes the position that the allegations in ERC's complaint are insufficient to support a claim that the company has violated either statute in regard to the provision of its services to persons who use non-foldable wheelchairs.

As noted above, to state a discrimination claim under section 12184 of the ADA, a complaint's allegations concerning the defendant's actions or nonactions, if true, must suffice to demonstrate that the defendant "discriminated" against individuals "on the basis of disability in the full and equal enjoyment of specified public transportation services[.]"  42 U.S.C. § 12184(a).  Under the ADA, a provider of specified public transportation services engages in unlawful discriminatory conduct when, among other

things, it imposes or applies "eligibility criteria that screen out or tend to screen out an individual with a disability . . . from fully enjoying the specified public transportation services provided by the entity," *id.* § 12184(b)(1), and/or when it fails to "make reasonable modifications" to its policies, practices, or procedures "when such modifications are necessary to afford such . . . services . . . to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such . . . services[,]" *id.* § 12184(b)(2)(A) (incorporating *id.* § 12182(b)(2)(A)(ii)).  Similarly, the DCHRA prohibits "deny[ing], directly or indirectly, any person the full and equal enjoyment of the . . . services . . . of any place of public accommodations" based on an individual's "actual or perceived" disability.  D.C. Code § 2-1402.31(a)(1).

Given the language of both section 12184 of the ADA and the DCHRA, this Court easily finds it plausible that Uber's alleged failure to address policies that may contribute to the purported dearth of wheelchair accessible vehicles in its fleet—such that users who need said vehicles face substantially longer wait times and significantly higher costs—qualifies as conduct that discriminates against persons with disabilities. In the complaint, ERC specifically alleges that, "[r]ather than requiring a reasonable number of its cars to be wheelchair accessible or otherwise facilitating that result, Uber's policies impose vehicle-type restrictions that actively discourage its drivers from acquiring and operating wheelchair accessible vehicles."  (Am. Compl. ¶ 8.)  ERC also asserts that Uber "has the ability to ensure that the supply of wheelchair accessible vehicles in its fleet meets demand better than what is currently provided in the D.C. area" (*id.* ¶ 39), but that Uber "has not put into place policies and practices" that would

achieve that result (*id*. ¶ 40), even though such changes would not "fundamentally alter Uber's business model . . . or pose an undue burden to [the] company" (*id*. ¶ 39).  If true, these allegations are sufficient to support a reasonable inference that Uber has failed to "make reasonable modifications" to its policies, and has thereby deprived individuals with disabilities of the full and equal enjoyment of its services in a manner that qualifies as unlawful discrimination under section 12184.  *See* 42 U.S.C. § 12184(b)(2)(A).

Uber resists this conclusion on the ground that, under the ADA's implementing regulations, "covered entities [such as taxis] 'are not required to purchase or lease accessible automobiles' or 'purchase vehicles other than automobiles in order to have a number of accessible vehicles in [their] fleet[s].'"  (Defs.' Mem. at 41 (alterations in original) (quoting 49 C.F.R. § 37.29(b)).)  If a taxi service does not violate the ADA by failing to purchase a single wheelchair accessible vehicle, the argument goes, Uber could not possibly have engaged in discrimination within the meaning of the ADA by having an allegedly insufficient number of wheelchair accessible vehicles in its fleet. (*See id*.)  But this analysis assumes that the gravamen of ERC's discrimination contention is that Uber has *failed to purchase or lease* wheelchair accessible vehicles, when, in fact, the complaint focuses primarily on Uber's alleged adoption of policies that actively discourage the purchase or lease of wheelchair accessible vehicles by its drivers.  There is a nuanced but necessary distinction between, on the one hand, alleged discrimination in the form of a failure to procure wheelchair accessible vehicles, and, on the other, alleged discrimination in the form of imposing requirements that prevent potential Uber drivers from using wheelchair accessible vehicles when they undertake

to work for the company.  ERC alleges the latter, and it is at least plausible that the fact that the anti-discrimination laws do not otherwise require drivers to "purchase or lease" wheelchair accessible vehicles (*see id.* at 41–42 (citing *Noel v. NYC Taxi & Limousine Comm'n*, 687 F.3d 63, 74 (2d Cir. 2012))) has no bearing on whether policies that allegedly discourage the purchase or use of such vehicles qualify as discrimination.

Uber likewise mistakenly suggests that a legal obligation to ensure that persons with disabilities have access to wheelchair accessible vehicles is the *only* relevant inquiry when evaluating whether ERC has plausibly alleged a discrimination claim. (*See id.*; *see also* Defs.' Reply at 20–21.)  This argument views section 12184 through too narrow an aperture, for "discrimination" as the ADA defines it in this context not only relates to an entity's outright denial of the full and equal enjoyment of a specified public transportation service to persons with disabilities, but also includes its failure to make "reasonable modifications" to its polices, practices, and procedures when doing so is necessary to ensure full access and would not fundamentally alter the nature of the entity's services.  42 U.S.C. § 12182(b)(2)(A)(ii) (cross-referenced in section 12184).

Nothing in Uber's argument forecloses the possibility that the company has discriminated against wheelchair users by failing to modify its policies even if the proposed modification does not entirely solve the disparate access problem.  Nor is it implausible that the company's incentive schemes could be altered so as to encourage, or at least permit, Uber drivers to purchase or lease wheelchair accessible vehicles.  And whether or not any such modification to Uber's current practices would fundamentally alter the nature of Uber's services will likely be the nub of the dispute at subsequent stages of this case.  *See Di Lella v. Univ. of D.C. David A. Clarke Sch. of L.*,

570 F. Supp. 2d 1, 8 (D.D.C. 2008) (explaining that the reasonableness of a modification under Title III of the ADA is a fact-intensive issue that generally cannot be assessed at the motion to dismiss stage). Therefore, the complaint's allegations are sufficient to state a claim for unlawful discrimination in violation of the ADA, and they also suffice to establish that, in the absence of any modification of Uber's present practices, persons who use wheelchairs in the District of Columbia are being unlawfully "den[ied] . . . the full and equal enjoyment of the . . . services, facilities, privileges, advantages, and accommodations" that Uber otherwise provides for non-disabled members of this community. D.C. Code § 2-1402.31(a)(1).

### 3. ERC's DCHRA Claim Is Timely

As its final salvo, Uber contends that ERC's DCHRA claim is time-barred under the purportedly applicable statute of limitations, which requires a plaintiff to file the complaint "within one year of the unlawful discriminatory act, or the discovery thereof[.]" D.C. Code § 2-1403.16(a). According to Uber, ERC's claim is untimely because ERC "discovered the allegedly incomparable service offered to individuals who use motorized wheelchairs as early as May 19, 2016" but did not "commence[] this action [until] June 28, 2017[.]" (Defs.' Mem. at 46.)

This argument fails because, per the plain terms of the statute, a plaintiff must file her claim *either* "within one year of the unlawful discriminatory act," *or* within a year after the plaintiff discovered the unlawful act. D.C. Code § 2-1403.16(a). And it is well established that where, as here, a plaintiff alleges that the defendant has systematically discriminated against individuals on a continuous basis (*see* Am. Compl. ¶¶ 25, 40, 84, 141), the claim is timely if the plaintiff shows a pattern of discrimination that persists "both before and during the statutory period." *See Boulton v. Inst. of Int'l*

*Educ.*, 808 A.2d 499, 503–04 (D.C. 2002) ("A continuing violation exists where there is a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the statutory period." (internal quotation marks and citation omitted)).

ERC has alleged that Uber's wheelchair accessible services have been demonstrably inadequate since at least May 2016 (Am. Compl. ¶ 80), and also that Uber continues to adhere to its discriminatory policies and practices to date (*id.* ¶¶ 84, 138). Thus, ERC has brought its claim within one year of Uber's alleged continuous discrimination, which means that the claim must be deemed timely. *See, e.g.*, *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 892 (D.C. 2003) (holding that a DCHRA hostile work environment claim was timely under the continuing violation theory because the conduct at issue constituted a "single unlawful practice"); *Boulton*, 808 A.2d at 503–04 (applying the continuing violation theory to assess the timeliness of a sexual orientation discrimination claim under the DCHRA); *cf. Moore v. Chertoff*, 427 F. Supp. 2d 156, 162–63 (D.D.C. 2006) (holding that plaintiffs' Title VII claim was timely under a continuing violation theory, because a violation of their rights allegedly occurred during the statutory period and the claim challenged "an alleged system of discrimination").[11]

---

[11] The Court also finds that Uber's singular focus on the "date of discovery" prong of the DCHRA's statute of limitations places undue preclusive weight on the date on which ERC first discovered Uber's allegedly discriminatory practices. *See* D.C. Code § 2-1403.16(a). As ERC explained in its opposition brief (*see* Pl.'s Opp'n at 52), the D.C. Court of Appeals has made clear that "the discovery rule was designed to *extend* the time during which a plaintiff may bring a suit, [] not to contract it[,]" *Lively*, 830 A.2d at 891 (emphasis added), meaning that the discovery prong should not be employed to keep claims out of court—as Uber is attempting to do here. Notably, Uber did not respond to this point in its reply brief, let alone reassert any argument concerning the DCHRA's statute of limitations. (*See* Defs.' Reply at 22.)

IV.    **CONCLUSION**

For the reasons explained above, this Court finds that ERC has associational

standing to bring its claims on behalf of its members, and that it has stated viable

claims under section 12184 of the ADA and the DCHRA.  As a result, and as set forth

in the accompanying Order, Uber's motion to dismiss (ECF No. 25) will be **DENIED**.

DATE:  March 15, 2021                          *Ketanji Brown Jackson*
                                               KETANJI BROWN JACKSON
                                               United States District Judge